## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

G.F.F.;* and J.G.O.;* on their own behalf and on behalf of others similarly-situated,

*Petitioners–Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, Attorney General of the United States, in her official capacity; KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, Acting Director of the Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCO RUBIO, Secretary of State, in his official capacity; U.S. STATE DEPARTMENT; WILLIAM P. JOYCE, in his official capacity as acting New York Field Office Director for U.S. Immigration and Customs Enforcement; PAUL ARTETA, in his official capacity as the Director of the Orange County Correctional Facility;

*Respondents–Defendants*.

Case No. 1:25-cv-02886

**CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

* Motion for these Petitioners to proceed under pseudonym has been concurrently filed with this class petition and class complaint.

## INTRODUCTION

1.      Petitioners-Plaintiffs ("Petitioners") are Venezuelan men in immigration custody threatened with imminent removal under the President's Proclamation—signed in secret on March 14, 2025, and published the next day—invoking the Alien Enemies Act ("AEA"), a wartime measure that has been used only three times in our Nation's history: the War of 1812, World War I and World War II.

2.      The Proclamation, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025),[1] purportedly authorizes "immediate" removal of noncitizens that the Proclamation deems to be alien enemies, without notice or any opportunity for judicial review.  It also contorts the plain language of the AEA: arrivals of noncitizens from Venezuela are deemed an "invasion" or "predatory incursion" by a "foreign nation or government," where Tren de Aragua, a Venezuelan gang, is deemed to be sufficiently akin to a foreign nation or government.

3.      But the AEA has only ever been a power invoked in time of war, and plainly only applies to warlike actions: it cannot be used here against nationals of a country—Venezuela— with whom the United States is not at war, which is not invading the United States, and which has not launched a predatory incursion into the United States.

4.      Pursuant to the Proclamation, on March 15, the government deported at least 137 noncitizens to a notorious prison in El Salvador, without any review of any aspect of the determination that they are alien enemies.  Petitioners, along with others who may be detained across the country and may not even know about their designations as alien enemies, were temporarily protected from these summary removals pursuant to the court's order in *J.G.G. v.*

---

[1] *Available at* https://perma.cc/ZS8M-ZQHJ.

*Trump*, No. 1:25-cv-766-JEB (D.D.C.). Multiple judges have already held there is likely no authority for the government's actions. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *5–10 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (AEA predicates of "invasion" or "predatory incursion" not met); *id*. at *13 (Millett, J., concurring) ("The Constitution's demand of due process cannot be so easily thrown aside."); *J.G.G. v. Trump*, No. CV 25-766 (JEB), 2025 WL 890401, at *2 (D.D.C. Mar. 24, 2025) (Boasberg, J.) ("before [petitioners] may be deported, they are entitled to individualized hearings to determine whether the Act applies to them at all").

5.      However, since the Supreme Court stayed that order on the basis that Petitioners had to proceed through habeas, Petitioners and others similarly situated to them are now all at imminent risk of removal. In fact, "the government in no uncertain terms [has] conveyed that—were the injunction lifted—it would immediately begin deporting the plaintiffs without notice." *J.G.G.*, 2025 WL 914682, at *12 (Henderson, J., concurring).

6.      With the *J.G.G.* injunction lifted, the government is resuming its summary removals of Venezuelans who are in ongoing immigration proceedings, including Petitioners here, without any judicial review—including by this Court.  For that reason, Petitioners and the putative class that they represent seek this Court's intervention to temporarily restrain these summary removals, and to determine that this use of the AEA is unlawful and must be stopped.

## JURISDICTION AND VENUE

7.      This case arises under the Alien Enemies Act ("AEA"), 50 U.S.C. §§ 21-24; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* and its implementing regulations; the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112

Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); the All Writs Act, 28 U.S.C.

§ 1651, and the Fifth Amendment to the U.S. Constitution.

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 2241 *et seq.* (habeas

corpus), art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1346 (United

States as defendant), 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. § 1651 (All Writs Act).

9.      The Court may grant relief pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 2243; the

Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; the All Writs Act, 28 U.S.C. § 1651; and

the Court's inherent equitable powers.

10.     Venue is proper in this District under 28 U.S.C. § 2241; 28 U.S.C. § 1391(b); and,

28 U.S.C. § 1391(e)(1) because at the time of the filing of this action the Petitioners were

detained in the Respondents' custody within the Southern District of New York; a substantial

part of the events and omissions giving rise to the claim occurred in this district; Respondents

Joyce and Arteta reside in this district; and Respondents are agencies of the United States or

officers of the United States acting in their official capacity.

## PARTIES

**A.  Petitioners-Plaintiffs ("Petitioners")**

11.     Petitioner G.F.F. is a 21-year-old Venezuelan national who is detained at the

Orange County Correctional Facility in New York, and who, having been nearly removed on

March 15, is at imminent risk of removal under the Proclamation.  G.F.F. entered the United

States in May 2024.  G.F.F. and his family fled Venezuela in part due to the threats they faced

from TdA. Moreover, G.F.F. has been threatened by the gang on account of his sexual

orientation. He also fears persecution from Venezuelan state actors, including police and

paramilitary groups, as well as gang members on account of his sexual orientation and gender

non-conformity. After entering the U.S., he was released on his own recognizance after a credible fear interview.  G.F.F. was arrested and detained in New York.  Upon his detention, DHS filed an I-213 identifying him as an "associate/affiliate of Tren de Aragua."  On March 9, 2025, he was moved from Orange County Correctional Facility in New York to Moshannon Valley Processing Center in Pennsylvania and then quickly to El Valle Detention Facility in Texas, transported only with other Venezuelans.  On March 14, 2025, ICE officers told G.F.F. that he was going to be deported in the middle of the night.  Because his immigration counsel alerted undersigned counsel, G.F.F. was able to secure a temporary restraining order in *J.G.G.* and pulled off the plane before being deported on March 15. He was then transferred back to Orange County Correctional Facility in Goshen, New York, on or about April 4, and now faces imminent removal despite having ongoing immigration proceedings and having given testimony and offered evidence to support his applications for asylum, withholding of removal, and protection under the Convention Against Torture.

12.     Petitioner J.G.O. is a 32-year-old Venezuelan national who is detained at the Orange County Correctional Facility in New York, and who, having been nearly removed on March 15, is at imminent risk of removal under the Proclamation.  J.G.O. entered the United States around September 29, 2022, and thereafter submitted an affirmative asylum application with U.S. Citizenship and Immigration Services.  J.G.O. actively protested against the Maduro regime in Venezuela, and ultimately fled because he feared torture, imprisonment, and death on account of his political activism.  On January 30, 2025, ICE officers abruptly arrested J.G.O. at his home and took him into immigration detention, transferred him from Orange County first to Moshannon and then, in early March, to El Valle.  On March 12, J.G.O. was told to sign papers in English, which is not his native language.  He refused to sign.  An ICE officer told J.G.O. that

he would be deported on the night of March 14, 15, or 16.  Because his immigration counsel alerted undersigned counsel, J.G.O. was able to secure a temporary restraining order in *J.G.G.* and pulled off the plane before being deported on March 15. He was transferred to Orange County Correctional Facility in Goshen, New York, around April 4, and now faces imminent removal despite being scheduled for an Individual Hearing on May 2, 2025, to present testimony and evidence in support of his applications for asylum, withholding of removal, and protection under the Convention Against Torture.

### B. Respondents-Defendants ("Respondents")

13.     Respondent Donald Trump is the President of the United States.  He is sued in his official capacity.  In that capacity, he issued the Proclamation under the Alien Enemies Act.

14.     Respondent Pamela J. Bondi is the U.S. Attorney General at the U.S. Department of Justice, which is a cabinet-level department of the United States government.  She is sued in her official capacity.

15.     Respondent Kristi Noem is the Secretary of the U.S. Department of Homeland Security, which is a cabinet-level department of the United States government.  She is sued in her official capacity.  In that capacity, Defendant Noem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

16.     Respondent U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include Immigration and Customs Enforcement ("ICE"). Defendant DHS is a legal custodian of Petitioners.

17.     Respondent Todd Lyons is the Acting Director of ICE.  Defendant Lyons is responsible for ICE's policies, practices, and procedures, including those relating to the detention

of immigrants during their removal procedures. Defendant Lyons is a legal custodian of Petitioners. Defendant Lyons is sued in his official capacity.

18.     Respondent ICE is the subagency of DHS that is responsible for carrying out removal orders and overseeing immigration detention. Defendant ICE is a legal custodian of Petitioners.

19.     Respondent Marco Rubio is the Secretary of State at the U.S. Department of State.  He is sued in his official capacity.

20.     Respondent U.S. Department of State, which is a cabinet-level department of the United States government.

21.     Respondent William P. Joyce is the acting director of ICE's New York Field Office, which is responsible for ICE activities in New York City and in Dutchess, Nassau, Orange, Putnam, Rockland, Suffolk, Sullivan, Ulster, and Westchester Counties. Defendant Decker's place of business is in the Southern District of New York, and he is an immediate legal custodian responsible for the arrest and detention of Petitioners. He is sued in his official capacity.

22.     Respondent Paul Arteta is the Sheriff of Orange County and the director in charge of the Orange County Correctional Facility, which detains individuals suspected of civil immigration violations pursuant to a contract with ICE. Defendant Arteta is the immediate physical custodian responsible for the detention of Petitioners. He is sued in his official capacity.

## **BACKGROUND**

**The Alien Enemies Act**

23.     The AEA is a wartime authority enacted in 1798 that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens.

24.     The AEA, as codified today, provides that "[w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies."  50 U.S.C. § 21.

25.     The AEA can thus be triggered in only two situations.  The first is when a formal declared war exists with a foreign nation or government.  The second is when a foreign nation or government perpetrates, attempts, or threatens an invasion or predatory incursion against the territory of the United States.

26.     To trigger the AEA, the President must make a public proclamation of the declared war, or of the attempted or threatened invasion or predatory incursion.  *Id.*

27.     The AEA also provides that noncitizens must be permitted the full time to depart as stipulated by any treaty between the United States and the enemy nation, unless the noncitizen has engaged in "actual hostility" against the United States.  If no such treaty exists, the President may declare a "reasonable time" for departure, "according to the dictates of humanity and national hospitality."  *Id.* § 22.

28.     Under the AEA, noncitizens who "refuse or neglect to depart" are subject to removal.  *Id.* § 21.

29.     The Act has been used only three times in American history, all during actual or imminent wartime.

30.     The AEA was first invoked several months into the War of 1812, but President Madison did not use the AEA to remove anyone from the United States during the war.

31.     The AEA was invoked a second time during World War I by President Wilson. Upon information and belief, there were no removals effectuated pursuant to the AEA during World War I.

32.     The AEA was used again during World War II, though it was never used as a widespread method of removal.

33.     On December 7, 1941, after the Japanese invaded Hawaii in the attack on Pearl Harbor, President Roosevelt proclaimed that Japan had perpetrated an invasion upon the territory of the United States.  The president issued regulations applicable to Japanese nationals living in the United States.  The next day Congress declared war on Japan.

34.     On the same day, President Roosevelt issued two separate proclamations stating that an invasion or predatory incursion was threatened upon the territory of the United States by Germany and Italy.  The president incorporated the same regulations that were already in effect as to Japanese people for German and Italian people.  Three days later Congress voted unanimously to declare war against Germany and Italy.

35.     Congress declared war against Hungary, Romania, and Bulgaria on June 5, 1942. Just over a month later, President Roosevelt issued a proclamation recognizing that declaration of war and invoking the AEA against citizens of those countries.

36.     Under these proclamations, the United States infamously interned noncitizens from Japan, Germany, Italy, Hungary, Romania, and Bulgaria (with U.S. citizens of Japanese descent subject to a separate order that did not rely on the AEA).

37.    It was not until the end of hostilities that the President provided for the removal of alien enemies from the United States under the AEA.  On July 14, 1945, President Truman issued a proclamation providing that alien enemies detained as a danger to public peace and safety "shall be subject upon the order of the Attorney General to removal from the United States."  The Department of Justice subsequently issued regulations laying out the removal process.  *See* 10 Fed. Reg. 12,189 (Sept. 28, 1945).  It was never used as a widespread method of removal. The regulations required, *inter alia*, notice of the removal order to be served on the designated alien enemy and that the alien enemy had thirty (30) days thereafter to depart—during which time they could seek judicial review of the removal order. *Id*.

**Systemic Overhaul of Immigration Law in 1952**

38.    Following the end of World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA").

39.    The INA, and its subsequent amendments, provide for a comprehensive system of procedures that the government must follow before removing a noncitizen from the United States.  The INA provides the exclusive procedure by which the government may determine whether to remove an individual.  8 U.S.C. § 1229a(a)(3).

40.    In addition to laying out the process by which the government determines whether to remove an individual, the INA also enshrines certain forms of humanitarian protection.

41.    First, the INA provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status," may apply for asylum.  8 U.S.C. § 1158(a)(1).  To qualify for asylum, a noncitizen must show a "well-founded fear of persecution" on account of a protected ground, such as race, nationality, political opinion, or religion.  8 U.S.C. § 1101(a)(42)(A).

42.     Second, Congress has barred the removal of an individual to a country where it is more likely than not that he would face persecution on one of these protected grounds.  8 U.S.C. § 1231(b)(3).  That protection implements this country's obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees.  The relevant form of relief, known as "withholding of removal," requires the applicant to satisfy a higher standard with respect to the likelihood of harm than asylum; granting that relief is mandatory if the standard is met absent limited exceptions.

43.     Third, the Convention Against Torture ("CAT") prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture.  *See* 8 U.S.C. § 1231 note.  That protection implements the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242.  As with withholding of removal, CAT relief also requires the applicant to satisfy a higher standard with respect to the likelihood of harm than asylum and relief is mandatory if that standard is met.  There is no exception to CAT relief.

**President Trump's Proclamation Invoking the AEA**

44.     On March 14, the President signed the AEA Proclamation at issue here. It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." See Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025).[2]

---

[2] *Available at*: https://perma.cc/ZS8M-ZQHJ.

45. Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the administration did not make the invocation public until around 3:53 p.m. EDT on March 15, despite making extensive preparations to remove class members under the Act.

46. The Proclamation characterizes Tren de Aragua as a *hybrid criminal state* engaged in an invasion and predatory incursion into the United States as a basis to invoke the AEA. It also characterizes Tren de Aragua, a criminal organization, as a foreign nation or government, and does not name Venezuela itself as the "foreign government" as the target of the AEA invocation.

47. The Proclamation alleges that Tren de Aragua is perpetrating, attempting, and threatening predatory incursions, hostile actions, and irregular warfare.

48. Thus, the Proclamation states that all Venezuelan citizens ages fourteen or older alleged to be members of Tren de Aragua—and who are not U.S. citizens or lawful permanent residents—are alien enemies.

49. Respondents have enacted a program to implement unlawful removals under the Proclamation ("AEA Process"). The AEA Process provides no means or process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation. Nor does it provide individuals with the statutory grace period in which they can both seek judicial review or arrange their affairs and leave voluntarily.

50. Instead, the Proclamation invokes the statutory exception to the "reasonable notice" requirement by claiming that the individuals subject to the Proclamation are "chargeable with actual hostility," and pose "a public safety risk," making them subject to immediate apprehension, restraint, and removal.

51.     Upon information and belief, the government employs a standardized check list, "Alien Enemy Validation Guide," to determine who is an "alien enemy" subject to the Proclamation. An ICE officer completes the form, tallying points for different categories of alleged TdA membership characteristics. However, the methodology that Respondents employs for TdA membership relies heavily on physical attributes like tattoos, hand gestures, symbols, logos, graffiti, and manner of dress. Experts who study the TdA have explained how none of these physical attributes are reliable ways of identifying gang members.

52.     Upon information and belief, after signing the checklist document, the noncitizen is subject to removal to any location as may be directed but consistent with applicable laws.

53.     Noncitizens subject to the Proclamation are not afforded credible fear interviews for asylum, nor will claims for protection under the Convention Against Torture ("CAT") be recognized.

54.     As multiple judges sitting in a preliminary posture have already found, the AEA Process is unlawful.

55.     First, the Proclamation does not satisfy the statutory requirements for proper invocation of the Alien Enemies Act. Tren de Agua, a criminal organization, is not a nation or foreign government and is not part of the Venezuelan government, nor does it receive support from the government.  The United States is not in a declared war with Venezuela.  The United States cannot declare war against Tren de Aragua because it is not a nation.  And neither Venezuela nor Tren de Aragua have invaded or threatened to invade the United States, nor has either engaged in a "predatory incursion" within the meaning of the AEA.

56.    Moreover, there is no process, notice or meaningful opportunity for individuals to challenge their designation as alien enemies. There is a significant risk that even individuals who do not fall under the terms of the Proclamation will be subject to it.

57.    Lastly, it violates the process and protections that Congress has prescribed elsewhere in the country's immigration laws for the removal of noncitizens.

58.    As a result, countless Venezuelans—including Petitioners in this district and many others in untold jurisdictions throughout the country—are at imminent risk of deportation without any hearing or meaningful review, regardless of their ties to the United States or the availability of claims for relief from and defenses to removal.

59.    Respondents seek to move Petitioners in secret, without due process, to a prison in El Salvador known for dire conditions, torture, and other forms of physical abuse—possibly for life. This has already borne out for over 130 individuals on March 15 who have lost all contact with their attorneys, family, and the world.

## CLASS ALLEGATIONS

60.    Petitioners bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.

61.    Petitioners seek to represent the following Proposed Class: All noncitizens in immigration custody who were, are, or will be subject to the March 2025 Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua' and/or its implementation.

62.    The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable.  Thousands from Venezuela will potentially be subjected to summary removal under the Proclamation and its implementation by

Respondents.  The proposed class also includes numerous future noncitizens who will enter the United States and will be subjected to the Proclamation.

63.    The class satisfies the commonality requirements of Rule 23(a)(2).  The members of the class are subject to a common practice: summary removal under the Proclamation contrary to the AEA, the INA, and the statutory protections Congress has enacted.  The suit also raises questions of law common to members of the proposed class, including whether the Proclamation and its implementation violate the AEA, the INA, and the statutory protections for asylum seekers.

64.    The proposed class satisfies the typicality requirements of Rule 23(a)(3), because the claims of the representative Petitioners are typical of the claims of the class.  Each proposed class member, including the proposed class representatives, has experienced or faces the same principal injury (unlawful removal), based on the same government practice (the Proclamation and its implementation), which is unlawful as to the entire class because it violates the AEA, the INA, and due process.

65.    The proposed class satisfies the adequacy requirements of Rule 23(a)(4).  The representative Petitioners seek the same relief as the other members of the class—among other things, an order declaring the Proclamation unlawful and an injunction preventing enforcement of the Proclamation.  In defending their rights, Petitioners will defend the rights of all proposed class members fairly and adequately.

66.    The proposed class is represented by experienced attorneys from the American Civil Liberties Union.  Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens.

67.    The proposed class also satisfies Rule 23(b)(2).  Respondents have acted (or will act) on grounds generally applicable to the class by subjecting them to summary removal under the Proclamation rather than affording them the protection of immigration laws.  Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

#### *Ultra Vires*, Violation of 50 U.S.C. § 21, *et seq.*
#### (All Respondents)

68.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

69.    The AEA does not authorize the removal of noncitizens from the United States absent a "declared war" or a "perpetrated, attempted, or threatened" "invasion or predatory incursion" into the United States by a "foreign nation or government."  *See* 50 U.S.C. § 21.  The Proclamation on its face mandates Petitioners' removal under the AEA where those preconditions have not been met.

70.    The AEA Process, which was purportedly established pursuant to the authority of 50 U.S.C. § 21, is not authorized by that law.

71.    The AEA (Section 21) permits removal only where noncitizens alleged to be "alien enemies" "refuse or neglect to depart" from the United States. 50 U.S.C. § 21. The AEA (Section 22) also requires the government to afford noncitizens alleged to be "alien enemies" sufficient time to settle their affairs and to depart the United States. *See* 50 U.S.C. § 22.

72.    However, Petitioners are being subject to forced removal without being afforded the privilege of voluntary departure, let alone any notice or an opportunity to respond to the designation of alien enemy.

73.    The application of the AEA Process to Petitioners is therefore ultra vires.  *See* 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1101, *et seq.*
### (All Respondents)

74.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

75.    The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by Congress for the removal of noncitizens.

76.    The INA provides that a removal proceeding before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA.  8 U.S.C. § 1229a(a)(3).

77.    The AEA Process creates an alternative removal mechanism outside of the immigration laws set forth by Congress in Title 8.

78.    The INA's "exclusive procedure" and statutory protections apply to any removal of a noncitizen from the United States, including removals authorized by the AEA.  Because the AEA Process provides for the removal of Petitioners without the procedures specified in the INA, it violates 8 U.S.C. § 1229a and the INA.

79.    As a result, the application of the AEA to Petitioners, which will result in their removal from the United States, is contrary to law.  *See* 5 U.S.C. § 706(2)(A).

80.    In addition, by refusing to grant Petitioners access to the procedures specified in the INA, Respondents have withheld and unreasonably delayed actions mandated by the statute. 5 U.S.C. § 706(1).

**THIRD CLAIM FOR RELIEF**

**Violation of 8 U.S.C. § 1158, Asylum**
**(All Respondents)**

81.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

82.     The INA provides, with certain exceptions, that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."  8 U.S.C. § 1158(a)(1).

83.     Respondents' application of the AEA Process to Petitioners prevents them from applying for asylum in accordance with 8 U.S.C. § 1158(a)(1), and is therefore contrary to law. *See* 5 U.S.C. § 706(2)(A).

**FOURTH CLAIM FOR RELIEF**

**Violation of 8 U.S.C. § 1231(b)(3), Withholding of Removal**
**(All Respondents)**

84.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

85.     The "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C. § 1231(b)(3), bars the removal of noncitizens to a country where it is more likely than not that they would face persecution.

86.     Respondents' AEA Process violates the withholding of removal statute because it does not provide adequate safeguards to ensure that Petitioners are not returned to a country

where it is more likely than not that they would face persecution.  As a result, Respondents'

actions against Petitioners are contrary to law.  *See* 5 U.S.C. § 706(2)(A).

87.    In addition, by refusing to grant Petitioners the procedural protections to which

they are entitled, Respondents have withheld and unreasonably delayed actions mandated by the

statute.  5 U.S.C. § 706(1).

## FIFTH CLAIM FOR RELIEF

**Violation of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"),
codified at 8 U.S.C. § 1231 note
(All Respondents)**

88.    All of the foregoing allegations are repeated and realleged as if fully set forth

herein.

89.    FARRA prohibits the government from returning a noncitizen to a country where

it is more likely than not that he would face torture.

90.    Respondents' AEA Process violates FARRA because it does not provide adequate

safeguards to ensure that Petitioners are not returned to a country where it is more likely than not

that they would face torture.  As a result, Respondents' actions against Petitioners are contrary to

law.  *See* 5 U.S.C. § 702(2)(A).

91.    In addition, by refusing to grant Petitioners the procedures to which they are

entitled, Respondents have withheld and unreasonably delayed actions mandated by the statute.

5 U.S.C. § 706(1).

## SIXTH CLAIM FOR RELIEF

***Ultra Vires*, Violation of 50 U.S.C. § 22
(All Respondents)**

92.    All of the foregoing allegations are repeated and realleged as if fully set forth

herein.

93.     The AEA requires that noncitizens whose removal is authorized by the AEA, unless "chargeable with actual hostility, or other crime against the public safety," be allowed the full time stipulated by treaty to depart or a reasonable time in which to settle their affairs before departing.  *See* 50 U.S.C. § 22.  The Proclamation on its face denies Petitioners any time under Section 22 to settle their affairs, because it declares everyone subject to the Proclamation to be "chargeable with actual hostility" and to be a "danger to public safety."

94.     The AEA Process thus contravenes 50 U.S.C. § 22 and is *ultra vires.*

95.     The application of the AEA Process to Petitioners is contrary to law.

**SEVENTH CLAIM FOR RELIEF**

**Violation of Due Process Under the Fifth Amendment**
**(All Respondents)**

96.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

97.     The Due Process Clause of the Fifth Amendment provides in relevant part that: "No person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

98.     In denying Petitioners meaningful procedural protections to challenge their removal, the Proclamation violates due process.

99.     The Proclamation on its face also denies Petitioners any time to settle their affairs before departing and thus violates due process.

**EIGHTH CLAIM FOR RELIEF**

**Violation of Habeas Corpus**
**(All Respondents)**

100.    Detainees have the right to file petitions for habeas corpus to challenge the legality of their detention or raise other claims related to their detention or to the basis for their removal.

101.    The detention of Petitioners under the Alien Enemies Act has violated and continues to violate their right to habeas corpus. See U.S. Const. art. I, § 9, cl. 2 (Suspension Clause); 28 U.S.C. § 2241.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully pray this Court to:

a.  Assume jurisdiction over this matter;

b.  Certify this action as a class action on behalf of the proposed Petitioner Class, appoint the Petitioners as class representatives, and appoint the undersigned counsel as class counsel;

c.  Grant a temporary restraining order to preserve the status quo pending further proceedings;

d.  Enjoin Respondents from transferring Petitioners out of this district during the pendency of this litigation;

e.  Grant a writ of habeas corpus to Petitioners that enjoins Defendants from removing them pursuant to the Proclamation;

f.  Enjoin Respondents from removing Petitioners pursuant to the Proclamation;

g.  Declare unlawful the Proclamation;

h.  Award Petitioners' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

i.  Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: April 8, 2025

My Khanh Ngo*
Noelle Smith*
Oscar Sarabia Roman*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
mngo@aclu.org
nsmith@aclu.org
osarabia@aclu.org

Respectfully submitted,

/s/ *Daniel Galindo*
Daniel Galindo
Lee Gelernt
Ashley Gorski
Omar C. Jadwat
Hina Shamsi
Patrick Toomey
Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org

Amy Belsher
Robert Hodgson
Molly Biklen
New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300
abelsher@nyclu.org
rhodgson@nyclu.org
mbiklen@nyclu.org

*Attorneys for Plaintiffs-Petitioners*
*\*Pro hac vice motions forthcoming*