**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

G.F.F.; and J.G.O.; on their own behalf and on behalf of others similarly-situated,

*Petitioners–Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents–Defendants*.

Case No. 1:25-cv-02886

**Plaintiffs-Petitioners' Memorandum of Law in Support of a Temporary Restraining Order**

## PETITIONER-PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF A TEMPORARY RESTRAINING ORDER

### INTRODUCTION

Petitioners-Plaintiffs ("Petitioners") respectfully request immediate action by this Court to avoid irreparable harm to Petitioners and to the proposed class – and to ensure that this Court is not permanently deprived of jurisdiction.

In a Proclamation signed on March 14 and published on March 15, the President invoked a war power, the Alien Enemies Act of 1798 ("AEA"), in an attempt to summarily remove noncitizens from the United States and bypass the immigration laws Congress has enacted. *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025)[1] ("Proclamation"). The evening of March 15, Petitioners, on behalf of a provisionally certified nationwide class, secured a court order from the District Court for the District of Columbia temporarily pausing removals under the Proclamation, though the

---

[1] https://perma.cc/ZS8M-ZQHJ.

government continued to remove at least two flights of people pursuant to the AEA. That order was immediately appealed by the government, but the court of appeals denied a stay. On April 7, 2025, the Supreme Court granted the government's application to stay the order on the basis that Petitioners had to proceed through habeas in this District. This case followed.

As several judges have already found, **Petitioners are likely to succeed in the merits of their challenge and are at imminent risk of removal to El Salvador**, where they face potentially permanent sentence in a notorious prison. Numerous accounts, both in declarations and public news reporting have raised serious questions about the validity of the government's designations of people as "alien enemies," with no process provided for anyone to contest those designations. A Temporary Restraining Order is needed because there may not be sufficient time for this Court to intervene before people are put on planes to remove Petitioners from the United States.

**Petitioners also seek an injunction preventing their transfer out of this District while the litigation is pending to preserve the Court's jurisdiction.** As already demonstrated, in their rush to transfer individuals to stage AEA removals, the government has mistakenly deported at least one individual without legal basis. *See Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *6 (4th Cir. Apr. 7, 2025) (Wilkinson, J., concurring) (noting "government conceding that it made an error in deporting the plaintiff to a foreign country for which he was not eligible for removal"). Any error would be just as devastating to Petitioners.

As multiple judges have noted, there is likely no authority for the government's actions. The United States is not at war, and the prerequisites for invocation of the AEA have not been met. *See* 50 U.S.C. § 21. The President can invoke the AEA only in a state of "declared war," or when an "invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government." *Id.* Not surprisingly, therefore, the Act

has been invoked only three times in our country's history, all in declared wars: The War of 1812, World War I, and World War II.

The Proclamation targets Venezuelan noncitizens whom the government accuses of being part of Tren de Aragua, a criminal gang. But the Proclamation is invalid under the AEA for several reasons. First, Tren de Aragua is not a "foreign nation or government." Second, Tren de Aragua is not engaged in an "invasion" or "predatory incursions" within the meaning of the AEA, because criminal activity does not meet the longstanding definitions of those statutory requirements—and has never been a sufficient basis for the executive to cast foreign nationals as "alien enemies" subject to arrest, internment, and removal. As a result, the government's attempt to summarily remove Venezuelan noncitizens exceeds the wartime authority that Congress delegated in the AEA. Moreover, the government has provided no process, notice or meaningful opportunity for individuals to challenge their designation as alien enemies, contrary to the AEA and due process. *See Trump v. J.G.G.*, No. 24A931, 2025 WL 102409, at *2 (Apr. 7, 2025) (requiring notice "within a reasonable time and in such a manner as will allow them to actually seek" relief from summary removals). Lastly, the removals using the AEA violate the process and protections that Congress has prescribed elsewhere in the country's immigration laws for the removal of noncitizens.

**Accordingly, Petitioners move the Court for a Temporary Restraining Order ("TRO") barring their summary removal under the AEA and barring Respondents from relocating them outside of the Southern District of New York.**

# LEGAL AND FACTUAL BACKGROUND

## I.     The Alien Enemies Act

The AEA is a wartime authority that grants the President specific powers with respect to

the regulation, detention, and deportation of enemy aliens. Passed in 1798 in anticipation of a war

with France, the AEA, as codified today, provides:

> Whenever there is a declared war between the United States and any foreign nation
> or government, or any invasion or predatory incursion is perpetrated, attempted, or
> threatened against the territory of the United States by any foreign nation or
> government, and the President makes public proclamation of the event, all natives,
> citizens, denizens, or subjects of the hostile nation or government, being of the age
> of fourteen years and upward, who shall be within the United States and not actually
> naturalized, shall be liable to be apprehended, restrained, secured, and removed as
> alien enemies.

50 U.S.C. § 21.

This Act has only ever been used three times in the country's history and each time in a

period of war. During the War of 1812, President Madison required British subjects to register

with federal officials and relocate away from the eastern seaboard. *See Lockington v. Smith*, 15 F.

Cas. 758 (D. Ct. Penn. 1817). President Wilson invoked the Act against Germany and Austria-

Hungary during World War I to regulate and detain Germans and Austro-Hungarians living in the

United States. And during World War II, President Roosevelt invoked the AEA against Japan,

Germany, Italy, Hungary, Romania, and Bulgaria.

The Act provides that, generally, individuals designated as enemy aliens will have time to

"settle affairs" before removal and the option to voluntarily "depart."[2] *See, e.g.*, *United States ex*

---

[2] 50 U.S.C. § 21 (providing for removal of only those "alien enemies" who "refuse or neglect to
depart" from the United States); *id*. § 22 (providing for "departure, the full time which is or shall
be stipulated by any treaty then in force between the United States and the hostile nation or
government of which he is a native citizen, denizen, or subject; and where no such treaty exists,
or is in force, the President may ascertain and declare such reasonable time as may be consistent
with the public safety, and according to the dictates of humanity and national hospitality").

*rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the Attorney General can lawfully remove him against his will.").

## II. Congress's Comprehensive Reform of Immigration Law

Following World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA"). The INA, and its subsequent amendments, provide for a comprehensive system of procedures that the government must follow before removing a noncitizen from the United States. *See* 8 U.S.C. § 1229a(a)(3) (the INA provides the "sole and exclusive procedure" for determining whether a noncitizen may be removed from the United States).

As part of that reform and other subsequent amendments, Congress prescribed safeguards for noncitizens seeking protection from persecution and torture. These protections codify the humanitarian framework adopted by the United Nations in response to the humanitarian failures of World War II. *See INS v. Cardoza-Fonseca*, 480 U.S, 421, 439-40 (1987) (describing the United States' adoption of the United Nations' post-war refugee protections). One of Congress's "primary purposes" was "to bring United States refugee law into conformance" with international refugee treaties and the bedrock principle that individuals may not be returned to countries where they face persecution or torture. *Id.* at 436. As the Second Circuit has recognized, "[i]t is no accident that many of our asylum laws sprang forth as a result of events in 1930s Europe." *Aliyev v. Mukasey*, 549 F.3d 111, 118 n.8 (2d Cir. 2008).

First, the asylum statute, 8 U.S.C. § 1158, provides that any noncitizen in the United States has a right to apply for asylum. *See* 8 U.S.C. § 1158(a)(1). Second, the withholding of removal statute, 8 U.S.C. § 1231(b)(3), provides that noncitizens "may not" be removed to a country where their "life or freedom" would be threatened based on a protected ground. A grant of withholding

is mandatory if the individual meets the statutory criteria. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999). Third, protections under the Convention Against Torture ("CAT") prohibit returning noncitizens to a country where it is more likely than not that they would face torture. *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16-.18 (implementing regulations).

### III. The AEA Proclamation and the Unlawful Removals

On March 14, the President signed the AEA Proclamation at issue here. It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025).[3] Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the administration did not make the invocation public until around 3:53 p.m. EDT on March 15, despite making extensive preparations to remove class members under the Act. *J.G.G. v. Trump*, No. 1:25-cv-766-JEB (D.D.C. Mar. 18, 2025), ECF No. 28-1 (Cerna Decl.) ¶ 5; *see generally id.* at ECF No. 1 (Complaint).

And the Proclamation does not provide any process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation. Nor does it provide individuals with the statutory grace period in which they can both seek judicial review or arrange their affairs and leave voluntarily. Instead, the Proclamation invokes the statutory exception to the "reasonable notice" requirement by claiming that all the individuals subject to the

---

[3] https://perma.cc/ZS8M-ZQHJ.

Proclamation are "chargeable with actual hostility," and pose "a public safety risk"—despite the fact that there is no evidence of the sort of "hostility" that the Act requires, e.g., skirmishes with U.S. forces, nor any public safety risk because the men can be securely confined. *See infra*; 50 U.S.C. § 22. The Proclamation also claims to supplant the removal process under the congressionally enacted immigration laws, which, among other things, provide a right to seek protection from persecution and torture. *See, e.g.*, 8 U.S.C. §§ 1158, 1231(b)(3); 1231 note.

To implement the Proclamation, in early March, the government began moving people who were already detained with upcoming immigration proceedings from ICE detention facilities around the country, causing confusion and disruption to court hearings where individuals were seeking asylum and other humanitarian protections. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *17 (D.C. Cir. Mar. 26, 2025) (Millett, J., concurring); *J.G.G.*, 2025 WL 890401, at *3. They were taken to detention centers in Texas, where detention officials began to tell the men they were to be immediately removed from the country. *See J.G.G.*, 2025 WL 890401, at *3.

On March 15, by the time the secret Proclamation was made public, these men, two of whom are the named Petitioners here, had been shackled and driven to an airport and told they would get on a plane, despite having no order permitting ICE to remove them and facing grave danger even if they were removed to their home country of Venezuela. *Id.*

Fortunately, named Petitioners' immigration counsel were able to get in touch with undersigned counsel, who mobilized quickly and filed a class action complaint and habeas in the District Court for the District of Columbia. *Id.* A TRO for the named Petitioners and others issued the morning of March 15, leading Petitioners to be pulled off the planes and, eventually, brought back to the El Valle Detention Facility in Texas. *Id.* Although the D.C. district court granted a TRO against removal for the provisionally certified class in the evening of March 15, the

government deported several planefuls of people, many of whom did not have final orders and were still pursuing asylum and humanitarian protections. *Id.* at *5.

For expediency, this motion incorporates by reference the facts found by Judge Boasberg in his order denying the government's motion to vacate the classwide TRO and the D.C. Circuit's panel opinions on the government's application for a stay of the TROs. *J.G.G.*, 2025 WL 890401, at *3-5; *J.G.G.*, 2025 WL 914682, at *2 (Henderson, J., concurring); *id.* at *16-19 (Millet, J., concurring).

To summarize: Well over one hundred people without final orders were summarily removed to El Salvador the evening of March 15 pursuant to the Proclamation. *See J.G.G.*, 2025 WL 890401, at *3; *see also* Statement from the White House Press Secretary (Mar. 18, 2025)[4] (describing Proclamation and stating that "nearly 300" people were removed). This included a Salvadoran man who has been granted withholding of removal and whom the government freely admits to have been removed by mistake. *See Abrego Garcia*, 2025 WL 1021113, at *6; *see also Abrego Garcia v. Noem*, No. 8:25-cv-951, ECF No. 11-3 ¶¶ 11–15 (D. Md. Mar. 31, 2025); *id.* ECF No. 12-1, at *8 (Apr. 1, 2025).

Neither J.G.O. nor G.F.F has had an opportunity to dispute the government's gang allegations. *See Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *4 (U.S. Apr. 2, 2025). Neither received advanced notice of the basis for their removal. Exh. A (Carney Decl.) ¶ 19; Exh. B (Shealy Decl.) ¶ 19. They were never given any paperwork. Exh. A (Carney Decl.) ¶ 19; Exh. B (Shealy Decl.) ¶ 19. Indeed, no government officers bothered to inform them that the plane they were boarding was headed to El Salvador. Exh. A (Carney Decl.) ¶ 19; Exh. B (Shealy Decl.) ¶ 19.

---

[4] https://perma.cc/5UMH-JDVA.

The government has suggested it provides individuals with notice of their status as alien enemies. *See* Reply in Support of Application to Vacate, *Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *8 (U.S. Apr. 2, 2025). But, upon information and belief, that form asserts the men are alien enemies and pointedly states that they are "not entitled to a hearing, appeal, or judicial review of this notice and warrant of apprehension and removal." *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Decl., Exh. 1) (AEA Validation Guide and Notice). Moreover, Petitioners and other members of the previously provisionally certified class received no such notice. Their immigration attorneys were never informed or notified of their impending deportation or the basis for the removal. *See, e.g.*, *id.* at ECF No. 67-14 (Thierry Decl.) ¶ 9; *id.* at ECF No. 67-15 (Caro-Cruz Decl.) ¶ 14; *id.* at 67-9 (Smyth Decl.) ¶ 6; *see also J.G.G.*, 2025 WL 1024097, at *6 ("when the District Court issued its temporary restraining order on March 15, 2025, the Government was engaged in a covert operation to deport dozens of immigrants without notice or an opportunity for hearings") (Sotomayor, J., dissenting).

Whether most (or perhaps all) of the class members lack ties to TdA remains to be seen, because the government secretly rushed the men out of the country and has provided Petitioners with no information about the class. But evidence since the flights on March 15 increasingly shows that many class members removed to El Salvador are not "members" of TdA as is required to fall within the Proclamation; many have no ties to TdA at all. *See J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Decl., Exhs. 4-20) (media and other reports regarding evidence contradicting gang allegations). These false accusations are particularly devastating here, where Petitioners have strong claims for relief under our immigration laws. Exh. A (Carney Decl.) ¶ 3; Exh. B (Shealy Decl.) ¶ 5.

9

The government's errors are unsurprising, given the methods it is employing to identify members of TdA. The "Alien Enemy Validation Guide" that, upon information and belief, the government is using to ascertain alien enemy status, requires ICE officers to tally points for different categories of alleged TdA membership characteristics. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Decl., Exh. 1). The government's methodology relies heavily on physical attributes like "tattoos denoting membership/loyalty to TDA" and hand gestures, symbols, logos, graffiti, or manner of dress. Experts who study the TdA have explained how none of these physical attributes are reliable ways of identifying gang members. *Id.* at ECF No. 67-3 (Hanson Decl.) ¶¶ 22-24, 27; *id.* at ECF No. 67-4 (Antillano Decl.) ¶ 14; *id.* at ECF No. 67-12 (Dudley Decl.) ¶ 25. The government also relies on other equally dubious indicia, including social media posts with known members of TdA, text messages with TdA members, or reports from any community member. *Id.* at ECF No. 67-21 (Sarabia Decl., Exh. 1).

Experts who have spent over a decade studying policing, violence, migration, prisons, and organized crime in Venezuela—and TdA in particular—have provided accurate, comprehensive picture of TdA and its activities. *See generally J.G.G.*, No. 1:25-cv-766-JEB, ECF Nos. 67-3 (Hanson Decl.), 67-4 (Antillano Decl.), 67-12 (Dudley Decl.). Experts explain that there is no evidence of direct and stable links between the Maduro regime and TdA, nor evidence that the gang is intertwined with the Maduro regime or an arm of the Venezuelan state. *Id.* at ECF No. 67-3 (Hanson Decl.) ¶¶ 1, 14, 17; *id.* at ECF No. 67-4 (Antillano Decl.) ¶ 13; *id.* at ECF No. 67-12 (Dudley Decl.) ¶¶ 2, 21, 23.

And experts on El Salvador have explained how those who have been removed to El Salvador face harm and threatening prison conditions at the Terrorism Confinement Center ("CECOT"), including electric shocks, beating, waterboarding, and implements of torture on

detainees' fingers to try to force confessions of gang affiliation. *See J.G.G.*, 2025 WL 1024097, at *9 (U.S. Apr. 7, 2025) (Sotomayor, J., dissenting) (individuals "face the prospect of removal directly into the perilous conditions of El Salvador's CECOT, where detainees suffer egregious human rights abuses"); *see also J.G.G.*, No. 1:25-cv-766-JEB, at ECF No. 44-4 (Bishop Decl.) ¶¶ 21, 33, 37, 39, 41; *id.* at ECF No. 44-3 (Goebertus Decl.) ¶¶ 8, 10, 17; *see also J.G.G.*, 2025 WL 1024097, at *5. These abusive conditions are life threatening, as demonstrated by the hundreds of people who have died in Salvadoran prisons. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 44-3 (Goebertus Decl.) ¶ 5; *id.* at ECF No. 44-4 (Bishop Decl.) ¶¶ 43–50. Worse, those removed to El Salvador and detained at CECOT face indefinite detention. *Id.* at ECF No. 44-3 (Goebertus Decl.) ¶ 3 (quoting the Salvadorean government that people held in CECOT "will never leave"); *id.* ("Human Rights Watch is not aware of any detainees who have been released from that prison."); Nayib Bukele, X.com post (Mar. 16, 2025, 5:13AM ET)[5] (detainees "were immediately transferred to CECOT . . . for a period of one year (renewable)").

## IV.    Petitioner-Plaintiffs ("Petitioners")

Petitioners are noncitizens in immigration custody who face a substantial risk of imminent removal under the President's AEA Proclamation.

Petitioner G.F.F. is a 21-year-old Venezuelan national who is detained at Orange County Jail in Goshen, New York, and who, upon information and belief, is at imminent risk of removal under the expected Proclamation. Exh. A (Carney Decl.) ¶ 2. G.F.F. entered the United States in May 2024. *Id.* ¶ 4. He was released on his own recognizance after a credible fear interview. *Id.* G.F.F. was arrested and detained in New York. *Id.* ¶ 5. Upon his detention, DHS filed an I-213 identifying him as an "associate/affiliate of Tren de Aragua." *Id.* ¶ 6. On March 15, G.F.F. was

---

[5] https://perma.cc/52PT-DWMR.

brought to the airport and nearly deported but for the temporary restraining order. *Id.* ¶¶ 11-16. On or about April 6, G.F.F. was transferred from El Valle to Orange County Jail. *Id.* ¶ 24. Officers again threatened him with deportation, despite the TRO. *Id.* ¶ 22. G.F.F. fears being deported because he risks persecution based on his sexuality. *Id.* ¶ 3.

Petitioner J.G.O. is a 32-year-old Venezuelan national who is detained at Orange County Jail in Goshen, New York, and who, upon information and belief, is at imminent risk of removal under the expected Proclamation. Exh. B (Shealy Decl.) ¶ 3. On January 30, 2025, ICE officers arrested and detained J.G.O. *Id.* ¶ 6. He was later transported to Moshannon, and then to El Valle Detention Facility in Texas. *Id.* ¶¶ 6, 18. On March 12, J.G.O. was told to sign papers in English, which is not his native language. *Id.* ¶ 9. He refused to sign. *Id.* On March 15, J.G.O. was brought to the airport and nearly deported but for the temporary restraining order. *Id.* ¶¶ 10-17. On April 5, he was transferred from El Valle to Orange County Jail. *Id.* ¶ 2. J.G.O. deeply fears deportation to Venezuela, where he faces beatings, torture, and imprisonment based on his political activism. *Id.* ¶¶ 5, 17.

## LEGAL STANDARD

To obtain a temporary restraining order, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *see SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 273-274 (2d Cir. 2021); *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020).[6]

---

[6] The standards for issuing a temporary restraining order and a preliminary injunction "are identical." *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002).

**ARGUMENT**

I.  **Petitioners Are Likely to Succeed on the Merits.**

A.  **The Proclamation Does Not Satisfy the AEA.**

The Proclamation is unprecedented, exceeding the President's statutory authority in three critical respects: there is no invasion or predatory incursion; no foreign government or nation; and no process to contest whether an individual falls within the Proclamation. When the government asserts "an unheralded power" in a "long-extant statute," courts "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That skepticism is well warranted here.

1.  **There Is No "Invasion" or "Predatory Incursion" upon the United States.**

The Proclamation fails on an essential statutory requirement: that there be an "invasion or predatory incursion" directed "against the territory of the United States." The text and history of the Alien Enemies Act make clear that it uses these terms to refer to military actions that are indicative of an actual or impending war. At the time of enactment, an "invasion" was a large-scale military action by an army intent on territorial conquest. *See* Webster's Dictionary, Invasion (1828) ("invasion" is a "hostile entrance into the possession of another; particularly, the entrance of a hostile army into a country for purpose of conquest or plunder, or the attack of a military force"); Johnson's Dictionary, *Invasion* (1773) ("invasion" is a "[h]ostile entrance upon the right or possession of another; hostile encroachment" such as when "William the Conqueror invaded England"); *see also J.G.G.*, 2025 WL 914682, at *20 (Henderson, J., concurring) (in the Constitution, "invasion" "is used in a military sense" "*in every instance*"). And "predatory incursion" referred to smaller-scale military raids aimed to destroy military structures or supplies, or to otherwise sabotage the enemy, often as a precursor to invasion and war. *See* Webster's

Dictionary, *Predatory* (1828) ("predatory" underscores that the purpose of a military party's "incursion" was "plundering" or "pillaging"); *id.*, *Incursion* (1828) ("incursion . . . applies to the expeditions of small parties or detachments of an enemy's army, entering a territory for attack, plunder, or destruction of a post or magazine"); *J.G.G.*, 2025 WL 914682, at *10 (Henderson, J., concurring) (early American caselaw indicates that "predatory incursion" is "a form of hostilities against the United States by another nation-state, a form of attack short of war").

The historical context in which the AEA was passed reinforces what Congress meant by "predatory incursion" and "invasion." At the time of passage, French ships were already attacking U.S. merchant ships in U.S. *See, e.g.*, 7 Annals of Cong. 58 (May 1797) (promoting creation of a Navy to "diminish the probability of . . . predatory incursions" by French ships while recognizing that distance from Europe lessened the chance of "invasion"); Act of July 9, 1798, ch. 68, 1 Stat. 578, 578 (authorizing US ships to seize "any armed French vessel" "found within the jurisdictional limits of the United States"). Congress worried that these attacks against the territory of the United States were the precursor to all-out war with France. *J.G.G.*, 2025 WL 914682, at *1 (Henderson, J., concurring) ("In 1798, our fledgling Republic was consumed with fear . . . of external war with France."). This "predatory violence" by a sovereign nation led, in part, to the AEA. *See* Act of July 7, 1798, ch. 67, 1 Stat. 578, 578 ("[W]hereas, under authority of the French government, there is yet pursued against the United States, a system of predatory violence").

At the same time, the 1798 Congress was considering whether to authorize the President to raise troops to respond to impending conflict with France. It ultimately did so, authorizing him to raise troops "in the event of a declaration of war against the United States, or of an actual invasion of their territory, by a foreign power, or of imminent danger of such invasion." Act of May 28, 1798, ch. 47, 1 Stat. 558. As Judge Henderson noted in a previous iteration of this case, "[t]his

language bears more than a passing resemblance to the language of the AEA, which the Congress enacted a mere thirty-nine days later. *J.G.G.*, 2025 WL 914682, at *9. As such, the historical context makes plain that Congress was concerned about *military* incursions by the armed forces of a foreign nation.

The interpretive canon of *noscitur a sociis* confirms that the AEA's powers extended beyond an existing war only when war was imminent. *Ludecke*, 335 U.S. at 169 n.13 (explaining that "the life of [the AEA] is defined by the existence of a war"). The three terms "declared war," "invasion," and "predatory incursion" appear alongside each other in a related list. Reading the latter two in light of the company they keep highlights the express military nature of their usage here. *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961).

An "invasion" or "predatory incursion" are thus military actions by foreign governments that constitute or imminently precede acts of war. "Mass illegal migration" or criminal activities, as described in the Proclamation, plainly do not fall within the statutory boundaries. On its face, the Proclamation makes no findings that TdA is acting as an army or military force. Nor does the Proclamation assert that TdA is acting with an intent to gain a territorial foothold in the United States for military purposes. And the Proclamation makes no suggestion that the United States will imminently be at war with Venezuela. The oblique references to the TdA's ongoing "irregular warfare" within the United States does not suffice because the Proclamation makes clear that it refers to "mass illegal migration" and "crimes"—neither of which constitute war within the Founding Era understanding. It asserts that TdA "commits brutal crimes" with the goal of "harming United States citizens, undermining public safety, and . . . destabilizing democratic nations." But these actions are simply not "against the territory" of the United States. Indeed, if mass migration or criminal activities by some members of a particular nationality could qualify as

an "invasion," then virtually any group, hailing from virtually any country, could be deemed enemy aliens.

### 2. The Purported Invasion Is Not by a "Foreign Nation or Government."

The Proclamation fails to assert that any "foreign nation or government" within the meaning of the Act is invading the United States. Put simply, the Proclamation never finds that TdA is a foreign "nation" or "government." Instead, the Proclamation asserts that "[o]ver the years," the Venezuelan government has "ceded ever-greater control over their territories to transnational criminal organizations." But the Proclamation notably does *not* say that TdA operates as a government in those regions[7] In fact, the Proclamation does not even specify that TdA currently controls *any* territory in Venezuela.

The AEA presumes that a designated nation possesses treaty-making powers. *See* 50 U.S.C. § 22 ("stipulated by any treaty . . . between the United States and the hostile nation or government"). Nations—not criminal organizations—are the entities that enter into treaties. *See, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 505, 508 (2008) (treaty is "a compact between independent nations" and "agreement among sovereign powers"); *Holmes v. Jennison*, 39 U.S. 540, 570-72 (1840) (similar). It should go without saying that TdA possesses no such power.

Moreover, when a "nation or government" is designated under the AEA, the statute unlocks power over that nation or government's "natives, citizens, denizens, or subjects." 50 U.S.C. § 21. *Countries* have "natives, citizens, denizens, or subjects." By contrast, criminal organizations, in the government's own view, have "members." Proclamation § 1 ("members of TdA"). And it designates TdA "members" as subject to AEA enforcement—but "members" are not "natives,

---

[7] Guantanamo Bay provides an analogy. There, the United States controls the naval base on the island. But the United States' control of a piece of land does not somehow render it the "government" of Cuba.

citizens, denizens, or subjects." That glaring mismatch underscores that Respondents are attempting not only to use the AEA in an unprecedented way, but in a way that Congress never permitted—as a mechanism to address, in the government's own words, a *non*-state actor. *Venezuela* has natives, citizens, and subjects, but TdA (not Venezuela) is designated under the proclamation. No amount of wordplay can avoid the obvious fact that *Venezuela* is the relevant country for statutory purposes here—and TdA is a non-state criminal organization.

Even as the Proclamation singles out certain Venezuelan nationals, it does not claim that *Venezuela* is invading the United States. And, as the President's own CIA Director recently testified, the intelligence community has no assessment that says the US is at war with or being invaded by Venezuela. Ryan Goodman, Bluesky (Mar. 26, 2025).[8] The AEA requires the President to identify a "foreign nation or government" that is invading or engaging in an invasion or incursion. Because it does not, the Proclamation fails on its face.

Instead, the Proclamation makes a half-hearted attempt to link TdA to Venezuela by suggesting that TdA is "supporting," "closely aligned with," or "has infiltrated" the Maduro regime. *See* Proclamation. But experts are in accord that it is "absolutely implausible that the Maduro regime controls TdA or that the Maduro government and TdA are intertwined." *Id.* at 67-3 (Hanson Decl.) ¶17; *id.* at 67-4 (Antillano Decl.) ¶ 13; *id.* at 67-12 (Dudley Decl.) ¶¶ 2, 21. As one expert who has done numerous projects for the U.S. government, including on the topic of TdA, explained, the Proclamation's characterization of the relationship between the Venezuelan state and TdA with respect to TdA's activities in the United States is "simply incorrect." *Id.* at 67-

---

[8] https://bsky.app/profile/rgoodlaw.bsky.social/post/3llc4wzbkr22k (Q: "Does the intelligence community assess that we are currently at war or being invaded by the nation of Venezuela?" A: "We have no assessment that says that."); *also available at* https://www.c-span.org/program/house-committee/national-security-and-intelligence-officials-testify-on-global-threats/657380.

12 (Dudley Decl.) ¶¶ 5, 17-18. The President's own intelligence agencies reached that same conclusion prior to his invocation of the AEA. *See id.* at 67-21 (Sarabia Roman Decl., Exh. 19) ("shared judgment of the nation's spy agencies" is "that [TdA] was not controlled by the Venezuelan government").

But the AEA's historical record confirms that it was intended to address conflicts with foreign sovereigns, not a criminal gang like TdA. *See* 5 Annals of Cong. 1453 (Apr. 1798) ("[W]e may very shortly be involved in war . . ."); John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, N.Y. State Bar Ass'n Annual Meeting: Civil Liberty in War Time, at 8 (Jan. 17, 1919) ("The [AEA] was passed by Congress . . . at a time when it was supposed that war with France was imminent."); Jennifer K. Elsea & Matthew C. Weed, Cong. Rsch. Serv., RL3113, Declarations of War and Authorizations for the Use of Military Force 1 (2014) (Congress has never issued a declaration of war against a nonstate actor). If Respondents were allowed to designate any group with ties to officials as a foreign government, and courts were powerless to review that designation, any group could be deemed a government, leading to an untenable and overbroad application of the AEA.

**3. Summary Removals Without Notice and a Meaningful Opportunity to Challenge "Alien Enemy" Designations Violate the AEA and Due Process.**

The government must provide Petitioners notice "within a reasonable time and in such a manner as will allow them to actually seek" relief from summary removals under the Proclamation. *J.G.G.*, 2025 WL 102409, at *2; *id.* ("detainees subject to removal orders under the AEA are entitled to notice and an opportunity to challenge their removal."); *see also J.G.G.*, 2025 WL 914682, at *21 (Millett, J., concurring) ("the government agrees that individuals are entitled to challenge in court whether they fall within the terms of the AEA or are otherwise not lawfully

removable under it.").  The government's concession that there must be an opportunity to contest one's designation as an enemy alien, *Trump v. J.G.G.*, 2025 WL 102409, at \*2, is well taken given that *Ludecke* expressly recognized as much.  335 U.S. at 171 n.17; *see also, e.g.*, *Ex parte Gilroy*, 257 F. 110, 114-24 (S.D.N.Y. 1919); *United States ex rel. Zdunic v. Uhl*, 137 F.2d 858, 860 (2d Cir. 1943); *Bauer*, 171 F.2d at 493-94.

Because the government is currently providing no notice, process, or opportunity to contest a designation, the precise contours of such review need not be determined here.  At this stage, even assuming the Court finds that the AEA can be used at all against a "gang" during peacetime, the Court need only hold that the current Proclamation is unlawful in failing to provide any process, even sufficient notice and opportunity to file the individual habeas petitions held out by the government.  The AEA, per *Ludecke*, as well due process, requires that noncitizens alleged to be alien enemies receive notice of the factual basis for removal and a meaningful opportunity to rebut it.  *See J.G.G.*, 2025 WL 102409, at \*2 ("'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings.") (quoting *Reno v. Flores*, 507 U. S. 292, 306 (1993)).

Finally, even if Petitioners were properly designated alien enemies (which they were not), the President may lawfully remove noncitizens under the AEA only when those designated noncitizens "refuse or neglect to depart" from the United States voluntarily.  50 U.S.C. § 21.  Indeed, even during World War II, courts in this circuit interpreting the AEA consistently recognized that "alien enemies" retained the right to voluntary departure.  *See U.S. ex rel. Ludwig*, 164 F.2d at 457  (Section 21 establishes a "right of voluntary departure" that functions as a "statutory condition precedent" to the government's right to deport enemy aliens); *United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the

privilege of voluntary departure before the Attorney General can lawfully remove him against his will.").

Under Section 21, there is no exception to the general right of voluntary departure; it is a "statutory condition precedent" to removal. *U.S. ex rel. Ludwig*, 164 F.2d at 457. Section 22 establishes separate rights concerning the particular conditions for departure, with an exception for those "chargeable with actual hostility, or other crime against public safety." 50 U.S.C. § 22. However, that exception cannot be invoked categorically. It instead requires individualized assessments—each noncitizen must specifically be "chargeable" with actual hostility or a crime against public safety to lose eligibility for the rights described in Section 22. Respondents have made no such individualized assessments here—much less provided any opportunity to contest such findings.

**B.    The Proclamation Violates the Specific Protections that Congress Established for Noncitizens Seeking Humanitarian Protection.**

The Proclamation is unlawful for an additional, independent reason: it overrides statutory protections for noncitizens seeking relief from torture by subjecting them to removal without meaningful consideration of their claims. Petitioners were not only barred from raising a torture claim but also were effectively precluded from doing so because Respondents never informed them of the country to which they would be removed—directly contravening protections enacted by Congress.

Congress enacted codified the United Nations Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT") to ensure that noncitizens have meaningful opportunities to seek protection from torture. *See* Foreign Affairs Reform and Restructuring Act of 1998 § 2242(a), Pub. L. No. 105-277, Div. G. Title XXI, 112 Stat. 2681 (1998) (codified at 8 U.S.C. § 1231 notes) (implementing CAT); C.F.R. §§ 208.16 to 208.18

20

(FARRA procedure). CAT categorically prohibits returning a noncitizen to any country where they would more likely than not face torture. *See* 8 U.S.C. §1231 note. These protections apply regardless of the mechanism for removal.

The D.C. Circuit recently addressed a similar issue in *Huisha-Huisha v. Mayorkas*, reconciling the Executive's authority under a public-health statute, 42 U.S.C. § 265, with CAT's anti-torture protections. 27 F.4th 718. The Court held that because § 265 was silent about where noncitizens could be expelled, and CAT explicitly addressed that question, no conflict existed. Both statutes could—and therefore must—be given effect. *Id.* at 721, 731-32 (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When . . . confronted with two Acts of Congress allegedly touching on the same topic," a court "must strive to give effect to both.") (cleaned up)). This case is on all fours with *Huisha-Huisha*. Because no genuine conflict exists between the AEA and FARRA, this Court correctly harmonized these statutes by concluding that FARRA's protections apply to removals under the AEA.

Despite this clear statutory framework, Respondents prevented both named Petitioners from asserting their rights under CAT (and undoubtedly have done the same to other members of the class). *See* Exh. A (Carney Decl.) ¶ 3 (describing threats on account of sexual orientation); Exh. B (Shealy Decl.) ¶ 5 (describing fear of persecution for political activity). Moreover, even if Petitioners had been permitted to apply, their opportunity would have been meaningless because Respondents deliberately withheld information about the country to which they were being removed.

The AEA can similarly be harmonized with other subsequently enacted statutes specifically designed to protect noncitizens seeking asylum and withholding. *See* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) (asylum and withholding); 8 U.S.C. §§ 1158 (asylum),

1231(b)(3) (withholding of removal).  Congress has unequivocally declared that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1).  Similarly, the withholding of removal explicitly bars returning a noncitizen to a country where their "life or freedom" would be threatened based on a protected ground.  *Id.* § 1231(b)(3)(A).

"In understanding this statutory text, 'a page of history is worth a volume of logic.'" *Jones v. Hendrix*, 599 U.S. 465, 472 (2023) (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)).  These humanitarian protections were enacted in the aftermath of World War II, when the United States joined other countries in committing to never again turn our backs on people fleeing persecution and torture.  Sadako Ogata, U.N. High Comm'r for Refugees, Address at the Holocaust Memorial Museum (Apr. 30, 1997).[9]  A President invoking the AEA cannot simply sweep away these protections.

## C.    The Proclamation Violates the Procedural Requirements of the INA

Since the last invocation of the AEA more than eighty years ago, Congress has carefully specified the procedures by which noncitizens may be removed from the United States.  And the INA leaves little doubt that its procedures must apply to every removal, unless otherwise specified by that statute.  It directs: "Unless otherwise specified in this chapter," the INA's comprehensive scheme provides "the sole and exclusive procedure for determining whether an alien may be admitted to the United States, or if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3); *see also United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ("Deportation and removal must be achieved through the procedures provided in the INA.").  This

---

[9] https://perma.cc/X5YF-K6EU.

language makes clear that Congress intended for the INA to "supersede all previous laws with regard to deportability." S. Rep. No. 82-1137, at 30 (Jan. 29, 1952).[10]

Congress was aware that alien enemies were subject to removal in times of war or invasion when it enacted the INA. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts presume Congress drafts statutes with full knowledge of existing law). Indeed, the AEA had been invoked just a few years before passage of the 1952 INA. With this awareness, Congress provided that the INA contains the "sole and exclusive" procedures for deportation or removal and declined to carve out AEA removals as an exception from standard immigration procedures, even as it expressly provided exceptions for other groups of noncitizens, including noncitizens who pose security risks. *See, e.g.*, 8 U.S.C. § 1229a(a)(3) (excepting noncitizens in expedited removal proceedings from the INA's "sole and exclusive" provision); 8 U.S.C. § 1531 et seq. (establishing fast-track proceedings for noncitizens posing national security risks).

Ignoring the INA's role as the "sole and exclusive" procedure for determining whether a noncitizen may be removed, Respondents purport to bypass the mandated congressional scheme in order to formulate an entirely separate procedure for removal and usurp Congress's Article I power in the process. Accordingly, the Proclamation violates the INA by denying Petitioners the process due under that law.

## II. The Administration's Abuse of the Alien Enemies Act Has Caused and Will Continue to Cause Petitioners Irreparable Harm.

---

[10] One of the processes otherwise specified in the INA is the Alien Terrorist Removal Procedure at 8 U.S.C. § 1531 *et seq.* The Attorney General may opt to use these proceedings when he or she has classified information that a noncitizen is an "alien terrorist." *Id.* § 1533(a)(1). But even that process requires notice, a public hearing, provision of counsel for indigents, the opportunity to present evidence, and individualized review by an Article III judge. *Id.* §§ 1532(a), 1534(a)(2), (b), (c)(1)-(2). And the government bears the burden of proving, by a preponderance of the evidence, that the noncitizen is subject to removal as an "alien terrorist." *Id.* § 1534(g).

In the absence of preliminary relief, Petitioners can be summarily removed to places, such as El Salvador, where they face life-threatening conditions, persecution and torture. *See J.G.G.*, 2025 WL 890401, at *33-35 (Boasberg, J.,) ("Needless to say, the risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm."). And while removal does not by itself ordinarily constitute irreparable harm, *Nken v. Holder*, 556 U.S. 418, 435 (2009), these are hardly run-of-the-mill removals. Petitioners' removals constitute grave and immediate irreparable harm because of what awaits them in a Salvadoran prison. *See J.G.G.*, 2025 WL 1024097, at *5 (U.S. Apr. 7, 2025) ("The record reflects that inmates in Salvadoran prisons are highly likely to face immediate and intentional life-threatening harm at the hands of state actors.") (citations and internal quotation marks omitted). Prison officials in El Salvador engage in widespread physical abuse, including waterboarding, electric shocks, using implements of torture on detainees' fingers, forcing detainees into ice water for hours, and hitting or kicking detainees so severely that it causes broken bones or ruptured organs. *See supra.*; *see also Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1326, 1339 (2d Cir. 1992) ("irreparable harm" where plaintiffs "may face torture" if they "are repatriated to Haiti"), *vacated as moot* 509 U.S. 918 (1993); *Huisha-Huisha*, 27 F.4th at 733 (irreparable harm exists where petitioners "expelled to places where they will be persecuted or tortured"); *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (holding that removal to a country where one faces harm constitutes irreparable injury). And Petitioners may never get out of these prisons. *See J.G.G.*, 2025 WL 1024097, at *5 (Sotomayor, J., dissenting); *see also supra,* Nayib Bukele, X.com.

And even if the government instead removes Petitioners to Venezuela, they face serious harm there, too. In fact, many petitioners fled Venezuela for the very purpose of escaping the persecution they faced in Venezuela and have pending asylum cases on that basis. For example,

G.F.F. has already suffered threats based on his sexuality and fears persecution if returned.  Exh. A (Carney Decl.) ¶ 3.  And returning to Venezuela labeled as a gang member by the United States government only increases the danger, as they will face heightened scrutiny from Venezuela's security agency, and possibly even violence from rivals of TdA.  *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ¶ 28.

Not only do Petitioners face grave harm, thus far the government has tried to execute their removals without any due process.  *See Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021) (finding irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the protections the immigration laws provide"); *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 517 (D.D.C. 2020) (irreparable injury exists where class members were "threatened with deportation prior to receiving any of the protections the immigration laws provide"); *see also supra* (discussing the lack of notice and meaningful process). Although the Supreme Court has made clear that meaningful notice is required under the AEA, *J.G.G.*, 2025 WL 102409, at *2, Respondents have yet to concede that they will provide meaningful notice.  *Cf.* Mar. 24 Hearing Tr. 1:44:39-1:46-23, *J.G.G. v. Trump*, 25-5067 (D.C. Cir. 2025) ("We take the position that the AEA does not require notice . . . [and] the government believes there would not be a limitation [on removal]" absent an injunction).  As such, there remains an unacceptably high risk that the government will deport class members who are not in fact members of TdA.

### III.    The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Temporary Restraining Order.

The balance of equities and the public interest factors merge in cases against the government. *See Nken*, 556 U.S. at 4365.  Here, the balance of hardships overwhelmingly favors Petitioners.  The public has a critical interest in preventing wrongful removals to places where

individuals will face persecution and torture. Conversely, the government can make no comparable claim to harm from an injunction. *See J.G.G.,* 2025 WL 914682, at *29 (Millett, J., concurring) ("the government's preference for habeas proceedings would produce at least the same restriction on the President's authority to remove the Plaintiffs that the TROs impose."); *see also Nken*, 556 U.S. at 436 (describing the "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm"); *Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) ("It is evident that '[t]here is generally no public interest in the perpetuation of unlawful agency action.'") (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also Make the Road N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 269 (S.D.N.Y. 2020) ("It is axiomatic that the President must exercise his executive powers lawfully. When there are serious concerns that the President has not done so, the public interest is best served by 'curtailing unlawful executive action.'") (quoting *Hawaii v. Trump*, 878 F.3d 662, 700 (9th Cir. 2017), *rev'd and remanded on other grounds,* 585 U.S. 667 (2018)).

Petitioners, moreover, do not contest the government's ability to prosecute criminal offenses, detain noncitizens, and remove noncitizens under existing statutory guidelines. At bottom, law enforcement and immigration enforcement officials lose no authority or ability to *lawfully* detain such individuals, even if the AEA Proclamation is enjoined. *See J.G.G.,* 2025 WL 914682, at *30 (Millett, J., concurring) ("The Executive remains free to take TdA members off the streets and keep them in detention. The Executive can also deport alleged members of TdA under the INA in expedited fashion.")

## IV.  The All Writs Act Confers Broad Power to Preserve the Integrity of Court Proceedings.

In addition to this Court's general equitable powers, this is a textbook case for use of the All Writs Act ("AWA"), which provides federal courts with a powerful tool to preserve the integrity of their jurisdiction to adjudicate claims before them. *See* 28 U.S.C. § 1651(a). If Petitioners are illegally sent to a foreign country, and the foreign government assumes jurisdiction over the Petitioners, the Court will likely lose jurisdiction to remedy the unlawful use of the AEA.

The All Writs Act encompasses a federal court's power to "maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels," *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966), and courts have found that the Act should be broadly construed to "achieve all rational ends of law," *California v. M&P Investments*, 46 F. App'x 876, 878 (9th Cir. 2002) (quoting *Adams v. United States*, 317 U.S. 269, 273 (1942)).

Whereas a traditional preliminary injunction requires a party to state a claim, an injunction based on the AWA requires only that a party identify a threat to the integrity of an ongoing or prospective proceeding, or of a past order or judgment. *Klay*, 376 F.3d at 1097 (a court may enjoin almost any conduct "which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion"); *see also United States v. Int'l Bhd. of Teamsters*, 266 F.3d 45, 50 (2d Cir. 2001) ("Act's grant of authority is plainly broad"); *Arctic Zero, Inc. v. Aspen Hills, Inc.*, 2018 WL 2018115, at *5 (S.D. Cal. May 1, 2018) (distinguishing AWA injunction from traditional preliminary injunction). It is sufficient for the Court to find that a party has identified a threat to the integrity of or "natural conclusion" of a federal case.

Courts have explicitly relied upon the AWA in order to prevent even a risk that a respondent's actions will diminish the court's capacity to adjudicate claims before it. *See Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995) (using the AWA to stay an order of deportation "in order

to safeguard the court's appellate jurisdiction" and preserve its ability to hear subsequent appeals by the petitioner).

## V. The Court Should Not Require Petitioners to Provide Security Prior to the Temporary Restraining Order.

The court should not require a bond under Federal Rule of Civil Procedure 65. The district court "is vested with wide discretion in the matter of security," including the option "to require no bond." *Dr.'s Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996); *see also State Farm Mut. Automobile Ins. Co. v. Tri-Borough NY Med. Practice P.C.*, 120 F.4th 59, 86 (2d Cir. 2024) ("Courts have the discretion . . . to require no security at all depending on the specific circumstances."). District courts routinely exercise this discretion to require no security in cases brought by indigent and/or incarcerated people, and in the vindication of immigrants' rights. *See, e.g.*, *Bass v. Richardson*, 338 F. Supp. 478, 489–90 (S.D.N.Y. 1971) ("indigents, suing individually or as class Petitioners, ordinarily should not be required to post a bond under Rule 65(c).")

## CONCLUSION

The Court should grant Petitioners' motion for a temporary restraining order as to the named Petitioners and the class.

Dated: April 8, 2025                          Respectfully submitted,

                                              /s/ *Daniel Galindo*
                                              Daniel Galindo
My Khanh Ngo*                                 Lee Gelernt
Noelle Smith*                                 Ashley Gorski
Oscar Sarabia Roman*                          Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION                Hina Shamsi
FOUNDATION                                    Patrick Toomey
425 California Street, Suite 700              Sidra Mahfooz*
San Francisco, CA 94104                       AMERICAN CIVIL LIBERTIES UNION
(415) 343-0770                                FOUNDATION,

mngo@aclu.org
nsmith@aclu.org
osarabia@aclu.org

125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org


Amy Belsher
Robert Hodgson
Molly Biklen
New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300
abelsher@nyclu.org
rhodgson@nyclu.org
mbiklen@nyclu.org

*Attorneys for Plaintiffs-Petitioners*

*\*Pro hac vice motions forthcoming*