# GRACE CARNEY ATTORNEY AFFIRMATION:
# ATTORNEY OF RECORD FOR G.F.F.

I, Grace Carney, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. My name is Grace Carney. I am a Staff Attorney at The Legal Aid Society within the New York Immigrant Family Unity Project ("NYIFUP"). I represent G.F.F. in his removal and bond proceedings. I first entered my appearance in his immigration case on December 31, 2024.

2. G.F.F. was born in Venezuela in 2003, and lived there until he was around 16 years old, when he family fled the country for Ecuador.

3. On January 24, 2025, I filed with the Court a Form I-589, Application for Asylum, Withholding of Removal, and Protection under the Convention Against Torture on G.F.F.'s behalf, on the basis of his fear of return to Venezuela. He identifies as a gay man, and Tren de Aragua has threatened him because of his sexuality. He fears returning to Venezuela because he will be targed once gain by TdA and be harmed for his sexuality. His individual hearing for these claims was scheduled for March 17, 2025 at 1:00PM EDT at the New York Varick Immigration Court.

4. G.F.F. initially entered the United States at or near El Paso, Texas, on or about May 15, 2024. He passed a credible fear interview and was released on his own recognizance.

5. G.F.F. was detained by ICE on December 6, 2024, following an ICE raid at apartment party he attended in the Bronx, New York. Approximately 50 people were in attendance, most of which G.F.F. believed were Venezuelans. G.F.F. attended the party at the insistence of a friend. He did not know anyone else in attendance at the party.

6. Federal officers arrived at the party to execute an S.D.N.Y. arrest warrant for an alleged member of Tren del Aragua. Following the arrest of the individual named in the warrant, federal officers questioned G.F.F. and the other attendees. G.F.F. was thereafter detained at Orange County Jail in Goshen, New York. Upon his detention by ICE, DHS filed an I-213 identifying him as an "associate/affiliate of Tren del Aragua."

7. A motion for custody redetermination was submitted on January 24, 2025. In support, I submitted a copy of G.F.F.'s I-589 Application and a detailed declaration outlining the bases of his claims for asylum.

8. The Immigration Judge scheduled a bond hearing for January 29, 2025. According to DHS's submissions, the individual who was arrested at the party was an alleged member of Tren del Aragua. ICE also filed an article describing the arrest, wherein G.F.F. was identified as a gang member. ICE additionally filed an informational packet on the organization of Tren del Aragua.

9. The Immigration Judge concluded that G.F.F. had not satisfied his burden in his bond proceedings. The Immigration Judge stated that there was insufficient corroboration that, despite no criminal record, G.F.F. presented a danger to the community and a flight risk.. The Immigration Judge based his decision on DHS's I-213 and an article identifying G.F.F. as a gang member.

10. G.F.F. vehemently denies membership or any association with Tren de Aragua. G.F.F. did not know anyone suspected of being in Tren de Aragua would be at that party where he was arrested in December 2024. Notably, G.F.F. and his family fled Venezuela in part due to threats the family faced from Tren de Aragua. Moreover, G.F.F. has outlined individualized threats received from the gang on account of his sexuality. G.F.F. has submitted into the record of his asylum proceedings numerous letters from friends and family corroborating his good character and confirming that G.F.F. has never been involved in the Tren de Aragua criminal gang. Additionally, G.F.F. possesses no criminal history. He maintains, and my own research as his attorney confirms, that he has never been arrested or convicted of a crime in the United States, Venezuela, or any other country.

11. At 6:00PM EDT on March 16, 2025, I was able to speak with G.F.F. for the first time since March 14, 2025. He told me that on the morning of March 15, 2025, he was awoken for breakfast at around 7:30AM CT. During breakfast the officers conducted a count of his unit, which he described was not customary thus far during his time at the El Valle Detention Facility. During the count, twenty-seven Venezuelans in his unit were called from a list. The twenty-seven were taken to a separate room at the El Valle Detention Facility with other Venezuelans. Everyone in the room was told that they were being transferred to the Port Isabel Detention Facility and told to collect their belongings. After collecting their belongings, everyone in the room was handcuffed and their ankles were shackled and led onto buses.

12. G.F.F. informed me that three buses full of Venezuelans left the El Valle Detention Facility. Instead of arriving at the Port Isabel Detention Facility, the buses arrived at the airport about one hour way. When they arrived at the airport, G.F.F. inquired where they were going, but at no point did the officers answer his questions.

13. G.F.F. informed me that he was loaded onto a plane in the afternoon. G.F.F. was on a plane for about forty minutes to an hour while other individuals were being loaded onto the plane. He described the plane as "chaos," people were crying and frightened. After about forty minutes to an hour, a guard boarded the plane and called G.F.F.'s name and three or four others. When G.F.F. inquired as to what was going on, he was told he had "just won the lottery."

14. After G.F.F. and the other individuals were pulled off the plane, they waited on a bus on the tarmac at the airport for the next several hours while the remaining planes were being loaded. G.F.F. recalled there being four planes total. While G.F.F. was waiting on the bus on the tarmac, one of his companions suffered a bloody nose. When the men asked for

15. G.F.F. and the men were at the airport until the planes were loaded, and then left the airport at about 5:30PM CT. G.F.F. did not return to El Valle until around 8:00PM CT, but was not processed back into his unit until around 2:00AM CT.

16. It was not until later upon being reprocessed did G.F.F. hear from other detainees at El Valle that the guards had been discussing that the plane they were on was set to go to either Guantanamo or El Salvador.

17. During our call, G.F.F. was very emotional, and could not stop crying. He said he was very scared that the government would try to deport him again. He said that the officers told him they would deport him in 14 days. He said the whole time he was being moved in and out of the El Valle Detention Facility on March 15, 2025, he had his paperwork for his March 17, 2025 hearing with him, because he was only ever told he was being transferred to Port Isabel and wanted to use the time to review his case.

18. G.F.F. appeared for his March 17, 2025 hearing despite the events of the weekend, as the Immigration Judge denied his motion for an emergency continuance. During the hearing, G.F.F. explained that he had little sleep and little to eat in the prior 72 hours, and that the government twice tried to deport him during that time. During this hearing G.F.F. testified for around four hours, recounting his fear of harm of return, and vehemently denying any affiliation with Tren de Aragua. The government did not produce any evidence or elicit any testimony to substantiate the allegations that G.F.F. is a member of Tren de Aragua.

19. At no time on March 14, March 15, or during the preceding days leading to the attempted removals did any officer show or provide G.F.F. with any paperwork explaining the basis for his removal. Likewise, no officer informed him that they were planning to remove him to El Salvador, nor did they provide any notice that he was designated an alien enemy under the Alien Enemies Act. On March 14th, when the government first attempted to remove him, he was told he would go to Mexico or Venezuela, depending on his criminal history, however he was at no point specifically told of his intended destination.

20. In my capacity as G.F.F.'s attorney I also took steps to inquire as to his location and intended destination on Friday March 14th and Saturday March 15th. I reached out to both El Valle Detention Facility and ERO on multiple occasions, and was at no point provided with an answer, even upon providing a signed G-28 and copy of the Temporary Restraining Order from the U.S. District Court for the District of Columbia that barred my client's deportation. I was informed on several occasions that G.F.F. was no longer at El Valle Detention Facility, but that they were not allowed to share where he presently was, the purpose of his move, or his intended ultimate destination.

21. G.F.F. has repeatedly denied any connection to Tren del Aragua. It appears from news reports that tattoos have been used as a basis for gang affiliation. G.F.F. tattoos are completely unrelated and have no connection whatsoever to Tren del Aragua. G.F.F. has one tattoo on his right arm of his parents' first names surrounded by flourishes like stars. On his I-213, the tattoo is listed and described as the following: "TATTOO ARM, RIGHT, NONSPECIFIC - TATTOO OF FATHER AND MOTHER FIRST NAMES." The I-213 does not allege the tattoo as a basis for any gang allegation, nor has the tattoo been raised as an issue during the asylum proceedings. DHS has never indicated G.F.F.'s tattoos as a basis for gang affiliation.

22. On Thursday April 3, 2025, I was connected with the deportation officer in charge of G-F-F-'s case after receiving a distressing call from G-F-F- that he was again being told he was being imminently deported in spite of the TRO that had been renewed through April 12, 2025.

23. On Friday, April 3, 2025, an ICE official informed me that the New York Field Office would be the point of contact moving forward and that G-F-F- was being physically returned to the New York Area, specifically Orange County Jail in Goshen, New York, where he had been previously detained.

24. On April 6, 2025, the ICE Detainee locator indicated that he was present at Orange County Jail, and I was able to schedule an attorney video call.

25. Additionally, on Monday, April 7, 2025, DHS filed a Motion to Change Venue to the New York Varick Detained Docket with the Immigration Court. The filing included an updated Form I-830, Notice of Change of Alien Address, dated April 6, 2025, reflecting G-F-F-'s location as Orange County Jail.

I, Grace Carney, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

April 8, 2025 _____/s_____

New York, NY                                                                                            Grace T. Carney, Esq