# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

G.F.F. et al.,

       *Petitioners*,

     v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

     *Respondents*.

No. 25-cv-2886 (AKH)

**RESPONDENTS' OPPOSITION TO PETITIONERS' MOTION FOR A TEMPORARY RESTRAINING ORDER (CONSTRUED AS A MOTION FOR A PRELIMINARY INJUNCTION)**

# Table of Contents

Introduction .................................................................................................. 1

Background .................................................................................................... 2

    I.    Tren de Aragua's designation as a Foreign Terrorist Organization and under the Alien Enemies Act .................................................. 2

    II.   *J.G.G. v. Trump* ............................................................................... 5

    III.  This suit ............................................................................................ 7

    IV.  DHS's notice procedure .................................................................. 8

Legal Standard ............................................................................................. 8

Argument ...................................................................................................... 9

    I.    This Court lacks jurisdiction over Petitioners' claims except the narrow review permitted of whether Petitioners are alien enemies. .......................................................................................... 9

        A.    There is no jurisdiction to review the President's Proclamation. ...................................................................... 9

        B.    This Court lacks jurisdiction to enjoin the transfer of Petitioners or putative class members outside this district. ................................................................................. 13

        C.    This Court lacks jurisdiction to consider CAT claims in habeas. ...................................................................... 15

    II.   Petitioners cannot succeed on the merits of their claims. ................... 15

        A.    The Proclamation comports with the requirements of the statute. ....................................................................... 15

            1.    TdA's actions constitute an invasion or predatory incursion into United States territory. ............................ 15

            2.    Given its intimate connection to Venezuela, TdA is a foreign nation or government for purposes of 50 U.S.C. § 21. ....................................................... 17

        B.    Petitioners are receiving all process they are due. ................... 20

C.      Petitioners are not entitled to a period of voluntary departure. ...................................................................... 25

D.      Title 8 is not the sole mechanism through which an alien may be removed. ......................................................... 26

E.      Petitioners are not entitled to seek relief or protection from removal under Title 8. ................................................ 28

III.    The remaining equitable factors weigh strongly in the government's favor. .................................................................... 30

A.      Petitioners have not established irreparable harm. .................. 30

B.      The balance of equities and public interest favor denial of preliminary injunctive relief. ........................................ 31

IV.     Petitioners must provide security .......................................... 34

Conclusion .......................................................................... 35

Exhibit A: Declaration of Deputy Assistant Director Selwyn Smith

Exhibit B: Declaration of Acting Assistant Director Marcos D. Charles

Exhibit C: Declaration of Michael G. Kozak

Exhibit D: Declaration of Deputy Assistant Director Matthew L. Elliston

Exhibit E: Declaration of Acting Assistant Field Office Director Khristopher Dawson

**Introduction**

Petitioners' motion for a preliminary injunction should be denied. First, Petitioners have not shown they are likely to succeed on the merits of their claims. To enable designated enemy aliens to be removed under the Alien Enemies Act ("AEA"), the President found that Tren de Aragua ("TdA") members are involved in, threatening, or attempting an "invasion" or "predatory incursion," and that TdA has "infiltrated," and "acts at the direction" of the Venezuelan government. For support, the President relied on specific descriptions of TdA's hostile activities and intertwinement with the Maduro regime, as well as the significant territory controlled by TdA in which it acts as a government unto itself. This Court has no jurisdiction to review whether the preconditions to the AEA are satisfied; in any case, they are satisfied. And the Immigration and Nationality Act ("INA") strips this Court of jurisdiction to enjoin transfers of aliens being detained under Title 8 out of this district.

Petitioners also fail to show their remaining claims will succeed on the merits. First, they are receiving all process to which they are due. Further, the INA has not implicitly repealed the AEA and Petitioners are not entitled to seek asylum, statutory withholding of removal, or voluntary departure, and this Court cannot review a determination that removal will not violate the Convention Against Torture ("CAT").

And Petitioners fail to satisfy the remaining requirements for preliminary injunctive relief. They cannot show irreparable harm because burdens attendant to removal are insufficient standing alone. Further, Petitioners have not shown that the balance of the equities and public interest lie with them. Individuals identified as

1

members of a Foreign Terrorist Organization cannot credibly claim injury from the President's decision to expel them from the United States. Meanwhile, the President—and public—have an overwhelming interest in the security of the United States and in ensuring that the Executive's significant outlay of diplomatic capital for this mission is not wasted.

## Background[1]

### I.    Tren de Aragua's designation as a Foreign Terrorist Organization and under the Alien Enemies Act

Tren de Aragua is a transnational criminal organization that originated in Venezuela and has "conducted kidnappings, extorted businesses, bribed public officials, and authorized its members to attack and kill U.S. law enforcement." Office of the Spokesperson, Dep't of State, Designation of International Cartels (Feb. 20, 2025); *see also* Smith Decl., Ex. A, ¶¶ 6–7; Charles Decl., Ex. B. The President has found that TdA operates "both within and outside the United States" and that its "extraordinarily violent" campaign of terror presents "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Exec. Order No. 14,157, 90 Fed. Reg. 8439, 8439 (Jan. 29, 2025). On the first day of his term, the President declared a national emergency to respond to that threat. *Id.*

---

[1] Petitioners purport to incorporate by reference facts from the D.C. Circuit's panel opinions on the government's application for a stay of the TROs. TRO Mot. 8. But those facts were not found by a court of competent jurisdiction. *See Trump v. J.G.G.*, 604 U.S. ——, No. 29A931, 2025 WL 1024097, at *1. (Apr. 7, 2025) (per curiam) (no jurisdiction for core habeas claims except in district of confinement). Thus, the district court's factfinding is of no effect. Factfinding must be made by this Court anew. *See* Local Civil Rule 7.1(a)(3) ("All motions must include . . . [s]upporting affidavits and exhibits thereto containing any factual information and portions of the record necessary for the decision of the motion . . . .").

The threat is so severe that, on February 20, 2025, the Secretary of State designated TdA a Foreign Terrorist Organization. 90 Fed. Reg. 10,030 (Feb. 20, 2025). The immigration laws authorize such a designation when a foreign organization engages in "terrorist activity" or "retains the capability and intent" to do so, thereby threatening "the national security of the United States." 8 U.S.C. § 1189(a)(1), (d)(4); *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 9 (2010). Because TdA poses a significant threat to national security, government officials have expended significant efforts engaging in delicate negotiations with foreign governments. As the Senior Bureau Official within the State Department's Bureau of Western Hemisphere Affairs has explained, high-level government officials have spent weeks negotiating at the highest levels with the Government of El Salvador and the Maduro regime to secure consent to the removal of Venezuelan nationals who are members of TdA. Kozak Decl., Ex. C, ¶ 2. Following those "intensive and delicate negotiations," the United States reached arrangements "with these foreign interlocutors" to accept the removal of some number of TdA members. *Id.*

On March 14, 2025, the President signed a proclamation, invoking his authority under the Alien Enemies Act, 50 U.S.C. §§ 21–24, against TdA members. See Proclamation No. 10,903, 90 Fed. Reg. 13,033, 13,034 (Mar. 20, 2025) (the "Proclamation"). Originally enacted in 1798, the AEA grants the Executive broad power to remove enemy aliens. *See* 50 U.S.C. § 21. The AEA's remaining provisions outline procedures for implementing that broad authority. An "alien who becomes liable as an enemy" but who "is not chargeable with actual hostility, or other crime

3

against the public safety," may be afforded some time to settle his affairs before departing. *Id.* § 22.

Here, the Proclamation outlines the President's findings that TdA members meet the statutory criteria for removal under the AEA. The President found that TdA, which "commits brutal crimes" including murder and kidnapping, is "conducting irregular warfare and undertaking hostile actions against the United States." *See* 90 Fed. Reg. at 13,033. The President further found that TdA has "engaged in and continues to engage in mass illegal migration" to further TdA's objectives: "harming United States citizens, undermining public safety, and supporting the Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States." *Id*. And the President found that TdA works with the Maduro-sponsored Cártel de los Soles to use "illegal narcotics as a weapon to 'flood' the United States." *Id*.

The President additionally found that TdA and other criminal organizations have taken control over Venezuelan territory. *Id*. Moreover, TdA is "closely aligned with" Maduro's regime in Venezuela, and indeed has "infiltrated" the regime's "military and law enforcement apparatus." *Id*. The resulting "hybrid criminal state," "is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States," posing "a substantial danger." *Id*. at 13,033–34.

Based on those findings, the President proclaimed that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United

States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies" under 50 U.S.C. § 21. *Id.* at 13,034. Further, the President found "all such members of TdA . . . chargeable with actual hostility against the United States" and "a danger to the public peace or safety of the United States." *Id.*

 The Proclamation adds that all such TdA members "are subject to immediate apprehension, detention, and removal." *Id.* To that end, the President directed the Attorney General and the Secretary of Homeland Security to, "*consistent with applicable law*, apprehend, restrain, secure, and remove every Alien Enemy described" above. *Id.* (emphasis added). Any such TdA member found within the United States is "subject to summary apprehension" under the Proclamation. *Id.* at 13,035. Alien enemies so apprehended may be detained until their removal to "any such location as may be directed" by the enforcing officers. *Id.*

TdA members remain deportable under other authorities, including Title 8, as members of a foreign terrorist organization or otherwise. *See id.* at 13,034 (permitting Secretary of Homeland Security "discretion to apprehend and remove any Alien Enemy under any separate authority"); *see also* 8 U.S.C. §§ 1182(b)(3)(B), 1227(a)(4)(B). But the Proclamation permits a particularly expeditious, statutorily authorized removal method for individuals found to present serious national-security threats under specified circumstances.

## II. *J.G.G. v. Trump*

On March 15, 2025, five aliens, nationals of Venezuela asserting fear of removal under the Proclamation (including the two named Petitioners here), filed a

putative class-action complaint along with a motion for a temporary restraining order ("TRO"). *J.G.G. v. Trump*, No. 25-cv-00766 (D.D.C.). The aliens also sought to certify a class of all noncitizens who were, are, or will be subject to the Alien Enemies Act Proclamation or its implementation. *J.G.G.*, Compl., ECF No. 1, ¶¶ 56–63.[2] The aliens sought relief in habeas and under the Administrative Procedure Act ("APA"), asking for an injunction barring enforcement of the Proclamation as contrary to the AEA, the INA, and other authorities. *Id.* ¶¶ 70–106. Finally, they asked for a TRO "barring their summary removal under the AEA." *J.G.G.*, ECF No. 3-2, at 2. Hours later, the district court granted a TRO as to the five aliens, *J.G.G.*, 2025 WL 825115 (D.D.C. Mar. 15, 2025), which the government immediately appealed.

At a hearing later that day, the aliens dismissed their habeas claims at the district court's suggestion. The district court then provisionally certified a class of "[a]ll noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation . . . and its implementation," and temporarily enjoined the government from removing class members not subject to removal under other authority. *J.G.G.*, 2025 WL 825116 (D.D.C. Mar. 15, 2025). The government immediately appealed that order.

After the D.C. Circuit denied the government's stay motions, the government applied to the Supreme Court to vacate the district court's TROs. The Court granted that application, holding that, because the aliens' claims "fall within the 'core' of the

---

[2] Respondents request this Court take judicial notice of the contents of these documents for background purposes only. *See* Fed. R. Evid. 201(b)(2), (c)(2).

writ of habeas corpus and thus must be brought in habeas," "jurisdiction lies in only one district: the district of confinement." *Trump v. J.G.G.*, 604 U.S. ——, No. 29A931, 2025 WL 1024097, at *1 (Apr. 7, 2025) (per curiam) (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)). The Court further held that the aliens are "entitled to notice and opportunity to be heard 'appropriate to the nature of the case,'" including notice "that they are subject to removal under" the AEA, "within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.* at *2 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).

## III.   This suit

The next day, Petitioners filed in this Court a petition for a writ of habeas corpus under 28 U.S.C. § 2241, ECF No. 1, an emergency TRO motion, TRO Mot., ECF No. 2, and a class-certification motion, ECF No. 4. This Court ordered that "Petitioners shall neither be removed from the United States, nor transferred out of this District." ECF No. 8. The next day, this Court granted the class-certification motion, certifying a provisional class of "[a]ll noncitizens in U.S. custody in the Southern District of New York who were, are or will be subject to the March 2025 Presidential Proclamation . . . and/or its implementation, who have not been given notice following the Supreme Court's decision . . . and granted a hearing." ECF No. 32.

This Court also granted the TRO motion, expanding the prohibition on removal or transfer to members of the provisional class. ECF No. 31.[3]

This Court further directed Respondents to file an opposition to a preliminary injunction. *Id.* Respondents proceed under the assumption that this Court construes Petitioners' TRO motion as a motion for a preliminary injunction.

## IV.    DHS's notice procedure

In accordance with the Supreme Court's decision in *J.G.G.*, the government has developed procedures for aliens newly subject to the Proclamation. Elliston Decl., Ex. D, ¶ 7. Under those procedures, an alien whom the government determines is subject to be removed as an alien enemy will receive individual notice of that determination. *Id.* ¶ 8. The notice will be provided to the alien in a language that the alien understands. *Id.* And the notice will allow the alien a reasonable time to file a petition for a writ of habeas corpus. *Id.*

## Legal Standard

Emergency injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the [petitioner] is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). The danger of a mistaken ruling on an incomplete record is heightened when, as here, the "requested immediate injunctive relief deeply intrudes into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978); *Sampson v. Murray*, 415 U.S. 61,

---

[3] On April 11, 2025, this Court amended the class definition by changing "All noncitizens in U.S. custody" to "All noncitizens in federal, state, or local custody." ECF No. 34. The TRO was amended accordingly. ECF No. 35.

83–84 (1974) (A court is "quite wrong in routinely applying . . . the traditional standards governing more orthodox 'stays'" in an area to which "the Government has traditionally been granted the widest latitude."); *see also Barr v. U.S. Dep't of Just.*, 819 F.2d 25, 26 (2d Cir. 1987) (recognizing holdings of *Sampson* and *Adams*).

Petitioners must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). This Court must ensure that each factor is satisfied before an injunction may issue. *Salinger v. Colting*, 607 F.3d 68, 79–80, 84 (2d Cir. 2010).

## Argument

## I.    This Court lacks jurisdiction over Petitioners' claims except the narrow review permitted of whether Petitioners are alien enemies.

### A.    There is no jurisdiction to review the President's Proclamation.

This Court lacks jurisdiction to review the Proclamation or enjoin the President's exercise of authority under Article II and the AEA. The Supreme Court has long recognized that courts cannot issue an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) (courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties"); *Trump v. United States*, 603 U.S. 593, 607 (2024) (recounting that the President "has important foreign relations responsibilities: [including] . . . recognizing foreign governments . . . overseeing international

diplomacy and intelligence gathering, and managing matters related to terrorism . . . and immigration"); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him.").

Consistent with that general rule, courts have held for over a century that the President's authority and discretion under the AEA is not a proper subject for judicial scrutiny: "The authority of the President to promulgate by proclamation or public act 'the manner and degree of the restraint to which they (alien enemies) shall be subject, and in what cases,' is, of course, *plenary and not reviewable*." *Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919) (emphasis added); *see also id.* ("Once the person is an alien enemy, obviously the course to be pursued is essentially an executive function, to be exercised in the discretion of the President."); *see also, e.g., Ludecke v. Watkins*, 335 U.S. 160, 163–64 (1948) (reasoning, on appeal from "[d]enial of a writ of habeas corpus," that "some statutes 'preclude judicial review'" and "the Alien Enemy Act of 1798 is such a statute," as demonstrated by the clear text and "controlling contemporary construction"); *id.* at 164–65 (noting that "every judge before whom the question has since come has held that the statute barred judicial review"); *United States ex rel. Schlueter v. Watkins*, 67 F. Supp. 556, 565 (S.D.N.Y. 1946) (reviewing habeas petition challenging detention as an alien enemy and explaining "courts are without power to review the action of the executive in ordering removal of an alien enemy . . . except with respect to . . . whether the relator is an enemy alien"), *aff'd*, 158 F.2d 853 (2d Cir. 1946); *United States ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898, 900 (2d Cir. 1943) (similar).

Ultimately, "[t]he very nature of the President's power to order the removal of all enemy aliens rejects the notion that courts may pass judgment upon the exercise of his discretion." *Ludecke*, 335 U.S. at 164. For that reason, it has long been established that "[u]nreviewable power in the President . . . is the essence of the" AEA. *Citizens Protective League v. Clark*, 155 F.2d 290, 296 (D.C. Cir. 1946).

This Court lacks power to review the President's Proclamation for another reason as well: Whether the AEA's preconditions are satisfied is a political question committed to the President's discretion, no different from the President's determination to trigger the Constitution's Invasion Clause (Article IV, section 4). *See Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) (holding plaintiffs' Invasion Clause claim nonjusticiable because "[t]he protection of the states from 'invasion' involves matters of foreign policy and defense, which are issues that the courts have been reluctant to consider"); *see also California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases). Any challenge to that determination is therefore foreclosed.

The Supreme Court has held that the political-question doctrine is "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962). To guide courts in determining when such a question is raised, the Supreme Court identified six factors that indicate a question has been committed to the political branches. *See, e.g.*, *Padavan*, 82 F.3d at 27. The President's determination under the AEA implicates at least two independently sufficient factors.

*First*, the determination that an "invasion" or "predatory incursion" is being perpetrated sits at the intersection of two areas the Constitution commits to the political branches: (1) foreign affairs, *see Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 327–28 (1994); and (2) immigration policy, *see Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Indeed, "any policy towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). Similarly, the power to recognize foreign states and governments "resides in the President alone." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015).

*Second*, even without the clear textual commitment to the Executive of the constitutional responsibilities undergirding issuance of the Proclamation, there are no manageable standards permitting courts to assess exactly when hostile entry and criminal and violent acts constitute an "invasion" or "predatory incursion" for AEA purposes. *See Martin v. Mott*, 25 U.S. 18, 31–32 (1827) (Story, J.). Thus there is no basis for second-guessing the Executive's policy judgment that such an "invasion" or "predatory incursion" is occurring. *See Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are nor ought to be published to the world. It would be intolerable that courts,

without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret.").

AEA proclamations are thus conclusive and preclusive. As for whether the Act's preconditions are satisfied, that is the President's call alone; the federal courts have no role to play.

### B. This Court lacks jurisdiction to enjoin the transfer of Petitioners or putative class members outside this district.

The government may detain aliens pending removal proceedings under 8 U.S.C. § 1226(a) and removable aliens under § 1231(a). And the government *must* detain aliens who are inadmissible or removable under certain provisions. *See id.* §§ 1226(c)(1), 1231(a)(2)(A). This Court's temporary restraining order is therefore overbroad insofar as it restrains the government from acting according to those authorities for aliens detained under Title 8, which provides separate sources of authority from the AEA for detention and removal. *See J.G.G.*, 2025 WL 825116.

Indeed, the INA bars this Court from entering injunctive relief with respect to transfers in three different ways. *First*, under 8 U.S.C. § 1231(g)(1), the Executive has great discretion in deciding where to detain Petitioners. The INA precludes review of "any . . . decision or action of the Attorney General . . . the authority for which is specified under this subchapter to be in the discretion of the Attorney General . . . ." 8 U.S.C. § 1252(a)(2)(B)(ii). Therefore, § 1252(a)(2)(B)(ii) bars relief that would impact where and when to detain Petitioners. *Dorval v. Barr*, 414 F. Supp. 3d 386, 396–97 (W.D.N.Y. 2019); *see also Van Dinh v. Reno*, 197 F.3d 427, 433–34 (10th Cir. 1999) (finding that judicial review of decision to transfer a

detainee is inappropriate due to lack of jurisdiction). This Court's TRO thus improperly second-guessed the government's decision where to detain Petitioners—Congress has specifically barred such judicial intervention.

*Second*, § 1252(g) also bars enjoining transfers under Title 8. It prohibits district courts from hearing challenges to decisions and actions about whether, when, and where to commence removal proceedings. Reading the discretionary language in §§ 1231(g)(1) and 1252(g) together confirms that Congress foreclosed piecemeal litigation over *where* a detainee may be placed into removal proceedings. *See Liu v. INS*, 293 F.3d 36, 41 (2d Cir. 2002) (habeas petition "must not be construed to be 'seeking review of any discretionary decision'" (quoting *Chmakov v. Blackman*, 266 F.3d 210, 215 (3d Cir. 2001))), *superseded by statute on other grounds as recognized by Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 113 (2d Cir. 2008); *see also Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002); *Tercero v. Holder*, 510 F. App'x 761, 766 (10th Cir. 2013) (Attorney General's discretionary decision to detain aliens is not reviewable by way of habeas.).

*And finally*, this Court lacks jurisdiction "to enjoin or restrain the operation of" 8 U.S.C. §§ 1221–32 "other than with respect to the application of such provisions to *an individual alien* against whom proceedings under such [provisions] have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). Thus, this Court has no authority to prevent the government's transfer of any putative class member, not named in this action on an individual basis, to a place of its discretion under 8 U.S.C. § 1231(g). *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) ("§ 1252(f)(1) 'prohibits federal

courts from granting classwide injunctive relief' but 'does not extend to individual cases.'" (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481–82 (1999))).

### C.    This Court lacks jurisdiction to consider CAT claims in habeas.

Petitioners' claims under the Convention Against Torture ("CAT"), as codified by the Foreign Affairs Reform and Restructuring Act ("FARRA"), *see* ECF No. 1, ¶¶ 88–91, are also barred. As the Second Circuit recently held, under 8 U.S.C. § 1252(a)(4), federal courts lack jurisdiction in habeas to consider CAT claims. *Kapoor v. DeMarco*, — F.4th ——, No. 22-2806, 2025 WL 908234, at *11 (2d Cir. Mar. 26, 2025).

## II.    Petitioners cannot succeed on the merits of their claims.

### A.    The Proclamation comports with the requirements of the statute.

In all events, the Proclamation and its implementation are perfectly lawful. The AEA grants the President discretion to issue a proclamation directing the apprehension, restraint, and removal of alien enemies when two conditions are met. First, there either must be "a declared war," "invasion," or a "predatory incursion" that is "perpetrated," "attempted," or "threatened against the territory of the United States." 50 U.S.C. § 21. Second, that hostile action must be by a "foreign nation" or "government." *Id.* The Proclamation satisfies both conditions.

#### 1.    TdA's actions constitute an invasion or predatory incursion into United States territory.

As to the first prerequisite, the President determined that TdA is perpetrating an invasion *or* a predatory incursion into the United States. Although the word

"invasion" includes a military entry and occupation of a country, the accepted definition of that term is far broader, as definitions contemporaneous with the passage of the AEA make clear. "Invasion" was defined to include a "hostile entrance," *see*, *e.g.*, 1 John Ash, *The New and Complete Dictionary of the English Language* (1775), or a "hostile encroachment" on another's territory, *see* Thomas Sheridan, *A Complete Dictionary of the English Language* (2d ed. 1789). Nor is there any requirement that the purpose of the incursion be to possess or hold territory. *See*, *e.g.*, *United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. Tex. 2024). Here, the actions of TdA fit accepted conceptions of an invasion. TdA's illegal entry and continued unlawful presence is an encroachment on U.S. territory that entails hostile acts contrary to the rights of citizens to be free from criminality and violence. *See* Smith Decl. ¶¶ 8–18.

At a minimum, the actions of TdA constitute a "predatory incursion" that justifies invocation of Section 21. The phrase "predatory incursion" encompasses (1) an entry into the United States (2) for purposes contrary to the interests or laws of the United States. *See*, *e.g.*, *Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189–90 (S.D. Tex. 1945) (noting use of the phrase to describe raids during hostilities with Mexico falling well short of "invasion"); *see also Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992) (using the phrase to refer to foreign fishing fleets unlawfully fishing in territorial waters); *Bas v. Tingy*, 4 U.S. (4 Dall.) 37 (1800) (broadly defining "enemy" and "war"). Here, there is no question that TdA members have effected entries into the United States and that the purposes of those entries are contrary to

both the interests and laws of this country: trafficking in substances and people, committing violent crimes, and conducting its business with interests antithetical to those of the United States. *See* 90 Fed. Reg. at 13,034.

Petitioners' main contention is that "invasion" and "predatory incursion" both *necessarily* entail military actions by foreign governments or the opening salvo of war meant to displace a government or conquer territory. *See generally* TRO Mot. 13–16. There is no question that definitions of both terms include military actions, but both unquestionably have broader meanings that are not foreclosed by any source cited by Petitioners. In fact, many of the sources relied on by Petitioners contain definitions supportive of the government's argument. *See Webster's Dictionary*, "Invasion" (1828) ("[a] hostile entrance into the possessions of another); *id.*, "Incursion" ("entering into a territory with hostile intention"). In short, both definitions *include* military action, but neither is *limited to* such action.

### 2. Given its intimate connection to Venezuela, TdA is a foreign nation or government for purposes of 50 U.S.C. § 21.

The Proclamation makes clear that TdA qualifies as a "foreign nation or government" for at least two independent reasons. First, TdA's infiltration of key elements of the Venezuelan state, make it indistinguishable from Venezuela. *See* Proclamation. TdA's growth itself can be attributed to promotion via the actions of former Governor of Aragua Tareck El Aissami, who was later appointed Vice President in the Maduro regime. 90 Fed. Reg. at 13,033. And Maduro's connections to the group, via the regime-sponsored narco-terrorism enterprise Cártel de los Soles, are also clear. *Id*. The Cártel de los Soles "coordinates with and relies on TdA . . . to

carry out its objective of using illegal narcotics as a weapon to 'flood' the United States." *Id.* Given how significantly TdA is intertwined in the fabric of Venezuela's structures, it functions as a governing entity. And through those ties, TdA has become indistinguishable from the Venezuelan state.

Although Petitioners try to depict this invocation of the AEA as novel, the United States has a long history of using war powers against formally nonstate actors. Historically, the United States authorized the use of force against "slave traders, pirates, and Indian tribes." Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005). It has engaged militarily, during broader armed conflicts, with "opponents who had no formal connection to the state enemy," including during the Mexican–American and Spanish–American Wars. *Id.* at 2066–67. President Wilson famously "sent more than seven thousand U.S. troops into Mexico to pursue Pancho Villa, the leader of a band of rebels opposed to the recognized Mexican government." *Id.* at 2067. And more recently, President Clinton authorized missile strikes on al Qaeda targets in Africa and elsewhere. *See generally El-Shifa*, 607 F.3d 836.

This history is important because statutes must be read "not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 573 U.S. 169, 2267 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). The AEA is a war powers statute and thus must be read in light of the United States' robust history of employing its war powers against nonstate actors.

In all events, TdA also acts as a governing authority in the areas where it operates. As the Proclamation recognizes, "Venezuelan national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations, including TdA." 90 Fed. Reg. at 13,033. In those areas where it operates, TdA acts as a criminal governing entity, independent or in place of the normal civil society and government. *See id.* Given TdA's governance and organizational structure, as well as its *de facto* control over parts of Venezuela where it operates with impunity, it is well within the President's discretion to determine it constitutes a foreign "government" for purposes of invoking section 21.

Petitioners' contrary arguments lack merit. They miss the point: the government is not arguing that TdA is itself a "nation." But the control and authority TdA exercises in Venezuela is consistent with founding-era definitions of "government." *See* Thomas Dyche & William Pardon, *A New General English Dictionary* (1754) ("the power or authority that one person exercises over another, or many"). Additionally, although the AEA references the possibility that a covered entity *may* be able to enter a treaty governing certain aspects of relations between it and the United States, the statute does not in any way establish treaty-making authority as a prerequisite to inclusion. *See* 50 U.S.C. § 22 (contemplating circumstances "where no such treaty exists"). Nor is there any reason that specific terminology used in the Proclamation should weigh against the President's determination, TRO Mot. 16–17; members of TdA are clearly "subject" to the

19

authority of that criminal organization and the governance it wields. *See* Dyche & Pardon, *supra* ("under the command, or at the disposal of another").

Fundamentally, Petitioners argue that other individuals do not agree with the President's determination that TdA and the state of Venezuela are sufficiently intertwined to justify invocation of the AEA. *See* TRO Mot. 17–18.[4] Yet the President is entitled to examine the available evidence, including intelligence not available to others, and make a final determination based on his *own* assessment of that evidence. *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (noting "the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information" unavailable to others); *cf. United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) ("[T]he President alone has the power to speak or listen as a representative of the nation."). It is not the role of this Court to second-guess those determinations based on nothing more than a handful of declarations by individuals not involved with the assessment of evidence or decisionmaking culminating in the Proclamation. *See Chi. & S. Air Lines*, 333 U.S. at 111.

### B.    Petitioners are receiving all process they are due.

Petitioners' arguments about "[s]ummary [r]emovals" and due process are unpersuasive. As an initial matter, the AEA permits absolute discretion to establish the conditions and processes the Executive will use to implement a Presidential

---

[4] And they cite declarations not submitted with their motion in this Court. *Contra* Local Civil Rule 7.1(a)(3).

Proclamation. *See* 50 U.S.C. § 21; *United States ex rel. Schlueter v. Watkins*, 158 F.2d 853, 853 (2d Cir. 1946) (the AEA authorizes "the making of an order of removal of an alien enemy without a court order and without a hearing of any kind"); *see also Ludecke*, 335 U.S. at 162–63 (noting the entirely administrative process established for determining whether an individual was an alien enemy). The only process due those deemed to fall within the scope of the Proclamation is notice and an opportunity to challenge that designation through habeas relief, where any "questions of interpretation and constitutionality" of the AEA must also be raised. *J.G.G.*, 2025 WL 1024097, at *2.

In any case, Petitioners are receiving all the process they are due: "notice . . . that they are subject to removal under" the AEA, "afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." 2025 WL 1024097, at *2; *see also* Elliston Decl. ¶ 8. Contrary to Petitioners' claim that the Proclamation "is unlawful in failing to provide any process" for them to seek habeas relief, TRO Mot. 19, the Proclamation authorizes the Attorney General, "in consultation with the Secretary of Homeland Security, to issue any guidance necessary to effectuate the prompt apprehension, detention, and removal" of the alien enemies that the Proclamation identifies. 90 Fed. Reg. at 13,035. And the procedures established pursuant to that guidance provide the reasonable notice the Supreme Court contemplated. The government is not required to provide procedures that a reviewing court or Petitioners find "preferable"; instead, a court "must evaluate the particular circumstances and determine what procedures

would satisfy the minimum requirements of due process." *Landon v. Plasencia*, 459 U.S. 21, 35 (1982).

Those requirements are notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Mullane*, 339 U.S. at 314, at a fundamentally fair hearing at a meaningful time and in a meaningful manner. *Zuniga-Perez v. Sessions*, 897 F.3d 114, 122 (2d Cir. 2018); *Burger v. Gonzales*, 498 F.3d 131, 134 (2d Cir. 2007). Although due process cannot amount to "a mere gesture," process is not constitutionally flawed simply because some "possibility of conceivable injury" to Petitioners remains. *Mullane*, 339 U.S. at 314–15. The government must only "afford [Petitioners] a reasonable time . . . to make their appearance" and "present their objections;" "if with due regard for the practicalities and particularities of the case these conditions are reasonably met[,] the constitutional requirements are satisfied." *Id.* What specific procedures satisfy those requirements "varies with the circumstances." *Landon*, 459 U.S. at 34.

Here, those circumstances consist of Petitioners' narrow entitlement to an opportunity to seek a limited form of habeas review in which each may raise only "questions of interpretation and constitutionality of the [AEA] as well as whether he or she "is in fact an alien enemy fourteen years of age or older." *J.G.G.*, 2025 WL 1024097, at *2. In other words, whether he is (1) a Venezuelan citizen, (2) fourteen years of age or older, (3) who is a member of TdA, (4) is within the United States, and (5) is not actually naturalized or a lawful permanent resident. 90 Fed. Reg. at 13,034.

22

These are narrow and predominantly factual questions that in most cases will be readily provable from the government's records and the alien's personal knowledge—and in many cases will be asked of aliens who have resided unlawfully in the United States for some time and so had opportunity and reason to prepare for an eventual hearing on the legality of their presence. Under those circumstances, the government's procedures—individual notice in a language the alien understands, and reasonable time to file a petition for a writ of habeas corpus, Elliston Decl. ¶ 8—afford Petitioners the requisite "opportunity to present their objections" to their alien-enemy designation in a habeas proceeding in the district of their confinement. *Mullane*, 339 U.S. at 314; *J.G.G.*, 2025 WL 1024097, at *1–2.

Further, given the urgent public interest in detaining and removing criminal gang members who threaten the United States, *see* 90 Fed. Reg. at 13,033, the government's procedures are sufficient in providing Petitioners an opportunity, at any time prior to their removal, to seek the limited habeas review available. The Constitution does not require that Petitioners be permitted to file their habeas petition immediately upon detention or in a forum of their choosing. *Landon*, 459 U.S. at 35; *see also Boumediene v. Bush*, 553 U.S. 723, 795–96 (2008) (rejecting the notion "that a habeas court should intervene the moment an enemy combatant steps foot in a territory where the writ runs," noting that "[t]he Executive is entitled to a reasonable period of time to determine a detainee's status before a court entertains that detainee's habeas corpus petition."). Thus, Petitioners show no likelihood of success in claiming that the government's process for notifying them of their AEA

designation and permitting them to seek limited habeas relief fall below minimum constitutional requirements.

Two final points. First, the two named Petitioners have been on notice of their designation as alien enemies for about a month. *See* TRO Mot. 1–2. They have had ample time to prepare and file individual habeas petitions challenging their designations as alien enemies within the scope of the Proclamation. So they have *no* credible claim that they have been denied due process here. Similarly, in light of the multiple and expanding TROs in this case, including the most recent one on April 11, any putative class member currently detained has had ample opportunity to file an individual habeas petition.

Second, as Respondents discuss in their separately filed motion to vacate the class certification, Petitioners' putative class is not valid—among other reasons, it is not sufficiently numerous. *See* Dawson Decl., Ex. E, ¶ 30 (only "8 Venezuelan citizens with alleged membership in TdA detained at Orange County Jail," including the two named Petitioners). Moreover, Petitioners sought to certify the class under Fed. R. Civ. P. 23(b)(2), which does not permit opt-outs. ECF No. 4, at 1. Certification under that provision would therefore disadvantage those who have greater due-process rights because this Court would have to apply the lowest common standard for relief to the entire class. *See Jennings v. Rodriguez*, 583 U.S. 281, 313–14 (2018) ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011))); *see also id.* at 314 ("'[D]ue process is flexible,' we have stressed

repeatedly, and it 'calls for such procedural protections as the particular situation demands.'" (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972))).

## C.   Petitioners are not entitled to a period of voluntary departure.

Petitioners' contention that a period of voluntary departure is *required* is not a defensible reading of the statute, especially in context. To be sure, the AEA permits the President to "provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom." 50 U.S.C. § 21. But it also broadly provides that alien enemies within the purview of a Proclamation "*shall be* . . . removed as alien enemies." *Id.* (emphasis added). In this context, where the alien enemies are members of the hostile force itself, the President cannot be required to provide any period of voluntary departure prior to effectuating removal. The AEA's entire purpose would be undercut if active participants in hostilities must be asked to depart on their own terms.

For that reason, the Proclamation explains that TdA engaged in "mass illegal migration to the United States to further its objectives of harming United States citizens," and that this activity undermines public safety, while also enhancing the "Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States." 90 Fed. Reg. at 13,033. That finding negates Petitioners' assertion that a period of voluntary departure is statutorily required here—the AEA makes clear that voluntary departure is available only if an alien enemy is "not chargeable with actual hostility, or other crime against public safety." 50 U.S.C. § 22. Here, all members of TdA have been so charged under the Proclamation and through their designation as members of a Foreign Terrorist Organization. 90 Fed. Reg. at 13,034.

Finally, Petitioners have not challenged the merits of that finding in the Proclamation, nor do they cite any authority for their conclusory assertion that 50 U.S.C. § 22 "cannot be invoked categorically." TRO Mot. 20. Those challenges are therefore forfeited. *See, e.g.*, *Royal & Sun Alliance Ins. PLC v. UPS Supply Chain Sols., Inc.*, 16 Civ. 9791 (NRB), 2018 WL 1888483, at *3 (S.D.N.Y. Apr. 5, 2018).

### D.    Title 8 is not the sole mechanism through which an alien may be removed.

Nor are Petitioners correct that the INA is the sole mechanism through which an alien may be removed. The determination required under the AEA does not relate to the "admissibility" or "deportability" of any alien, so there is no reason to believe that Title 8 and its "sole and exclusive" means for addressing *those* questions is implicated in this case. *See* 8 U.S.C. § 1229a(a)(3) (removal proceedings are "exclusive" only to the extent the government is determining admissibility or removability, as those terms are defined under Title 8). Rather, the INA and AEA are distinct mechanisms for effectuating the removal of certain aliens, just as Title 42 and the INA constitute different bases for *excluding* aliens. *See generally Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022).

In fact, the immigration laws and AEA have been read harmoniously for over 75 years. *See United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429, 437 (S.D.N.Y. 1947). Not all alien enemies will be subject to removal under Title 8 because the authority under Title 50 extends to aliens regardless of lawful status. Likewise, not all aliens subject to Title 8 will be subject to removal under the AEA—as removal under the AEA is premised on discrete findings, such as nationality and age, beyond

admissibility or removability. And for aliens subject to both Title 8 and Title 50, the Executive has discretion in deciding how and whether to proceed under either or both statutes. *See id.* (recognizing this discretion under pre-INA immigration law). Thus, the AEA, INA, and FARRA coexist with some overlap that gives the Executive discretion to determine how, whether, or when to apply them. *See*, *e.g.*, *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When confronted with two Acts of Congress allegedly touching on the same topic, this Court . . . must . . . strive to give effect to both." (cleaned up)).

Even if there *were* a conflict between the AEA and the INA, it is the AEA that would control in this circumstance. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). Here, the AEA provides specific rules for the removal of a subset of aliens—those designated as alien enemies through a discrete mechanism providing authority to the President—against the more general provisions relating to removability provided by the INA. Thus, to the extent there may be any conflict, the AEA provides an exception to the more general applicability of the INA's removal provisions, and this is true regardless of the later enactment of the INA. *See*, *e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").

E.    **Petitioners are not entitled to seek relief or protection from removal under Title 8.**

The Proclamation does not impermissibly prohibit aliens from seeking relief and protection from removal under federal law. As a threshold matter, as mentioned above, there is no jurisdiction to consider CAT claims in habeas. *Kapoor*, 2025 WL 908234, at *11.

There is no direct conflict between the United States' obligations under the CAT as codified by the FARRA and removals under the AEA. The United States continues to abide by its policy not to remove aliens to countries in which they are likely to be tortured. *See Munaf v. Geren*, 553 U.S. 674, 702 (2008). And "[s]eparation of powers principles . . . preclude the courts from second-guessing the Executive's assessment of the likelihood a detainee will be tortured by a foreign sovereign." *Arar v. Ashcroft*, 585 F.3d 559, 578 (2d Cir. 2009) (en banc) (ellipsis in original) (quoting *Kiyemba v. Obama*, 561 F.3d 509, 515 (D.C. Cir. 2009)). "Under *Munaf* . . . the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee." *Kiyemba*, 561 F.3d at 514.

Nor is there a colorable argument that enemy aliens *must* be permitted to seek relief or protection prior to removal. Such relief is generally permitted only in the exercise of the President's discretion. *See Citizens Protective League*, 155 F.2d at 294 (noting common-law rule that "alien enemies have no rights, no privileges, unless by the king's special favor"). Petitioners' asserted conflict between the INA and the AEA is illusory. The INA provides a system for determining removability and any relief or protection from removal for aliens under the authority of Title 8, whereas the AEA

provides its own mechanisms permitting the President or his delegates to implement procedures and regulations governing removal, detention, and any other issue related to invocation of the AEA, *see* 50 U.S.C. § 21.

With respect to asylum and statutory withholding of removal related to persecution claims, none of the cited provisions constrain the *President's* actions under Title 50. *See* 8 U.S.C. § 1158(b)(1)(A) (Attorney General or Secretary of Homeland Security); 8 U.S.C. § 1231(b)(3) (Attorney General); 8 C.F.R. §§ 1208.16, 1208.18 (immigration judges, via delegation from the Attorney General); *see also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 172–73 (1993) (recognizing distinct grants of authority under the INA to the President and Attorney General among others). Nor are such constraints implicated just because the President has delegated certain authorities, including implementation of the Proclamation, to the Attorney General. *See id.* at 172 n.28 (in implementing the Proclamation, Attorney General is "carrying out an executive, rather than a legislative, command, and therefore would not necessarily [be] bound" by provisions of the INA).

In any event, individuals subject to removal under Title 50 are barred from asylum and withholding of removal. Asylum is a discretionary form of relief, and eligibility for such relief may be foreclosed on a categorical basis. *See Huisha-Huisha*, 27 F.4th at 730–31. Here, the AEA disallows relief for covered enemy aliens, and that represents the Executive's categorical conclusion that such aliens are not entitled to relief in the exercise of discretion. Likewise, aliens subject to removal under the AEA would not be eligible for statutory withholding of removal because the President's

invocation of the AEA suggests that "there are reasonable grounds to believe that [such aliens are] a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(B)(iv).

## III. The remaining equitable factors weigh strongly in the government's favor.

### A. Petitioners have not established irreparable harm.

First, Petitioners' allegations of irreparable harm through "removals without any due process" carry no weight. TRO Mot. 25. As explained above, the process provided to Petitioners is adequate to provide them notice and opportunity to meaningfully challenge their designation as an alien enemy or raise any questions of interpretation or constitutionality, which is precisely the judicial review available to Petitioners under the AEA. *J.G.G.*, 2025 WL 1024097, at *2. The constitutional adequacy of Petitioners' process completely refutes any allegation that they are receiving no due process. So Petitioners have made no such showing of irreparable harm.

Nor have Petitioners made a showing of likely irreparable harm from "life-threatening conditions, persecution and torture" if removed to El Salvador. TRO Mot. 24. Again, they cite no evidence properly before this Court, instead relying on findings by a court lacking jurisdiction to find facts. *Id.* Correctly conceding that "removal does not by itself ordinarily constitute irreparable harm," *id.* (citing *Nken*, 556 U.S. at 435), Petitioners nevertheless emphasize conditions they fear they may face if removed. But, as explained above, the United States continues to abide by its policy not to remove aliens to countries where they are likely to be tortured. *See Munaf*, 553 U.S.

at 702; *Arar*, 585 F.3d at 578. Nor have Petitioners demonstrated a likelihood of persecution in El Salvador—their only evidence to that effect lies in statements made by their respective counsel, neither of whom has personal knowledge as to whether G.F.F. was "threatened . . . because of his sexuality," Carney Decl., ECF No. 2-2, ¶ 3, or whether J.G.O. "would be targeted and disappeared" because he "protested peacefully" in Venezuela, Shealy Decl., ECF No. 2-3, ¶ 5.[5]

Failing to make those showings, Petitioners' chief complaint is of a general "burden of removal." *See Nken*, 556 U.S. at 435. As the Supreme Court held, "it is accordingly plain that" such a burden "cannot constitute the requisite irreparable injury." *Id.*

**B.    The balance of equities and public interest favor denial of preliminary injunctive relief.**

The balance of harms and the equities strongly favor the government here as an injunction irreparably harms the United States' conduct of foreign policy. An injunction effectively usurps the President's statutory and constitutional authority to address what he has identified as an invasion or predatory incursion by a group undertaking hostile actions and conducting irregular warfare. Such an injunction "deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and frustrates the "public interest in effective

---

[5] Indeed, J.G.O. cannot credibly fear targeting and disappearance by the Maduro regime if he is removed to El Salvador, a noted adversary of Maduro's regime. *See, e.g.*, Nelson Renteria, Reuters, *El Salvador Expels Venezuelan Diplomats from the Country* (Nov. 3, 2019, 4:22 AM), https://www.reuters.com/article/world/el-salvador-expels-venezuelan-diplomats-from-the-country-idUSKBN1XD030; Nayib Bukele, X.com, https://x.com/nayibbukele/status/1190841653164154880 (Nov. 3, 2019, 12:02 AM). Respondents request this Court take judicial notice of El Salvador's opposition to the Maduro regime under Fed. R. Evid. 201(b)(2), (c)(2).

measures to prevent the entry of illegal aliens," *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). The Executive Branch's protection of these interests, including "sensitive and weighty interests of national security and foreign affairs" inherent to combating terrorist groups, warrants the utmost deference. *Humanitarian Law Project*, 561 U.S. at 33–35; *see also Barr*, 819 F.2d at 26.

Additionally, the Supreme Court has warned of "the danger of unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013); *Biden v. Texas*, 597 U.S. 785, 816 (2022) (Kavanaugh, J., concurring) ("Nothing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to American foreign policy and foreign relations."). An injunction does just that, impeding the Executive's ability to swiftly remove alien enemies after an appropriate hearing to confirm the determination that Petitioners are alien enemies under the Proclamation. *See, e.g.*, *Nken*, 556 U.S. at 436 (noting there "is always a public interest in prompt execution of removal orders" even where an alien asserts a risk of harm, and that interest "may be heightened" where "the alien is particularly dangerous").

An injunction also risks compromising the ability of the United States to negotiate in the future on key foreign-affairs and national-security issues, as foreign actors may "change their minds regarding their willingness to accept" alien enemies or might otherwise seek to "leverage [any delay] as an ongoing issue." Kozak Decl. ¶¶ 3, 4.

Beyond that, enjoining the Executive's ability to transfer detainees will work harm on the government's immigration-enforcement operations. Orange County Jail, in Goshen, New York, where Petitioners and six other Venezuelan citizens alleged to be TdA members are currently held, Dawson Decl. ¶¶ 16, 24, is unable to accommodate aliens of certain risk classifications because of a lack of capacity, *see id.* ¶ 29. Currently housing 142 detainees, it can hold at most 168 detainees total, and the remaining 16 beds are reserved for medium/high-risk detainees. *Id.* ¶¶ 27–29. And Orange County Jail is the only facility available for Immigration and Customs Enforcement ("ICE") to hold detainees in this district. *Id.* ¶ 26. As a result of this Court's order, ICE may not remove Venezuelan citizen with alleged membership in TdA, even if they are subject to removal under Title 8. *Id.* ¶ 31. And ICE also may not transfer them to out-of-district facilities with sufficient bed space. *Id.* ¶ 32. This impedes the government's ability to enforce the immigration laws and to arrest, detain, and remove unlawfully present aliens who may pose a danger to the public, such as alleged TdA members, under its undisputed authority to do so under the INA.

In contrast to the harm to the government and the public, transfer to another district will not prejudice detainees because (1) this Court will retain jurisdiction over any petitions for writs of habeas corpus they file here, *see Singh v. Whitaker*, 362 F. Supp. 3d 93, 106 (W.D.N.Y. 2019); and (2) even if the provisionally certified class contains any other members, the government has already committed to providing them the process they are due—reasonable notice and opportunity to seek relief through habeas corpus, *J.G.G.*, 2025 WL 1024097, at *2 ("The Government expressly

agrees that 'TdA members subject to removal under the Alien Enemies Act get judicial review.'"); Elliston Decl. ¶ 8.

Petitioners largely repeat the same meritless arguments they have already made, assuming incorrectly that the government is acting unlawfully. TRO Mot. 25–26. Because they have not shown the balance of the equities and public interest lie in their favor, they have not made this essential showing for injunctive relief.

## IV. Petitioners must provide security.

Under the federal rules, this Court "may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). If this Court grants preliminary relief to Petitioners, it should order Petitioners to post security for taxpayer funds expended during the pendency of this Court's order if it is later determined that Respondents were wrongfully enjoined. Moreover, despite their citation of *Bass v. Richardson*, 338 F. Supp. 478, 489–90 (S.D.N.Y. 1971), for the proposition that indigents are not ordinarily required to post bond under Rule 65(c), Petitioners have not adduced evidence of indigence.

## Conclusion

The motion should be denied.

Respectfully submitted,

**Yaakov M. Roth**
Acting Assistant Attorney General
Civil Division

s/Drew C. Ensign
**Drew C. Ensign**
Deputy Assistant Attorney General
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 514-2000
drew.c.ensign@usdoj.gov

**Anthony Nicastro**
Acting Director
Office of Immigration Litigation

Dated: April 15, 2025                    *Counsel for Respondents*