# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.G.G., *et al.*,<br><br>Petitioner,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Respondents. | No. 1:25-cv-766 (JEB)<br><br>Declaration Of Acting Assistant Director Marcos D. Charles |

**DECLARATION OF MARCOS D. CHARLES**

I, Marcos D. Charles, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am an Acting Assistant Director for Field Operations at Enforcement and Removal Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2. As the (A) Assistant Director, I am responsible for providing guidance and counsel to the twenty-five ERO Field Office Directors, ensuring all field operations are working to efficiently execute the agency mission. I began my career with the U.S. Government as a border patrol agent for the former Immigration and Naturalization Service in Hebbronville, TX. Over time I was promoted to Senior Border Patrol Agent, Supervisory Border Patrol Agent, and Field Operations Supervisor. I joined ICE in 2008 as the Assistant Officer in Charge. Overtime I was promoted to Supervisory Detention and Deportation Officer, Assistant Field Office Director,

Chief of Staff, Deputy Field Office Director, and Field Office Director before becoming the Acting Assistant Director.

3.   I am aware that the instant lawsuit has been filed regarding the removal of Venezuelan members of Tren de Aragua ("TdA") pursuant to the Alien Enemies Act ("AEA").

4.   I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.   On March 15, 2025, President Trump announced the Proclamation *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* stating that, "Evidence irrefutably demonstrates that TdA has invaded the United States and continues to invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare within the country; and used drug trafficking as a weapon against our citizens" (the Proclamation) (https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/). In the same Proclamation, President Trump announced that, pursuant to 50 U.S.C. § 21, "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies."

6.   Gangs remain one of the more formidable issues that corrections officials face in the management of prisons and civil detention facilities. Gangs are responsible for a disproportionate amount of prison misconduct and violence. Their continued presence challenges ongoing efforts to maintain control, order, and safety in the facilities. While all gangs disrupt the

orderly administration of detention facilities, TdA represents a heightened challenge beyond what prisons in the United States face, given TdA's formation and history in penal institutions.

      7.      TdA is not just a normal gang. Open-source information documents the gang's history and growth over the last decade. As reported in National Public Radio's article titled, *Tren de Aragua, a criminal organization with roots in Venezuela, has roots in Venezuela, has rapidly expanded across Latin America*, TdA was founded in 2014 in the Tocorón prison, in the central Venezuelan state of Aragua, led by Héctor Rusthenford Guerrero Flores, alias "Niño Guerrero." The gang largely controlled the Tocorón prison and eventually branched out overseas. The gang's leaders fled the prison in 2023 when it was taken over by security forces. While leadership splintered after fleeing the prison, TdA recruited new gang members from among the eight million Venezuelans who had fled the country's economic crisis. Initially, it established criminal cells in neighboring Colombia, Peru, and Chile, where it smuggled drugs and people and operated extortion rackets and prostitution rings. TdA's most notorious alleged crime was the 2024 killing of Ronald Ojeda, a former Venezuelan army officer who conspired against Nicolás Maduro, the country's authoritarian leader, then fled to Chile. Suspected gang members dressed as Chilean police officers abducted Ojeda from his apartment. Days later, his body was found stuffed in a suitcase and buried in cement. The history reflects over a decade of savage criminal activity, vicious disregard for authority, and violent crimes which threaten the stability of order. TdA poses the same terrorizations in the United States as the origin countries from which they started – Venezuela, and now also to include Colombia, Peru and Chile.

      8.      While in confinement in Venezuela, TdA was able to grow its numbers exponentially. Multiple examples of their savagery can be found in open-source news articles highlighting the numerous abhorrent activities they have conducted while in the United States

including but not limited to murder, rape, kidnapping, sex trafficking, drug trafficking, robbery, and assault. Further, TdA has been designated a Foreign Terrorist Organization. Their continued presence in ICE custody poses significant risks such as the ability to recruit new TdA members. Detention of hundreds of members of a designated Foreign Terrorist Organization, among other populations of aliens is an unnecessary danger to other detainees and facility staff.

      9.      The designation of TdA as a terrorist organization has introduced new budgetary challenges for ICE/ERO. This classification necessitates a shift in resource allocation, directing limited funds and human capital towards the identification, arrest, detention, and removal of individuals within this newly prioritized organization. ICE is bound by statutory requirements to not release certain aliens from immigration detention based on criminal or threat designations. This shift in priorities hampers ICE's ability to properly detain those aliens who are not statutorily eligible for release or for whom an ICE officer determines is a public safety or flight risk during the custody determination process. Detaining this dangerous population of aliens detracts from our already limited bedspace capacities and diminishes our resources and obstructs ICE's ability to detain other criminal aliens, and make difficult decisions on which aliens are the most egregious, dangerous and/or removable all while also being bound by statutory requirements in the Immigration and Nationality Act (INA), which imposes limitations on release, such as aliens subject to expedited removal, or for whom there is a prohibition of release under the mandatory detention provision of INA § 236(c). ICE currently has roughly 41,500 beds available for detention. These beds cost the American public roughly $152 a bed daily. Because members of TdA pose a significant threat of danger at ICE detention facilities, their swift removal from the United States after entering ICE custody ensures the preservation of security and order for both detainees and facility personnel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April, 2025.

MARCOS D CHARLES
Digitally signed by MARCOS D CHARLES
Date: 2025.04.01 22:48:40 -04'00'

Marcos D. Charles
Acting Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security