# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

G.F.F.*; and J.G.O.*, on their own behalf and on behalf of others similarly-situated,

Petitioners–Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, PAMELA BONDI, Attorney General of the United States, in her official capacity; KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, Acting Director of the Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCO RUBIO, Secretary of State, in his official capacity; U.S. STATE DEPARTMENT; WILLIAM P. JOYCE, in his official capacity as acting New York Field Office Director for U.S. Immigration and Customs Enforcement; PAUL ARTETA, in his official capacity as the Director of the Orange County Correctional Facility,

Respondents–Defendants.

Case No. 1: 25-cv-02886-AKH

## PETITIONERS-PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

Daniel Galindo
Lee Gelernt
Ashley Gorski
Patrick Toomey
Omar C. Jadwat
Hina Shamsi
Sidra Mahfooz*
AMERICAN CIVIL
    LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
dgalindo@aclu.org

My Khanh Ngo*
Noelle Smith*
Oscar Sarabia Roman *
Cody Wofsy*
AMERICAN CIVIL
    LIBERTIES UNION
    FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0770
mngo@aclu.org

Amy Belsher
Robert Hodgson
Molly Biklen
NEW YORK CIVIL
    LIBERTIES UNION
    FOUNDATION
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300
abelsher@nyclu.org

Dated: April 17, 2025
    New York, NY

*Attorneys for Plaintiffs-Petitioners*
*Pro hac vice motions forthcoming*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................... 3

INTRODUCTION ........................................................................................................ 1

ARGUMENT ................................................................................................................ 1

   I.   The Court Has Jurisdiction to Review Whether the Proclamation Complies with the AEA ........................................................................................................................ 2

      A.   Respondents Have Not Provided the Process Required Under the AEA and the Due Process Clause. ................................................................................................ 6

      B.   The Proclamation Fails to Satisfy the AEA. ................................................... 8

      C.   The Proclamation Violates the Specific Protections that Congress Established for Noncitizens Seeking Humanitarian Protection. ........................................... 11

      D.   The Proclamation Violates the INA's Procedural Requirements. ................. 12

   III.  None of the INA Provisions Identified by the Government Bars an Injunction on Transfers out of this District. ......................................................................... 12

   IV.  Equitable Factors Weigh in Petitioners' Favor. .................................................. 15

      A.   Petitioners Face Irreparable Harm upon Removal to El Salvador. ............... 15

      B.   The Balance of Equities and Public Interest Weighs in Favor of Petitioners. .............. 16

   V.   Class Certification Was and Continues to Be Appropriate. ............................... 16

   VI.  The Court Should Not Require Petitioners to Provide Security. ....................... 18

## TABLE OF AUTHORITIES

**Cases**................................................................................................................Page(s)

*Abdi v. Duke,* 323 F.R.D. 131 (W.D.N.Y. 2017) ................................................................17

*Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1 (1st Cir. 2007) ................................................................................................................................14

*Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181 (S.D. Tex. 1945)..........................14

*Baker v. Carr*, 369 U.S. 186 (1962)....................................................................................4

*Bas v. Tingy*, 4 U.S. 37 (1800).............................................................................................4

*State of California v. United States*, 104 F.3d 1086 (9th Cir. 1997) ..................................5

*Citizens Protective League v. Clark*, 155 F.2d 290 (D.C. Cir. 1946)................................4

*Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867 (1984) .......................................17

*El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836 (D.C. Cir. 2010) ..................4

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018) ...............................................................12

*Francis v. Fiacco*, 942 F.3d 126 (2d Cir. 2019) .................................................................7

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) ...........................11, 12, 14

*Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919 (1983) .....................................5

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986)..................................5

*J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ........4, 5, 16

*J.G.G. v. Trump*, No. 25-cv-766, 2025 WL 890401 (D.D.C. Mar. 24, 2025) ......8, 11, 12

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1102 (11th Cir. 2004)........................14

*Kucana v. Holder*, 558 U.S. 233 (2010) ............................................................................13

*Landon v. Plasencia*, 459 U.S. 21 (1982) ...........................................................................7

*Lane Hollow Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 137 F.3d 799 (4th Cir. 1998) ................................................................................................................................6

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)........................16

*Ludecke v. Watkins*, 335 U.S. 160 (1948) ...............................................................2, 3, 4

*Martin v. Mott*, 25 U.S. 19 (1827).............................................................................................5

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) .................................................7

*Nat'l Treasury Emp.'s Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974) ...........................................7

*Nken v. Holder*, 556 U.S. 418 (2009)..........................................................................................15

*Padavan v. United States*, 82 F.3d 23 (2d Cir. 1996).....................................................................5

*Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019)..............................................................................13

*Ralls Corp. v. Comm. on Foreign Inv. in the United States*, 758 F.3d 296 (D.C. Cir. 2014) ...........7

*Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471 (1999) ..................13, 14

*Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204 (4th Cir. 2019).............................................................14

*Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097 (U.S. Apr. 7, 2025)...............................1, 2, 4

*United States ex rel. D'Esquiva v. Uhl*, 137 F.2d 903 (2d Cir. 1943) ..............................................3

*United States ex rel. Gregoire v. Watkins*, 164 F.2d 137 (2d Cir. 1947) .........................................3

*United States ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116 (2d Cir. 1949) .....................................3

*United States ex rel. Jaegeler v. Carusi*, 342 U.S. 347 (1952) ........................................................3

*United States ex rel. Kessler v. Watkins*, 163 F.2d 140 (2d Cir. 1947)............................................3

*United States ex rel. Ludwig v. Watkins*, 164 F.2d 456 (2d Cir. 1947)............................................3

*United States ex rel. Sero v. Preiser*, 506 F.2d 1115 (2d Cir. 1974)...............................................17

*United States ex rel. Von Heymann v. Watkins*, 159 F.2d 650 (2d Cir. 1947) .................................3

*United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429 (S.D.N.Y. 1947) ...................12

*United States v. Tinoso*, 327 F.3d 864 (9th Cir. 2003) .................................................................12

*United States ex rel. Zdunic v. Uhl*, 137 F.2d 858 (2d Cir. 1943) ..................................................3

*Westchester Indep. Living Ctr., Inc. v. State U. of New York, Purchase Coll.*, 331 F.R.D. 279
    (S.D.N.Y. 2019) .......................................................................................................................17

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .....................................................6

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012).......................................................4

*Zadvydas v. Davis*, 533 U.S. 678 (2001)......................................................................................13

**Statutes, Rules and Regulations**

8 U.S.C. § 1225(b) ...................................................................................................12

8 U.S.C. § 1227(a)(4) ..............................................................................................12

8 U.S.C. § 1229a(a)(3) .............................................................................................12

8 U.S.C. § 1231(b)(3)(B) ....................................................................................14, 16

8 U.S.C. § 1531 .......................................................................................................12

50 U.S.C. § 22 ..................................................................................................7, 8, 10

**Other Authorities**

Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005) ...............................................10

*Government*, Black's Law Dictionary (12th ed. 2024) .................................................9

Sheridan, *Government*, A Complete Dictionary of the English Language (3d ed. 1790) ...............9

William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 18:17 (6th ed. 2022) ........17

## INTRODUCTION

The government's brief refuses to squarely accept what the Supreme Court just said in *J.G.G.* on the very issues presented here. On the one hand, the government acknowledges that noncitizens deemed "alien enemies" are "entitled to notice and opportunity to be heard," including "notice 'that they are subject to removal under' the AEA, 'within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs.'" Opp. 7 (quoting *Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *7 (U.S. Apr. 7, 2025)); *see also* Opp. 8, 21, 23, 33 (recognizing the requirement that petitioners be provided with reasonable notice). Yet just pages later the government claims that "the AEA permits absolute discretion to establish the conditions and processes the Executive will use to implement a Presidential Proclamation." Opp. 20. And in a hearing in the Southern District of Texas, the government refused to rule out that a mere 24 hours was reasonable notice in its view. As this Court properly found, however, at the TRO stage, reasonable notice is required. ECF No. 35 at 2.

The government also wrongly asserts that the Proclamation satisfies the statutory requirements of the AEA. But whatever theoretical possibilities might be presented by modern military warfare by groups that actually govern territory, the Proclamation, on its face, comes nowhere close to asserting such a scenario. Nor has the government provided any basis for its claim that this Court cannot enforce rights under the Convention Against Torture ("CAT"). Most remarkably, on the equities, the government compares the situation facing Petitioners to ordinary removal cases, ignoring that the Salvadoran prison is one of the most notorious in the world, where torture and death are common, and where Petitioners may remain for the rest of their lives.

## ARGUMENT

The threshold issue in this case is whether the AEA can be used during peacetime against a criminal organization. And contrary to the government's contention, and as the Supreme Court

has firmly established, the Court can review whether the Proclamation satisfies the AEA's statutory predicates.

# I. THE COURT HAS JURISDICTION TO REVIEW WHETHER THE PROCLAMATION COMPLIES WITH THE AEA.

This Court can review the Proclamation and whether the AEA's statutory predicates have been met. As the Supreme Court recently confirmed, courts can review not only whether an individual "'is, in fact, an alien enemy'" under the AEA, but also "'questions of interpretation and constitutionality' of the Act." *J.G.G.*, 2025 WL 1024097, at *2 (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172 n.17 (1948)). Thus, Petitioners' claims that the AEA's predicates have not been met—because TdA is not a "nation or government," and is not engaged in an "invasion" or "predatory incursion"—are fully within this Court's jurisdiction.[1]

*Ludecke* itself reached the merits of the statutory question presented there: whether a "declared war" no longer existed within the meaning of the Act when "actual hostilities" had ceased—*i.e.*, the "shooting war" had ended. 335 U.S. at 166-70. The Court concluded, on the merits, that the statutory term "declared war" did not mean "actual hostilities," and that once Congress declares war, the war continues for purposes of the AEA until the political branches declare it over. *Id.* at 171. The "political judgment" that *Ludecke* declined to revisit, *id.* at 170, was simply the decision of Congress and the President not to formally declare the war over, *id.* at 169. Nowhere did *Ludecke* suggest that questions of statutory interpretation are beyond the courts' competence. Indeed, four years later, the Court reversed a government World War II removal decision because "[t]he statutory power of the Attorney General to remove petitioner as an enemy

---

[1] Petitioners do not seek to enjoin the President. *See* Opp. 9-10. But he remains a proper respondent because, Petitioners may obtain declaratory relief against him. *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974).

alien ended when Congress terminated the war." *U.S. ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952).

Consistent with *Ludecke*'s recognition that questions about the "construction," "interpretation," and "validity" of the AEA are justiciable, 335 U.S. at 163, 171, courts have reviewed a range of issues concerning the meaning and application of the AEA's terms. *See, e.g.*, *U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 142 (2d Cir. 1947) (interpreting the meaning of "foreign nation or government"); *U.S. ex rel. Zdunic v. Uhl*, 137 F.2d 858, 860-61 (2d Cir. 1943) ("[t]he meaning of [native, citizen, denizen, or subject] as used in the statute . . . presents a question of law"; interpreting "denizen" and remanding for hearing on disputed facts); *U.S. ex rel. Gregoire v. Watkins*, 164 F.2d 137, 138 (2d Cir. 1947) (interpreting the meaning of "native"); *U.S. ex rel. D'Esquiva v. Uhl*, 137 F.2d 903, 905-07 (2d Cir. 1943) (interpreting the meaning of "native" and reviewing executive branch's position on legal status of Austria); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) (interpreting "within the United States"; requiring executive branch to show that the petitioner "refuse[d] or neglect[ed] to depart" under Section 21); *U.S. ex rel. Ludwig v. Watkins*, 164 F.2d 456, 457 (2d Cir. 1947) (interpreting "refuse or neglect to depart" in Section 21 as creating a "right of voluntary departure"); *U.S. ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116, 117-18 (2d Cir. 1949) (interpreting "reasonable time" to depart under Section 22). These kinds of questions—concerning the "construction" and "interpretation" of the AEA, *Ludecke*, 335 U.S. at 163, 171—are precisely the types of questions that this Court can and must review.

The government contends that the AEA "preclude[s] judicial review." Opp. 10 (quoting *Ludecke*, 335 U.S. at 163). But this language from *Ludecke* refers only to the breadth of presidential discretion *after the statute's predicates have been met*, and even then, the statute imposes

enforceable limits. *See, e.g.*, *U.S. ex rel. Ludwig*, 164 F.2d at 457 (enforcing right to depart). The first-order question—whether the statute's powers are available at all—is plainly subject to judicial review, as *Ludecke* itself makes clear.[2]

The government is also wrong to argue that the "political question" doctrine bars this Court from reviewing whether the AEA's predicates are satisfied. Opp. 11-13. The Supreme Court foreclosed that possibility in *J.G.G.* and *Ludecke*, by instructing courts to resolve questions of the AEA's "construction and validity" and "interpretation and constitutionality." *Ludecke*, 335 U.S. at 163, 171; *J.G.G.*, 2025 WL 1024097, at *2; *see also, e.g.*, *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *5-7 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (rejecting government's political-question arguments). More generally, the political question doctrine is a "narrow exception" to courts' jurisdiction, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012), and exists primarily to reinforce the separation of powers, *Baker v. Carr*, 369 U.S. 186, 210 (1962). But applying the doctrine here would undermine Congress's constitutional authority, because it would render the limits that Congress wrote into the statute unenforceable. Petitioners are not aware of any Supreme Court decision that has found a statutory claim non-justiciable. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 855 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) ("The Supreme Court has never applied the political question doctrine in a case involving alleged *statutory* violations.").

---

[2] Respondents also cite language from a handful of lower-court cases to argue that judicial review of the AEA's statutory predicates is limited. Opp. 10-11. Not only do these cases predate *Ludecke*, but they do not uniformly support Respondents. For example, in *Citizens Protective League v. Clark*, 155 F.2d 290, 292, 295 (D.C. Cir. 1946), the court reviewed whether the proclamation was within "the precise terms" of the AEA, reviewed whether the AEA was impliedly repealed, and decided plaintiffs' constitutional claim on the merits. Regardless, insofar as any of these cases would limit review of the AEA's predicates, they are superseded by the Supreme Court's subsequent decisions in *Ludecke* and *J.G.G.* concerning the courts' power to review the construction, interpretation, and validity of the statute.

The government's reliance on *Padavan v. United States*, 82 F.3d 23 (2d Cir. 1996), and *State of California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997), is misplaced. Opp. 11. *Padavan* did not involve a statutory claim, and the court's broad-brush analysis is at odds with the Supreme Court's subsequent guidance about the political-question doctrine. *See, e.g.*, *Zivotofsky*, 566 U.S. at 195; *see also J.G.G. v. Trump*, 2025 WL 914682, at *7 (*California* is "inapposite" and "cuts directly against the government"). To the extent *Padavan* is relevant at all, its recognition that immigration does not constitute an "invasion" supports Petitioners. *Padavan*, 82 F.3d at 28.

The government's remaining arguments are baseless. The interpretation of the AEA's terms is in no way "textually committed" by the Constitution to other branches, and certainly not to the executive branch alone, as even Respondents implicitly seem to recognize. *See* Opp. 12. (describing "foreign affairs" and immigration" as two areas committed by the Constitution "to the political branches (emphasis added)). The government is also wrong to argue that there are no "manageable standards" for interpreting the AEA's terms against the factual record. Opp. 12. It relies on *Martin v. Mott*, 25 U.S. 19 (1827), but that case addressed a separate statute concerning the use of militias, and its language about executive power rested on the President's need to maintain discipline in military service as leader of the militia. *Id*. at 30-31. As the Supreme Court explained in *Japan Whaling Association*, "interpreting congressional legislation is a recurring and accepted task for the federal courts." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 229-30 (1986) (rejecting argument that political question doctrine barred review).

Finally, the government cannot elide the AEA's statutory bounds by pointing to the President's inherent Article II power. Opp. 9. The President has no constitutional power to unilaterally remove people. Under Article I, Congress holds plenary power over immigration. *See INS v. Chadha*, 462 U.S. 919, 940 (1983). The AEA operates as a specific delegation of authority

from Congress to the President, a delegation that Congress limited to instances of war or imminent war by a foreign nation or government. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-388 (Jackson, J., concurring).

## II.    PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    Respondents Have Not Provided the Process Required Under the AEA and the Due Process Clause.

Respondents' argument that the AEA permits the executive branch "absolute discretion to establish the conditions and processes" for implementing the Act, Opp. at 20-21, has already been squarely rejected by binding Supreme Court precedent. Respondents' purported notice procedures—consisting of just two sentences—are wholly inadequate. ECF No. 41-4 ¶ 8. Mr. Elliston testifies that the government's newly adopted procedures will "require that each such alien by provided individual notice, in a language the alien understands, of the government's determination that the alien is subject to removal as an alien enemy under the Proclamation," and "[t]he notice will allow the alien a reasonable time to file a petition for a writ of habeas corpus." *Id.* Respondents' notice is deficient.

Respondents' representation that the government will allow some undisclosed "reasonable time" to file a habeas petition is highly suspect, especially given that the government told another Court that they were not ruling out providing only 24 hours' notice. *J.A.V. v. Trump*, No. 1:25-cv-072, Apr. 11 Oral Arg;[3] *see also Lane Hollow Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 137 F.3d 799, 807 (4th Cir. 1998) (collecting cases holding that several days notice does not satisfy due process). Twenty-four hours would be unreasonable under any circumstances but it is especially unreasonable given that these individuals are likely unrepresented and unfamiliar with

---

[3] Due to audio quality issues, a transcript is not yet available for this hearing.

how to file a habeas action. And nowhere in the government's brief or declaration does it disown the 24-hour representation.

The government states only that it will notify Petitioners of their designation but not the factual basis for that designation. *See Ralls Corp. v. Comm. on Foreign Inv. in the United States*, 758 F.3d 296, 318 (D.C. Cir. 2014) (individuals "the right to know the factual basis for [government] action and the opportunity to rebut the evidence supporting that action are essential components of due process."). The government also does not claim that notice procedures will alert individuals of their right to petition for habeas and the deadline for doing so. As such, the "means employed" are not "desirous of actually informing" class members of their right to timely petition for habeas. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950).

Additionally, the scant process laid out by Mr. Elliston does not meet the "minimum requirement of due process." *Landon v. Plasencia*, 459 U.S. 21, 35 (1982). The government does not outline any procedure by which class members can notify a court that they wish to petition for habeas. Respondents' process also does not require the government to notify counsel (either class counsel or individual immigration counsel) of the designation. *Cf. Francis v. Fiacco*, 942 F.3d 126, 143-44 (2d Cir. 2019) ("merely notifying a prisoner that his liberty might be in jeopardy and then placing upon him the burden of navigating the legal system, from his prison cell and without counsel, does not satisfy the requirements of the Due Process Clause"). And it does not clarify whether the government will facilitate phone calls between class members and counsel during the period to apply for habeas.

Notice is essential for another reason specific to the AEA: because notice allows individuals to exercise their right to voluntarily depart, rather than face detention or forcible removal under the AEA. Respondents claim that under 50 U.S.C. § 21 the President may remove

7

individuals without first providing an opportunity for voluntary departure. Opp. 25-26.   But Section 21 contains no such exception, and, as the Second Circuit has held, the right to voluntary departure is a "statutory condition precedent" to removal under Section 21. *U.S. ex rel. Ludwig*, 164 F.2d at 457; *see also J.G.G. v. Trump*, No. 25-cv-766, 2025 WL 890401, at *14 (D.D.C. Mar. 24, 2025). Indeed, even during World War II, courts interpreting the AEA consistently recognized that "alien enemies" retained the right to voluntary departure. *See, e.g.*, TRO Mot. at 19-20 (collecting cases).[4]

In sum, the AEA and due process, as understood by the Supreme Court unequivocally require that Petitioners receive meaningful notice and opportunity to obtain judicial review. Respondents' opaque notice process is unlawful.

### B.    The Proclamation Fails to Satisfy the AEA.

*First*, there is no invasion or predatory incursion within the meaning of the AEA. Respondents offer no serious response to Petitioners' arguments demonstrating that the statutory and historical context of "invasion" and "predatory incursion" indicate that Congress intended to cover *military* actions. *See* TRO Mot. 15 (applying *noscitur a sociis*); *id.* at 13-15 (discussing historical context in which, in 1798, "invasion" and "predatory incursion" referred to military actions). Instead, Respondents assert sweepingly broad definitions of "invasion" and "predatory incursion" wholly unmoored from the statutory and historical context. Respondents' proposed definitions would unlock staggering wartime presidential power in situations well short of the

---

[4] Respondents also mistakenly invoke Section 22's exception for those "chargeable with actual hostility, or other crime against public safety" to suggest that the right to voluntary departure may be categorically denied. Opp. 25-26 (citing 50 U.S.C. § 22). But that exception necessarily requires a specific, individualized finding—each noncitizen must be "chargeable" with *actual* hostility or a crime against public safety—and thus requires a process that goes beyond mere designation as an alien enemy under Section 21. *Kessler*, 163 F.2d at 141 (describing individualized findings regarding an alien enemy's dangerousness).

statute's intended scope. And, understandably, Respondents' brief does not make any serious claim that TdA's actions in the U.S. are military in nature. Notably, Respondents' own declarant about TdA never mentions military attacks, and notably states 15 times that TdA engages in "crimes" or "criminal" behavior that should be addressed through "available *law enforcement* tools." *See* ECF No. 41-1 ¶ 21. None of Respondents' cases are to the contrary.

*Second*, any purported invasion is not perpetrated by a "foreign nation" or "foreign government." Respondents readily admit that TdA is not a "nation" within the meaning of the AEA. Opp. 19. They instead contend that TdA is sufficiently intertwined with the Venezuelan government to meet the statutory predicate. But the statute requires a "nation." TRO Mot. 16-18. The Proclamation never says that TdA is the "governing authority in the areas where it operates." *See* Opp. 19. Instead, it makes vague allegations that the Venezuelan government has ceded some level of control to various criminal organizations, not limited to TdA. But that does not establish that TdA is remotely acting as an independent government, under either modern or founding-era definitions. *See, e.g.*, Sheridan, *Government*, A Complete Dictionary of the English Language (3d ed. 1790) ("Form of community with respect to the disposition of the supreme authority; an establishment of legal authority; administration of publick affairs"); *Government*, Black's Law Dictionary (12th ed. 2024) ("The sovereign power in a country or state; the political and administrative authority of a state."). Respondents' argument that TdA's de facto territorial control somehow renders it a "government" is further belied by the fact that the Proclamation names *Venezuela*, not TdA, as the relevant "foreign government."

Respondents attempt to bolster the President's invocation of the AEA against an admittedly non-state actor by pointing to the government's history, in other contexts, of using war powers against such entities. What controls here is the statutory text. Congress knows how to delegate

executive authority to act militarily against non-state actors, and at times it does so under *other* legal frameworks. *See* Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005) ("Congress was aware that it was authorizing the President to use military force against non-traditional actors."). But Congress specifically limited the delegation here to attacks by a "foreign nation or government"—plainly state actors. The historical context of the AEA itself indicates that it was intended to address conflicts with foreign sovereigns, not a criminal gang. *See* TRO Mot. 18 (citing historical record).

Respondents dismiss the AEA's treaty clause as not a "prerequisite to inclusion." Opp. 19. While a signed treaty between the U.S. and the parallel sovereign is not necessarily a prerequisite to invocation of the AEA, the statute makes clear that foreign nations and governments are the kinds of state actors that would have the authority to make such a treaty with the U.S. *See* 50 U.S.C. § 22. And Respondents simply do not engage with Petitioners' point that the Proclamation itself admits that TdA has "members," not "natives, citizens, denizens, or subjects," as required by the statutory text.

In short, the Court need look no further than the face of the Proclamation to find that the President's invocation runs far afield of any "foreign nation or government." The facts set forth in the attached declarations by Petitioners' experts, Rebecca Hanson, Andres Antillano, and Steven Dudley, only confirm what the Proclamation itself acknowledges: TdA is neither a nation nor a government within the meaning of the statute. In fact, Respondents' declarants, Marcos Charles and Selwyn Smith, are in accord. TdA is not an organized "nation" or "government."[5] Nor is TdA

---

[5] *Compare* Smith Decl. ¶ 10, ECF No. 41-1 (TdA is "a loosely organized criminal syndicate"), *and* Charles Decl. ¶ 7, ECF No. 41-2 (TdA "leadership splintered" in 2023), *with* Exh. B (Antillano Decl.) ¶ 11, (since 2023, "the group's coordinating role appears to have weakened"), *and* Exh. A (Hanson Decl.) ¶ 16 ("the gang has become increasingly fragmented and

taking any concerted action on behalf of the Venezuelan government within the United States.[6]

Indeed, Respondents' primary declarant on TdA points out that the Venezuelan government is

investigating multiple members of TdA—directly undermining their argument that the two entities

are "indistinguishable." *See* Smith Decl. ¶ 24, ECF No. 41-1.

### C.    The Proclamation Violates the Specific Protections that Congress Established for Noncitizens Seeking Humanitarian Protection.

Summary removal is unlawful for an additional independent reason: it fails to provide

designated individuals with an opportunity to seek protection from persecution and torture.

Respondents argue that there is no direct conflict between the CAT, and removals under the AEA

because the United States avoids removals to countries where noncitizens will likely be tortured.

Opp. 28 But that assertion ignores evidence about the Salvadoran prison. *See* Exh. D (Bishop

Decl.); Exh. E (Goebertus Decl.). More fundamentally, it ignores the central defect in the

Proclamation: it categorically forecloses any opportunity for individuals to invoke CAT protections

to show they would face torture. Indeed, Plaintiffs are not only barred from raising a torture claim

but are also effectively precluded from doing so because Defendants do not inform them of the

country to which they will be removed—directly contravening protections enacted by Congress.

TRO Mot. 20.

Respondents also try to evade CAT protections by arguing that the INA and AEA provide

their own separate removal systems.  Opp. 26.  Although they cite *Huisha-Huisha v. Mayorkas*, 27

F.4th 718 (D.C. Cir. 2022), they misunderstand its import. *J.G.G.*, 2025 WL 890401, at *15

_____

decentralized since 2023"), *and* Exh. C (Dudley Decl.) ¶ 22 ("since 2023, the group has become
more dispersed and holds less sway").

[6] *Compare* Smith Decl. ¶ 9, ECF No. 41-1 (TdA is "a loosely affiliated collection of independent
calls committing disorganized and opportunistic crimes of violence"), *with* Exh. B (Antillano
Decl.) ¶ 13 (TdA is "a decentralized and uncoordinated group"), *and* Exh. A (Hanson Decl.) ¶ 17
(suspected TdA crimes "do not indicate a systemic criminal enterprise"), *and* Exh. C (Dudley
Decl.) ¶ 24 ("no evidence of a structured or operational presences in the United States").

(*Huisha-Huisha* is "on all fours" with AEA removal cases). Both the AEA and INA could—and therefore must—be given effect. *Huisha-Huisha*, 27 F.4th at 721, 731-32 (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When . . . confronted with two Acts of Congress allegedly touching on the same topic," a court "must strive to give effect to both.") (cleaned up)). Because no genuine conflict exists between the AEA and INA, this Court must harmonize these statutes by concluding that FARRA's protections apply to removals under the AEA. *See J.G.G.*, 2025 WL 890401, at *15 ("Since both statutes can be given meaning, the Court must do so[.]").

> **D.      The Proclamation Violates the INA's Procedural Requirements.**

Respondents contend that the AEA and INA constitute wholly separate removal regimes, and that the INA's procedural mechanisms are therefore irrelevant. Opp. 26-27. Their reliance on *United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429 (S.D.N.Y. 1947), is misplaced. Opp. 26. That decision predates the INA and offers no meaningful insight into how the modern, exclusive removal framework applies to AEA removals. *See* 8 U.S.C. § 1229a(a)(3); *United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003). Unlike the AEA, the INA sets forth detailed removal procedures and expressly provides exceptions for specific categories of noncitizens, including those who pose national security risks. *See, e.g.*, 8 U.S.C. §§ 1227(a)(4), 1229a(a)(3), 1531 *et seq*. Congress knew of the AEA when it enacted the INA and yet deliberately declined to exclude AEA-based removals from this statutory scheme—even as it carved out express exceptions elsewhere. *See, e.g.*, §§ 1225(b), 1531.

## III.    NONE OF THE INA PROVISIONS IDENTIFIED BY THE GOVERNMENT BARS AN INJUNCTION ON TRANSFERS OUT OF THIS DISTRICT.

Respondents do not contend that any of the INA's jurisdictional provisions prevent the Court from reviewing whether individuals can be removed outside the country under the AEA. That is understandable since the government's position is the AEA process exists outside the

immigration process. Opp. 26-27.   But Respondents contend that the INA's jurisdictional provisions do bar this Court from prohibiting transfers within the United States.  Opp. 13-14. Even assuming the government could transfer people outside of this District, the Court would retain jurisdiction over this case because the class habeas petition and motion for class certification were filed prior to any transfer.  In any event, Respondents are wrong that the INA's jurisdictional provisions bar this Court from prohibiting transfers within the United States.

As an initial matter, if the INA's jurisdictional provisions do not apply to the removal of individuals here—which Respondents say they do not because "the INA and AEA are distinct mechanisms for effecting the removal" of noncitizens, Opp. 26-27—then they similarly do not apply to the transfer of individuals inside the country. Regardless, none of the INA provisions apply to claims that Petitioners raise.

*First*, both 8 U.S.C. § 1252(a)(2)(B)(ii) and § 1252(g) apply only to *discretionary* determinations. *See Kucana v. Holder*, 558 U.S. 233, 247 (2010) (holding that § 1252(a)(2)(B)(ii) applies only to those decisions where Congress has "set out the Attorney General's discretionary authority in the statute"); *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 482 (1999).  Here, Petitioners raise non-discretionary statutory and constitutional challenges; in other words, Petitioners are not challenging *discretionary* actions that the provisions are meant to shield from review. *See Zadvydas v. Davis*, 533 U.S. 678, 688 (2001)*; Ragbir v. Homan*, 923 F.3d 53, 63 (2d Cir. 2019).[7]

---

[7] Respondents' cases do not support a contrary result. *Van Dinh v. Reno* predates *Kucana*, and its failure to identify any discretion specified by statute is flatly inconsistent with the Supreme Court's holding. 197 F.3d 427 (10th Cir. 1999).   *Dorval v. Barr*, is even further afield as the court held that no order on transfers was necessary since it was already grating the habeas petition. 414 F. Supp. 386, 396 (W.D.N.Y. 2019). Likewise, both *Liu v. INS*, 293 F.3d 36, 41 (2d Cir. 2002), and *Tercero v. Holder*, 510 F. App'x 761, 766 (10th Cir. 2013), both involved a challenge to removal orders under the *INA*.

*Second*, the government mistakenly claims that 8 U.S.C. § 1231(g) provides discretionary authority for transfers (and hence bars injunctions under § 1252(a)(2)(B)(ii), § 1252(g), and § 1252(f)(1)), but nothing in § 1231(g) mentions or even authorizes "transfer," let alone commits transfer decisions to the agency's unreviewable discretion. *See Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 209-10 (4th Cir. 2019); *Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 20 (1st Cir. 2007). Likewise, because § 1231(g) does not address transfers, they are not encompassed within the actions that cannot be enjoined under § 1252(f)(1). And again, *transfers* (especially pursuant to the AEA) do not fall within the three specific, discrete actions covered under § 1252(g). *See AADC*, 525 U.S. at 482.

*Lastly*, the government cites 8 U.S.C. § 1252(a)(4) and argues that claims under the CAT may only be raised in immigration proceedings followed by review in the circuit. Opp. 15. But that argument is wholly untenable under the government's own reasoning, since the government is claiming that the AEA overrides the INA and for that reason Petitioners can be removed notwithstanding their ongoing immigration proceedings. For that reason, Petitioners' claims that their AEA removals would violate CAT are reviewable by this Court; otherwise, the government could avoid its mandatory duty to send individuals to torture simply by using a different mechanism. *See Huisha-Huisha*, 27 F.4th at 730 (reviewing plaintiffs' claim raised, in district court, that the government could not bypass protections against persecution or torture simply by using the public health laws rather than the INA).[8]

---

[8] The All Writs Act permits a court to "enjoin almost any conduct which, left unchecked, would have the practical effect of diminishing the court's power to bring the litigation to a natural conclusion." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1102 (11th Cir. 2004). As a practical matter, if the government were permitted to transfer Petitioners and class members outside the District to distant detention centers, counsel will face obstacles in gathering evidence and presenting facts relevant to the claims in this case, including whether or not Petitioners and class members are properly designated as alien enemies under the Proclamation.

## IV.    EQUITABLE FACTORS WEIGH IN PETITIONERS' FAVOR.

### A.    Petitioners Face Irreparable Harm upon Removal to El Salvador.

Respondents argue that the burden of removal does not constitute requisite irreparable harm—but this case does not involve run-of-the-mill deportations. ECF No. 31 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Indeed, there is no shortage of evidence showing that Petitioners will face life threatening conditions, persecution and torture in El Salvador. *See* Exh. D (Bishop Decl.) ¶¶ 2, 21, 33, 37, 39, 41, ECF No. 44-4 (describing "harsh and life threatening" conditions in these prisons, including through widespread physical abuse, waterboarding, electric shocks, implements of torture and other mistreatment); Goebertus Decl. ¶¶ 3-4, 8, 10, 17, ECF No. 44-3 (noting "cases of torture, ill-treatment, incommunicado detention, severe violations of due process and inhumane conditions"); *see also* Nayib Bukele, X.com, (Mar. 16, 2025, 5:13AM ET) (noting Petitioners may never get out of CECOT).

The government's reliance on *Nken* is misplaced not only because the Supreme Court there stated there is a public interest in preventing immigrants from being wrongfully removed, particularly to countries where they face substantial harm, but also because the Court relied on the government's concession that individuals could return to the U.S. if they prevailed in their cases. 556 U.S. at 435. But as this Court is undoubtedly aware, the government has taken the position that even if it errs—as it did in removing a Salvadoran man to CECOT—courts have no ability to remedy the situation. *See Abrego Garcia v. Noem*, No. 8:25-cv-951, ECF No. 11-3 ¶¶ 11-15 (D. Md. Mar. 31, 2025); *id.* ECF No. 12-1, at *8 (Apr. 1, 2025). If the real risk of swift, wrongful removal on flimsy evidence, without adequate notice or process, to imprisonment abroad in a prison system known for torture and abuse—with the possibility of return being unknown—is not irreparable harm, it is hard to imagine what would qualify.

### B.    The Balance of Equities and Public Interest Weighs in Favor of Petitioners.

The government attempts to justify its extraordinary use of the AEA during peacetime to summarily deport individuals without due process by relying on vague assertions that an injunction may interfere generally with the "President's statutory and constitutional authority." ECF No. 31. But the government cannot engage in unlawful conduct contrary to statutory and constitutional law in order to meet its political goals. *See*, *e.g., League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action").

Respondents make conclusory claims of harm to foreign policy negotiations. ECF No. 32 ("foreign actors *may* 'change their minds'") (emphasis added). But that pales in comparison to the concrete harms Petitioners face. *J.G.G.*, 2025 WL 914682, at *11 ("Equity will not act 'against something merely feared as liable to occur at some indefinite time.'") (citation omitted). And as noted, Respondents remain free to detain and remove individuals they believe to be security threats under existing statutory authority and by lawful means. *See e.g.*, 8 U.S.C. §§ 1158(b)(2)(A)(ii)-(iii); *id.* § 1231(b)(3)(B)(ii)-(iii); *see also id.* §§ 1226(c),1231(a)(6).

Respondents' attempts to demonstrate irreparable harm based on the Court enjoining transfers to other districts where Petitioners may be at risk of being deported under the AEA likewise fall flat. The government fails to explain why the eight individuals that fall under the Court order could not be detained in one of the 26 currently available beds in Orange County Jail or one of the several large facilities within driving distance. Fleischaker Decl. ¶¶ 7-11 (former longtime ICE official explaining why Respondents' claims are inaccurate).

## V.    CLASS CERTIFICATION WAS AND CONTINUES TO BE APPROPRIATE.

Respondents argue for vacatur of class certification based on a motion that has yet to be filed. Opp. 24. Their argument seems premised on the lack of numerosity and the lack of "opt-

outs" for Rule 23(b)(2) classes, *id.*, but neither justifies decertification, especially at this stage when the government has been less than forthcoming about their notice protocols.

The class is defined as all noncitizens in custody in this District "who were, are, or will be subject to" the March 2025 AEA Proclamation. ECF No. 34 at 1. While Respondents note that only eight people with alleged TdA membership are detained at the Orange County Jail, Dawson Dec. ¶ 30, ECF No. 41-5, this excludes (1) those who have been and are currently designated as alien enemies in custody elsewhere in the Southern District of New York (including in criminal custody or the non-detained docket), and (2) any other people who are designated in the future. "[B]ecause the class's composition is fluid and changing," and "the identities of some class members are unknowable to plaintiffs," joinder is impracticable, favoring certification. *Westchester Indep. Living Ctr., Inc. v. State U. of New York, Purchase Coll.*, 331 F.R.D. 279, 290 (S.D.N.Y. 2019). The Second Circuit has, in particular, articulated why class action treatment is appropriate in the habeas context where many of the class are illiterate and lack sufficient education, and thus are unable to bring their own claims. *See United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125-26 (2d Cir. 1974); *Abdi v. Duke,* 323 F.R.D. 131, 140 (W.D.N.Y. 2017) ("The fluid composition of a prison population is particularly well-suited for class status[.]").

And if the only question that remains is whether a given individual is, on their particular facts, a TdA member, at that point, individual habeas actions will be appropriate. Any class member claims that are individualized in nature do not merge into a class judgment and are not barred thereafter. *Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 880 (1984); *see generally*, William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 18:17 (6th ed. 2022).

17

## VI.   THE COURT SHOULD NOT REQUIRE PETITIONERS TO PROVIDE SECURITY.

Respondents fail to engage with Petitioners' authority that district courts are "vested with wide discretion in the matter of security," including the option "to require no bond." TRO Mot. 28 (collecting cases).  Nor are Respondents correct that this class of detained immigrants are not indigent and should be made to pay a bond to assert their statutory and constitutional rights See ECF No. 2-2 ¶¶ 1-2; ECF No. 2-3 ¶¶ 1,5.

Dated: April 17, 2025                              Respectfully Sumbitted,
       New York, NY

                                                   */s/ Daniel Galindo*
                                                   Daniel Galindo
                                                   Lee Gelernt
                                                   Ashley Gorski
                                                   Patrick Toomey
                                                   Omar C. Jadwat
                                                   Hina Shamsi
                                                   Sidra Mahfooz*
                                                   AMERICAN CIVIL LIBERTIES UNION
                                                       FOUNDATION
                                                   125 Broad Street, 18th Floor
                                                   New York, NY 10004
                                                   Tel: (212) 549-2660
                                                   dgalindo@aclu.org

                                                   My Khanh Ngo*
                                                   Noelle Smith*
                                                   Oscar Sarabia Roman *
                                                   Cody Wofsy*
                                                   AMERICAN CIVIL LIBERTIES UNION
                                                       FOUNDATION
                                                   425 California Street, Suite 700
                                                   San Francisco, CA 94104
                                                   Tel: (415) 343-0770
                                                   mngo@aclu.org

                                                   Amy Belsher
                                                   Robert Hodgson
                                                   Molly Biklen
                                                   NEW YORK CIVIL LIBERTIES UNION
                                                       FOUNDATION
                                                   125 Broad Street, 19th Floor

18

New York, NY 10004
Tel: (212) 607-3300
abelsher@nyclu.org

*Attorneys for Plaintiffs-Petitioners*
*\*Pro hac vice motions forthcoming*

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(c)

The total word count, according to the word count function of Microsoft Word, the word processing program used to prepare this document, of all printed text in the body of the brief, exclusive of the caption, table of contents, table of authorities and signature block, is 5,759.

Dated: April 17, 2025                    */s/Daniel Galindo*
      New York, N.Y.                    Daniel Galindo