# EXHIBIT A

# DECLARATION OF REBECCA HANSON,

## ASSSISTANT PROFESSOR OF SOCIOLOGY AND CRIMINOLOGY AT THE UNIVERSITY OF FLORIDA

I, Rebecca Hanson, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

**Summary**

1. The Venezuelan gang Tren de Aragua ("TdA") is a loose, disorganized group. There is no evidence that the Maduro regime controls TdA or that the Maduro government and TdA are intertwined. Nor is there evidence that the Maduro regime has directed the TdA to enter the United States or directed any TdA activities within the country. Moreover, it has no structured presence in the United States, and its members cannot be identified using indicia like tattoos or hand gestures.

**Qualifications**

2. I received my Ph.D in Sociology from the University of Georgia in 2017. My doctoral dissertation was entitled "Civilian Policing, Sociality Revolution, and Violent Pluralism in Venezuela."

3. Currently, I am an Assistant Professor at the University of Florida. I have a joint appointment in the Departments of Sociology & Criminology and Law, and the Center for Latin American Studies. I am also the Director of the University of Florida's International Ethnography Lab. I am currently a visiting fellow at Harvard's David Rockefeller Center for Latin American Studies and Notre Dame's Kellogg Institute for International Studies.

4.  I have received various grants and other funding related to my work on Venezuela, including from the Fulbright Association and Development Bank of Latin America. Through these grants, I have studied topics such as policing, gangs, politics, and incarceration in Venezuela.

5.  I have published numerous peer reviewed articles covering topics from militarized policing, gangs and other armed actors in Venezuela, and the security policies of the governments of Hugo Chávez and Nicolás Maduro. My work has been published in the *Journal of Latin American Studies*; *Crime, Law, and Social Change*; and *Latin American Research Review*, among others. My newest book, Policing the Revolution: The Transformation of Coercive Power and Venezuela's Security Landscape During Chavismo, was published by the Oxford University Press in 2025.

6.  I teach courses on Criminological Theory, Crime and Violence in Latin America, Gangs and Society, and Law and Order in Latin America.

7.  My opinions derive from over a decade of studies that I have carried out specific to the topics of policing, violence, and gangs in Venezuela. Since 2010, I have conducted extensive, long-term ethnographic research and interviews with over 200 Venezuelan police officers as well as dozens of interviews with gang members and residents of communities where these gangs operate. I regularly collaborate with Venezuelan scholars who develop rigorous and reliable empirical research in that country.

8.  Based on my experience, I have been asked to assess the government's description of the TdA and how it is identifying potential TdA members. My conclusions are set out below.

9. I have read the Proclamation and the Cerna Declaration (ECF No. 26) submitted in this case.

10. I provide this declaration based on my personal and professional knowledge.

**Findings and Opinions**

11. I have been closely following reporting and politicians' statements regarding recent deportations of Venezuelan migrants and claims about deportees being members of TdA. Most of the claims about Tren de Aragua, its relationship to the Maduro government, and its supposed presence within the United States lack credible evidence to substantiate them or completely contradict what empirical research has demonstrated.

12. The TdA is a relatively new gang that emerged in Tocorón prison around 2014. While there are no reliable estimates of current TdA membership, between 2014 and 2017 the gang most likely had at most 200 to 300 members. Given a current lack of rigorous research and verifiable data I am skeptical of the U.S. government's ability to correctly estimate current membership.

13. TdA does not act as the de facto government in any region of Venezuela.

14. TdA does not have political objectives, and is not an arm of the Maduro government.

15. The gang's established and existing revenue streams and criminal work is largely outside the United States. There is no evidence to suggest that drug or arms trafficking or transnational extortion are core sources of income for the group. The TdA is a relatively new gang with limited resources and therefore relatively limited capacity as compared to peer gangs.

16. The gang has become increasingly fragmented and decentralized since 2023, further limiting its capacity. That year the Venezuelan government began cracking down on TdA, including when they sent 11,000 soldiers to raid the Tocorón prison that had been a hub of TdA activity. Ultimately, the TdA is of modest prominence and is nowhere near as established as other gangs in Central and South America.

17. It is absolutely implausible that the Maduro regime controls TdA or that the Maduro government and TdA are intertwined. The relationship between the Maduro government and TdA is largely antagonistic. The relationship is best characterized as conflictive and competitive, with brief moments of coordination when the government and TDA benefit economically and politically from this coordination. For example, the government has, in the past, sometimes turned a blind eye to illicit activities in exchange for a reduction in visible criminal activity. But there are no clear, direct, and stable links between TdA and the Maduro government.

18. The government's proclamation mentions Tareck El Aissami. Mr. El Aissami has not been an important figure in the Maduro regime for the past several years. Maduro's government arrested Mr. El Aissami in April 2024 on charges that he was part of a scheme through which hundreds of millions of dollars in state oil proceeds seemingly disappeared. He remains incarcerated. At present, the relationship between Mr. El Aissami and the Maduro regime is conflictual and antagonistic.

19. There is no credible evidence that TdA has a foothold as a criminal organization within the United States. TdA activities are neither widespread nor coordinated within the United States. The profile of suspected TdA crimes in the United States do not indicate a systemic

4

criminal enterprise. Rather, the vast majority of arrests of suspected TdA members in the United States have been for crimes like shoplifting and cell phone robbery—crimes commonly handled by police departments.

20. Nor is there any credible evidence to establish that the Maduro regime has directed the TdA to enter the United States or directed any TdA activities within the country. Maduro simply does not control the gangs in Venezuela, TdA included. Moreover, there is no credible evidence that the migration of young Venezuelan men, with or without criminal records, to the United States has been directed by the Maduro government. Instead, research has found that this migration is the result of the horrific economic and humanitarian crisis that began in 2014 and left many families in the country without access to food, healthcare, water, and electricity. Human rights organizations have also found that police abuse and repression and human rights violations have played a role in some Venezuelans' decisions to migrate.

21. There is currently no credible way to link Venezuelan migrants in the United States to TdA. The methods identified by the government are not reliable.

22. Tattoos are not a reliable way to identify members of the group. The TdA, and gangs more generally in Venezuela, do not have a history of using tattoos to indicate membership. Indeed, no credible scholarship or studies of gangs in Venezuela indicate tattooing as a shared common practice among gang members. TdA members may, of course, have tattoos, but this is not part of a collective identity. In fact, many young Venezuelans who have no association with the TdA individually opt for personal tattoos based on personally meaningful symbols or popular culture iconography. The government's reliance on tattoos appears to result from an incorrect conflation of gang practices in Central America and Venezuela. In countries

like El Salvador and Honduras, gangs have long used tattoos to indicate membership and identity.

23. Hand gestures are also not a credible way to identify the TdA. There are no formal hand gestures associated with the group. Overall, I am aware of no iconography or unifying cultural motifs, such as symbols, insignias, logos, notations, graffiti tags, music, or drawings associated with it. Nor does the gang have a typical manner of dress. Other gangs in Central and South America might have certain hand gestures, symbols, or dress associated with them, but not the TdA.

24. I have reviewed law enforcement bulletins provided to me through a Freedom of Information Act request by the nonprofit Property of the People. These documents indicate various tattoos that law enforcement agencies believe to be associated with TdA. Far from being indicative of TdA members, the tattoos identified were merely representative of the cultural milieu of poor and working-class neighborhoods in Venezuela. For example, the government highlighted tattoos with the phrase "Real Hasta la Muerte." That is an album by a Puerto Rican rapper that is popular in Venezuela. The bulletin from the Chicago Homeland Security Investigations Office also said that wearing a Chicago Bulls basketball jersey, especially a Michael Jordan jersey, was an identifier of TdA. But NBA basketball—and Michael Jordan in particular—are very popular in Venezuelan culture. Venezuelans also take great pride when their fellow Venezuelans are on U.S. professional sports teams, especially baseball and basketball teams. Using sports attire from U.S. professional sports teams with Venezuelan nationals on them to identify TdA membership is simply not credible.

25. The government has also stated it uses previous criminal records to identify TdA members in the United States. However, the U.S. government has no reliable access to criminal records within Venezuela. Given the current contentious relationship between the U.S. and Venezuelan governments, it is implausible that Venezuelan security institutions would share these records with ICE or other police departments in the United States.

26. Indeed, statements made by ICE demonstrate an alarming unfamiliarity with the TdA. For example, on March 21, 2025, ICE agents announced they had arrested two TdA gang members from Venezuela that had been hiding in the U.S. since 2003.[1] However, the assertion that TdA gang members have been in hiding in the U.S. since 2003 is illogical given that TdA did not exist until 2014.

27. At bottom, the TdA is a loose, disorganized group that has weakened significantly since 2023. It is not acting at the direction of the Maduro regime, it has no structured presence in the United States, and its members cannot be identified using indicia like tattoos or hand gestures.

28. Finally, individuals who are erroneously labeled as TdA members face enormous risk if they are returned to Venezuela. Being labeled as a TdA associate puts that person in grave danger because they may be targeted by police and other gang members.

Executed on 27th of March, 2025, in Notre Dame, Indiana.

Rebecca Hanson

---

[1] *See* ICE, X.com (Mar. 21, 2025), *available at* https://x.com/ICEgov/status/1903250363332903128.