P4MBGFFH

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   G.F.F. and J.G.O., on their
     own behalf and on behalf of
 4   others similarly situated,,

 5            Petitioners,

 6       v.                              25 Civ. 2886 (AKH)

 7   DONALD J. TRUMP, in his
     official capacity as President
 8   of the United States, et al,

 9            Respondents.
                                         Hearing
10   ------------------------------x
                                         New York, N.Y.
11                                       April 22, 2025
                                         2:30 p.m.
12
     Before:
13
                     HON. ALVIN K. HELLERSTEIN,
14
                                         District Judge
15

16                      APPEARANCES

17   AMERICAN CIVIL LIBERTIES UNION
     FOUNDATION IMMIGRANTS' RIGHTS PROJECT
18            Attorneys for Petitioners
     BY:  LEE GELERNT
19        DANIEL GALINDO
          OMAR JADWAT
20        HINA SHAMSI

21   UNITED STATES DEPARTMENT OF JUSTICE
     CIVIL DIVISION
22            Attorneys for Respondent
     BY:  TIBERIUS DAVIS
23        JEFFREY OESTERICHER

24

25
```

P4MBGFFH

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your

3     appearance for the record.

4          MR. GELERNT:  Lee Gelernt for petitioners.  Good

5     afternoon, your Honor.

6          THE COURT:  Introduce your colleagues as well.

7          MR. GELERNT:  This is Dan Galindo also from ACLU for

8     petitioners, Omar Jadwat from the ACLU for the petitioners, and

9     Hina Shamsi for the petitioners as well.

10          MR. DAVIS:  Good afternoon, your Honor. Tiberius Davis

11     on behalf of the United States.  And with me is Jeffrey

12     Oestericher with the Southern District of New York.

13          THE COURT:  Good afternoon.  I have to leave at

14     4 o'clock today.  If we're not finished, we'll go over to 10:30

15     tomorrow morning and finish up then.  If I should have to

16     reserve decision, I would tend to extend the TRO from tomorrow

17     which is the 14th day until 14 days thereafter or May 7.  Is

18     there any objection to that, government?

19          MR. DAVIS:  Your Honor, the government does object to

20     any continuation.

21          THE COURT:  You do or you don't?

22          MR. DAVIS:  We do object to any continuation of the

23     TRO.

24          THE COURT:  On the substantive ground that it's not

25     merited or on the procedural ground that the Court needs

P4MBGFFH

1    further time to consider?

2            MR. DAVIS:  On substantive grounds, your Honor.

3            THE COURT:  All right.  So not to preclude the

4    substantive ground, what I intend to do is extend it for

5    another 14 days.

6            MR. DAVIS:  Understood, your Honor.

7            THE COURT:  If I have to.  Okay.  First thing I'd like

8    to take up is the motion that was filed today by the United

9    States to decertify the class.  Mr. Davis, do you wish to

10   argue?

11           MR. DAVIS:  Yes, your Honor.  We believe that the

12   class fails for a number of reasons.  First and foremost is

13   commonalty and typicality.  The named plaintiffs in this case

14   have received and will continue to receive continued due

15   process.  They have been in custody for several months as their

16   own counsel have said.

17           THE COURT:  Well, the fact that you've done it because

18   I ordered it and the Supreme Court ordered it doesn't

19   necessarily mean that you would do it without a court order.

20           MR. DAVIS:  Well, your Honor, I believe we've been in

21   compliance, and we're in compliance with the Supreme Court,

22   regardless whether there is a TRO here. And again they were in

23   custody for months beforehand and have had an opportunity to

24   file a habeas.  That habeas will be adjudicated.

25           THE COURT:  They were in detention beforehand, not

P4MBGFFH

1    because of the Alien Enemies Act, because the normal processes

2    of the Immigration Nationality Act.  One of the petitioners was

3    slated for a hearing on May 7, as to withdrawal of removal.  So

4    he lost that, he'd be out of the country.  It would make no

5    difference whether you did it now or whether it's the intention

6    doing it later.

7         But going ahead with deporting him and depriving him

8    of his hearing doesn't give me any confidence that without an

9    order he would get a fair hearing.

10        MR. DAVIS:  Well, your Honor, since they have filed

11   their habeas petitions, they will not be removed under the

12   Alien Enemies Act until those are adjudicated.  If the Title 8

13   process moves forward with the immigration judge, that might be

14   other grounds for removal.  But currently there are no plans to

15   remove the named plaintiffs.

16        THE COURT:  I'm not touching that, and I don't think

17   my TRO affects that.  Let me check.

18        MR. DAVIS:  I believe that is correct.  That is our

19   understanding, your Honor.

20        THE COURT:  I think that's so.  If it needs

21   clarification, we can do it, but I do not intend that my order

22   affect the normal processes under the INA.  So the question is,

23   assuming, as I believe an order is necessary, the question is

24   numerosity.  You say there's only eight?

25        MR. DAVIS:  That's correct, your Honor.

P4MBGFFH

THE COURT:  But if I don't issue an order affecting all eight, we'll have to do this all over again each time, and it's a waste of energy and failure to give protection to people who might need it.  They might be pushed out of the country before they would have a chance to have their cases adjudicated in a hearing.  And furthermore, there are other people who the government seeks to remove as well within this districts.  So I don't think that numerosity is the crucial item.

Under the Second Circuit law, particularly Chief Judge Kaufman's decision in *United States v. Ex Rel Sero v. Preiser*, I don't have to follow the dictates of Rule 23 regarding habeas proceedings.  And there are persuasive justifications to, as there were in that case, to justify the class action device as appropriate.  It's true that there were about 500 people in that case, but the fact that there are eight, and perhaps many more in this case has a similarity to it because of the people that are involved.

In Judge Kaufman's case they were likely to be illiterate or poorly educated.  Many of the people here are barely literate.  They certainly are not literate in English. And I don't know about their education, but we can assume that the mysteries of the removal and the tension and absence of a lawyer and absence of communication with others creates the kind of circumstance that darkens the intellect and prevents action on the part of the person who is apt to be removed.  And

P4MBGFFH

so I hold that the numerosity requirement of Rule 23 is not

necessarily applicable to a class action or an aggregate action

in a habeas proceeding.

On the other matters, the cases of the two are typical

because the request is for notice in a hearing.  It's not an

adjudication of the merits.  It's just the fact that they're

entitled to a notice and a hearing.  And that's common to all.

It presents common questions to all, and the people who were

involved have their cases typical to the rest.  And clearly

they are adequately, superbly I would say, represented by

experience lawyers, highly experienced in this litigation, in

this form of litigation, so I deny your motion to decertify the

class.

MR. DAVIS:  Your Honor, respectfully we disagree.  We

think that habeas --

THE COURT:  I know you disagree, that's why you made

the motion, right?

MR. DAVIS:  Understood, your Honor.  I just want to

preserve for appeal that we do not believe that.

THE COURT:  Very clear you're not agreeing with me.

It's very clear.

MR. DAVIS:  Thank you, your Honor.

THE COURT:  Give me a moment.  Now the conditions of

the motion for the preliminary injunction.  There are four

criteria that have to be satisfied; likely of success on the

P4MBGFFH

merits, likelihood to suffer irreparable harm, balancing of
equities petitioners' favor, and the injunction being in the
public interest.  I think one, three and four, notwithstanding
objections from the government are evident.  Not one.  Likely
to succeed in the merits needs to be argued.  But that
petitioners are likely to suffer irreparable harm in the
absence of a preliminary injunction is plain to see.  This TRO
here and the Supreme Court's decision in the J.G.G. case
against Trump stopped the removal of people.  And in a
subsequent order, the Supreme Court ordered that the people not
be removed.  The need for these decisions is patent, because
absent those decisions, people would be removed.

Justice Sotomayor's dissenting decision shows how
preparation was made by the government to remove people, even
before the issuance of the proclamation.  And so it's necessary
to have an order restraining illegal removal if it's illegal to
avoid irreparable harm.  That there will be irreparable harm,
again notwithstanding the government's argument, is also
evident.  The conditions of the jails in El Salvador are not
appetizing at all to say the least.  They're cruel.  The
interviews in the press in the absence of anymore competent
evidence, no reason not to believe the credibility, when
Senator Hollen's visited, he found a person having been
detained incommunicado with others, deprived of all sensory
existence and ability to communicate with others.

P4MBGFFH

1          And once moved out of the country, it's

2     extraordinarily difficult to get him back.  Despite the Supreme

3     Court order and the decision of the district court of the

4     District of Columbia, the person who was mistakenly removed is

5     not being brought back, notwithstanding the obligation to

6     facilitate bringing him back.  The government has found all

7     kinds of ways to delay and avoid its obligation clearly spelled

8     is out in judicial decisions.  So there's a irreparable harm if

9     this person, if these petitioners are moved out of the country,

10    or the members of the class.

11         The balance of equities clearly tip in petitioners'

12    favor.  They do not present a danger.  They are already

13    detained under the provisions of the Immigration Nationality

14    Act, and there's no indication that the circumstances of the

15    detention is such as to give rise to any public safety problems

16    that could be argued.  So while in detention, there is no need

17    for the government to urge, to hasten up the removal of people

18    from the country, assuming they win on that issue.  Either

19    under the Aliens Enemies Act or the INA.

20         Injunction is in the public's interest because it's

21    important that the interpretation and application of the law be

22    deliberated upon by a different courts faced with that

23    question, and normally the Supreme Court, freezing anything

24    that happens during that time will allow the courts to proceed

25    in proper fraction without any kind of danger or risk to the

P4MBGFFH

1    government.

2            So the consideration is two, three, and four,

3    irreparable harm, balance of equities, public interest heavily

4    favor the petitioners.  I'll stop if you want to make any

5    comment about that, Mr. Davis.

6            MR. DAVIS:  Your Honor, the government obviously

7    disagrees with your ruling respectfully.  We first believe on

8    the irreparable harm.  Aliens are removed all the time.  That

9    in and of itself is not irreparable harm.  They're again going

10   to get the due process as per the Supreme Court's order.  And

11   we are enacting that as we speak, and I'm free to talk about

12   some of the things that are being done, especially for the

13   named plaintiffs who again have been in custody for quite

14   sometime and are going to have their habeas petitions fully

15   adjudicated.

16           As far as the injuries to the government.  The

17   Declaration of Charles paragraphs eight and nine points out

18   that Tren De Aragua is a gang that was formed in a prison and

19   knows how to operate in prisons.  They serve as a potential

20   hazard for the employees of the prison and for ICE officers.

21   And ICE has very limited resources to bed and house people for

22   long periods of time, so it's a serious restraint on the

23   ability to detain and remove other serious criminals and for

24   people who are subject to removal.

25           THE COURT:  There's no indication that ICE would not

P4MBGFFH

1    be able or indeed the warden of the detention place would not

2    be able to assert government authority and avoid the problems

3    that exist with gangs in jails.  Our jails have experience with

4    gangs, and experience in being able to deal with the gangs in

5    such a way as to avoid further planning of actions against the

6    public interest and public safety.  There's no reason that

7    shouldn't be applicable to these fellahs as well.

8        MR. DAVIS:  Again, your Honor, we respectfully

9    disagree, but understand your position on that.  As far as the

10   public interest and equities.  The executive has the

11   prerogative in Immigration and National Affairs to remove

12   people and to deal with foreign terrorist organizations, which

13   Tren De Aragua has been labeled.  And they have caused serious

14   public safety concerns, including taking over apartment complex

15   in Colorado, which is in the declaration, causing that town to

16   declare an emergency and having to clear it out.  We are trying

17   to remove them as fast as possible for the safety of the

18   public.  The President was elected on this exact program, and

19   it remains his most popular policy, despite media attempts to

20   turn it otherwise.

21       THE COURT:  We're not talking about popularity.  I

22   understand the desire to remove, but there's also due process

23   of law, and I think you do agree that these people being inside

24   the United States are entitled to due process of law.  You

25   would agree with that, no?

P4MBGFFH

1          MR. DAVIS:  Yes, your Honor.  We believe it's a

2   flexible standard under *Mathews v. Eldrige*.

3          THE COURT:  Of course it's a flexible standard.  At a

4   minimum, they're entitled to notice and a hearing, but you're

5   saying they've been given that and I want to tell me more about

6   it.  I'd like to hear that.  Why don't you take the podium.

7          MR. DAVIS:  Your Honor, with regards to the due

8   process points here.  The named plaintiffs, as I mentioned,

9   have been in custody for months.  They, by their counsels'

10  declarations have had, at least G.F.F. has had contact with

11  counsel multiple times, and has had multiple hearings in front

12  of an immigration judge.  J.G.O. also has an immigration judge

13  hearing coming up in May.  Both of them have had an opportunity

14  to file habeas.

15         And now that they have filed habeas, they will not be

16  removed until those habeas petitions are fully adjudicated.

17  That is plenty of due process. That is the due process they are

18  entitled to.

19         THE COURT:  What about the other six?

20         MR. DAVIS:  As far as the other six, your Honor.

21  Again, we disagree that they should be included.  But accepting

22  your Honor's ruling, we have a declaration from Officer Dawson

23  that says this after the Supreme Court's ruling in J.G.G., they

24  put in procedures to ensure that all people who are subject to

25  the proclamation are given notice that is in Spanish that tells

P4MBGFFH

1    them that they are subject to removal under the Alien Enemies

2    Act, and that they can make a phone call.  So that we believe

3    gives them due process and notice.  And they have an

4    opportunity to file habeas.  Once they do file habeas, again

5    they will be allowed to adjudicate their habeas petition

6    without being removed.

7             THE COURT:  The INA lays out the provisions of what a

8    notice should be in Section 1229, Title 8.  It specifies that

9    the notice should specify the nature of the proceedings against

10   the alien; the legal authority under which the proceedings are

11   conducted; the acts or conduct alleged to be in violation of

12   law; and the charges against the alien and the statutory

13   provision alleged to have been violated.  Stopping there.

14   There are more.

15            But have the acts or conduct alleged to be in

16   violation of law been made specific in the notice as to each of

17   the people involved, people subject to removal?

18            MR. DAVIS:  Your Honor, I'm not sure about the

19   specifics of each notice.  I do know that they tell them they

20   are removable under the Alien Enemies Act, so the statutory

21   basis, the legal basis is present there, and it's in Spanish so

22   they can understand it.

23            THE COURT:  But it doesn't talk about their acts, why

24   they should be classified properly as a person subject to

25   removal.  We'll go through the acts and talk about it in a few

P4MBGFFH

1    minutes, but I don't think that's contemplated in your notice.

2    I think these people are being thrown out of the country

3    because of tattoos.

4            MR. DAVIS:  Your honor, part of the reason that the

5    President wanted to use the Alien Enemies Act is because it's

6    very specific to a small group of individuals that can be

7    determined by declaration to be part of a foreign government

8    and involved in invasion of predatory act, and that gives him

9    the extra powers to remove people more easily.  We don't have

10   to follow all the INA strictures.  That's the whole point of

11   using the Alien Enemies Act, or else it would just be under the

12   INA.

13           THE COURT:  But the question is, he's entitled to give

14   notice and a hearing.  Notice legally requires some information

15   before you can have a hearing, and a hearing must comport with

16   due process.  It will because it's a hearing in a habeas

17   proceeding.  A person's got to be able to get counsel.  The law

18   requires under Section 1229 at least 10 days so the person can

19   get counsel.  It provides a list of lawyers who are on a pro

20   bono basis to take immigration cases.  None of that I gather is

21   being done.

22           My point is this:  Assuming that the President has the

23   power to remove people who are aliens and fit the definitions

24   of the proclamation, assuming the proclamation is duly issued

25   under the Act; nevertheless, there must be notice and a

P4MBGFFH

1    hearing, and the notice must accord with due process.  And the

2    items specified in Section 1229 of the INA are short stated of

3    what due process requires.  A person has to be told what are

4    the charges against them.  This is not a secret court, an

5    inquisition of Medieval Times.  This is the United States of

6    America.

7        And if you want to have due process, you got to tell a

8    person what he's done to merit his being removed.  And since

9    these people are detained, the motivation of haste is not

10   meaningful.  I do think that notice requires you to specify the

11   factors set out in Section 1229 of the INA.

12       MR. DAVIS:  Respectfully, your Honor, we don't believe

13   the INA applies here, and if we could give an analogy.  There

14   is expedited removal.  And in expedited removal, the statute

15   itself says that they should be removed within 24 hours, or at

16   the latest seven days.

17       THE COURT:  After an adjudication is made.  After, not

18   before.  After.

19       MR. DAVIS:  Again, your Honor, they have a chance to

20   file habeas petitions.  And once they do, they will get a full

21   hearing.

22       THE COURT:  And that gives them?  How much time do

23   they need to file a habeas?

24       MR. DAVIS:  At least 24 hours, but individuals can

25   have more just depends on the circumstances.

P4MBGFFH

        THE COURT:  But 24 hours.  Do you think that a person
in a strange part of the country able to make one telephone
call can mount a habeas corpus proceeding?  Is that feasible?

        MR. DAVIS:  Your Honor, I assume that the ACLU has
habeas petitions ready to go.

        THE COURT:  What makes you think they know of the
ACLU?

        MR. DAVIS:  There are named petitioners right now who
have them as counsel in the same exact prison.

        THE COURT:  How about the bunch of people that were
thrown out of the country?  Did they have a chance to call the
ACLU?

        MR. DAVIS:  I do not know, your Honor.

        THE COURT:  Do they know how to get the ACLU?  Do they
know anybody in the ACLU?  You can't assume that the person
thrown out of the country has the knowledge that you have,
Mr. Davis.

        MR. DAVIS:  Understood.

        THE COURT:  He's probably never had a habeas before,
which is why the numerosity requirement is not a stringent, I
believe, an application to habeas corpuses brought under the
removal statute, as would normally be the case in a class
action.  Do your notices charge the acts of conduct alleged to
be in violation of?

        MR. DAVIS:  I don't know the specifics other than they

P4MBGFFH

1    are in Spanish and that they say they are being removed subject

2    to the Alien Enemies Act.

3         THE COURT:  It seems to me the notice has to specify

4    what the hearing will be about, and it must give time for a

5    person to get a lawyer, file a writ of *habeas corpus*, and know

6    where it's going to be held and when it's going to be held so

7    they can attend.  If they have to attend, the law provides they

8    don't have to attend in person.  Other provisions can be made.

9    It has to be a meaningful notice and a meaningful hearing, and

10   that's worthy of an order.  Otherwise, it's not going to be

11   done.  All right.  So much for that.

12        Let's go back to the act itself.  And I'd like to

13   focus on the act and the proclamation that goes with it.  If

14   you give me a moment.  Do you have a text of the law of the

15   proclamation in front of you?

16        MR. DAVIS:  Yes, your Honor.  Is there a particular

17   section you want?

18        THE COURT:  Yes, we'll start with Section 21 in the

19   last three lines. "To provide for the removal of those who, not

20   being permitted to reside within the United States, refuse or

21   neglected to part therefrom."  Has there been in the

22   proclamation an opportunity for the subject to refuse or to be

23   indifferent to an order?

24        MR. DAVIS:  Well, your Honor, the proclamation is

25   obviously public.  If somebody believes that they might be

P4MBGFFH

1    subject to it, they could certainly self-remove.

2             THE COURT:  That's not an answer.

3             MR. DAVIS:  But there's an exception for public

4    safety.  And given the serious situation --

5             THE COURT:  Where is the exception?  The law is clear.

6    If you're kicking out a person, you give them an opportunity to

7    leave themselves.  You may detain them, but you don't kick them

8    out.  Let's see what the petition says.  Okay.  You know, I

9    don't want to fight this anymore.  I go.  He doesn't get a

10   chance to do that.  He's removed.  And think of the

11   circumstances about the removal.  Have the picture in mind of

12   the 50 or so detainees who are shackled.  They're handcuffed,

13   hands in back of them.

14            They're bent over in an unnatural pose that must be

15   excruciating and difficult to keep. They're shackled to their

16   feet.  What way is that to treat a normal being?  Cows have

17   better treatment now under the law than that.

18            MR. DAVIS:  Your Honor, we can look at Section 22(f).

19   This is what discusses the ability for them to, goods and

20   effects and departure.

21            THE COURT:  Let's take it piece by piece.  It's not

22   chargeable with actual hostility.  Is a tattoo actual

23   hostility?

24            MR. DAVIS:  Or other crime against the public safety.

25            THE COURT:  What crime have they committed?

P4MBGFFH

        MR. DAVIS:  There was just an indictment the other day

for Rico conspiracy.

        THE COURT:  If there's an indictment then a person

would be subject to a trial and punishment, and then he's

kicked out of the country under the INA.  What does that do?

What does it say?  We get pleas after a guilty conviction for

those who are ultimately deported.  There's a judge.  No need

to sentence him to a long imprisonment.  He's going to be

deported.  That's no excuse.  We sentence them.  The public is

safe while he's in jail.  Then when he finishes his term or a

shorter term the government provides, then he's removed under

the INA.  What's wrong with that?  Why do we need something

different here.  Actually, it's not different.

        It says, if he's chargeable with actual hostility or

other crime against public safety.  Actual, means he's got to

do something.  If it's a conspiracy, he has to share the

purpose of the conspirators to do the wrongful thing against

the United States.  He's not done that.

        MR. DAVIS:  Well, your Honor, we would submit that

just like being a member of Al-Qaeda, even if you yourself have

not committed a direct terrorist act in the United States,

being a member of Tren De Aragua is part of a hostile entity on

United States soil.  And the point of the Alien Enemies Act --

        THE COURT:  When I charge a conspiracy, which is what

you're talking about.  When I charge a conspiracy, I tell the

P4MBGFFH

1    jury, that mere association is not a conspiracy.  You have to

2    have joined it, knowingly, adopting the purpose of the

3    conspirators, and seeking to further the purposes of the

4    conspiracy.  We're not dealing with guilt by association, and

5    you can't throw a person out just by guilt by association.

6    That's why there's the process in the INA before an immigration

7    judge.  That process will now have to go on in *a habeas corpus*.

8        MR. DAVIS:  Your Honor, respectfully.  I think your

9    interpretation renders the Alien Enemies Act superfluous.  It's

10   just completely swallowed by the INA.  The point of the Alien

11   Enemies Act is to give expedited ability to remove people when

12   there are serious situations in the narrow class of cases that

13   determine it.  And the President so far has determined that

14   just qualifies for this one gang, Tren De Aragua, and has made

15   findings that are not subject to judicial review for why that

16   group meets these qualifications.

17       THE COURT:  The President has made declarations.  He

18   hasn't made findings.  There've been no fact finding cause

19   there would be an Administrative Procedure Act in that matter.

20   The President's not subject to the Administrative Procedure

21   Act.  He can issue a proclamation, but he can't disturb what is

22   due process.  That's the point I'm making.  We're trying to

23   fill in what we mean by notice and hearing.  And it has to be

24   applied to this.  That's Section 22 and Section 23, talks about

25   the duty of the court to give a full examination and hearing on

P4MBGFFH

1    a complaint.

2            "After any such proclamation has been made, Section 23

3    provides, the several courts of the United States are

4    authorized, and it shall be their duty upon complaint against

5    any alien, any resident and at large within such jurisdiction

6    or district to the danger of the public peace or safety in

7    contrary to the tenor or intent of such proclamation or other

8    regulations which the President may have established.  To cause

9    such alien to be dually apprehended and conveyed before such

10   court," which has not been done, "and after a full examination

11   hearing on such complaint and sufficient cause appearing to

12   order such alien to be removed out of the territory of the

13   United States, or to give sureties for his good behavior." He's

14   not been given that opportunity either.

15           MR. DAVIS:  Again, your Honor, our understanding of

16   the Supreme Court's order in J.G.G. is that they be given

17   notice and an opportunity to file for habeas.  And they get

18   this in habeas, and they will give that in the habeas

19   communication.

20           THE COURT:  Yeah, but you're not doing what the notice

21   is required, and there's no procedure that you're talking about

22   that could immediately be followed.

23           Let's look at the proclamation, because I think

24   there's serious problems with the proclamation as well.

25   Section 1 in the proclamation, about two thirds of the way

P4MBGFFH

1    through toward the end declares that all members of the TDA are

2    "by virtue of the membership in that organization chargeable

3    with actual hostility against the United States, and are

4    therefore ineligible for the benefits of 50 U.S.C. Section 22.

5    Remind me what that is?

6         MR. DAVIS:  That's the self-removal opportunity, your

7    Honor.

8         THE COURT:  Now, what's the difference?  If a person's

9    a danger and he removes himself, why is it necessary to have

10   the kind of procedure where people are shackled, taken in the

11   middle of the night and sent to El Salvador?

12        MR. DAVIS:  Well, your Honor, I don't think because of

13   the nature of this group we have any belief that they will

14   self-remove and not be a threat to the public safety.

15        THE COURT:  They're not giving them an opportunity to

16   do so, and they're detained, most of these people anyhow.  Why

17   can't they go through the normal procedures of detention and

18   removal there?  And if they're enemy aliens, that could just be

19   another class.  Terrorist aren't part of the class that could

20   be removed.  A person chargeable with the kind of incursion

21   that the President is talking about in his proclamation is

22   doing a terrorist act by the definition of the President could

23   be removed under the INA.  This cause, "By virtue of the

24   membership in the organization."

25        Association is not a conspiracy.  A conspirator has to

P4MBGFFH

1    adopt the purposes and further the purposes.  And to say you're

2    a member because you have a tattoo is a further enlargement on

3    the law.  I think that this clause is ultra vires the statute.

4    Go on.

5         MR. DAVIS:  Your Honor, respectfully we don't believe

6    that whether the prerequisites of the statute are met is

7    subject to judicial review.  The Supreme Court in *Ludecke* said

8    that they weren't going to question whether the war had ended.

9    Just as Donitz said, The firing had ended.  Victory in Europe

10   had been declared.  But the Supreme Court and the majority

11   said, We're not going to question the political branches on

12   whether those prerequisites were met.  And we think the same

13   things here.  The president has a basis.

14        THE COURT:  There was no government in Germany at the

15   time.  It was total anarchy.  You have military forces in

16   Germany.  There still was great worry about what would happen,

17   and there's war in Japan and concern in Japan.  You can't liken

18   the situation that operated the *Loki* case to those that are

19   here.  These people are in jail.  They're not free at large

20   infiltrating our society.  Now, the law says they have to be in

21   --

22        MR. DAVIS:  Actual hostility.

23        THE COURT:  -- actual hostility.  Yes, thank you.

24        MR. DAVIS:  Again, your Honor, we believe that they

25   are, and we don't have all of them detained.

P4MBGFFH

| | |
|---|---|
| 1 | THE COURT:  Okay.  We got that.  And then Section 3 |
| 2 | directs that these aliens, describing one, are subject to |
| 3 | immediate apprehension, detention and removal.  Well, immediate |
| 4 | apprehension and detention is part of the INA, but immediate |
| 5 | removal is not; nor does it satisfy the requirements of due |
| 6 | process stated by the Supreme Court.  That part of it is ultra |
| 7 | vires the statute as well.  The same point in Section 6(a). |
| 8 | Actually, the language is a little different there.  They shall |
| 9 | be immediately apprehended and detained until removed.  The |
| 10 | point is that before there's removal, there's got to be a |
| 11 | hearing, and that hearing has to find membership more than just |
| 12 | association. |
| 13 | 6(b), they shall be subject to detention until removed |
| 14 | from the United States, and such place of detention is maybe |
| 15 | directed by the offices responsible for the execution of these |
| 16 | regulations.  As applied, they're detained in El Salvador. |
| 17 | There's nothing in this statute or proclamation that authorizes |
| 18 | the United States of America to hire a jail in a foreign |
| 19 | country where people could be subjected to cruel and unusual |
| 20 | punishment not allowable in the United States jails. |
| 21 | MR. DAVIS:  Your Honor, respectfully, once they've |
| 22 | already been removed, they're not in United States's custody. |
| 23 | That's El Salvador.  They're a separate foreign sovereign. |
| 24 | THE COURT:  That's exactly the point.  They're ours |
| 25 | until we remove them.  Under the INA, they can't be removed to |

P4MBGFFH

1  a place where they can be persecuted, or where they're freedom

2  will be taken away.  That's what we've done in El Salvador.  We

3  put them in a place which the INA forbids, and so this

4  proclamation is contrary to law.  Anything else you want to

5  tell me?

6        MR. DAVIS:  What was that, your Honor?

7        THE COURT:  Anything else you want to tell me?

8        MR. DAVIS:  Obviously we respectfully disagree.  We

9  believe that the Alien Enemies Act was created and is still

10 good law in order to allow the President to make these sort of

11 narrow determinations for public safety and to on an expedited

12 schedule remove people.  And that putting the strictures of INA

13 on top of it, renders that superfluous.  For example, there's

14 still expedited removal, which is within 24 hours as the

15 Supreme Court has said in *Mathews v. Eldrige*.

16       THE COURT:  Isn't that after adjudication?

17       MR. DAVIS:  Again, your Honor, we are providing

18 notice.

19       THE COURT:  Isn't that after adjudication, that case?

20       MR. DAVIS:  Which case was that, your Honor?

21       THE COURT:  The one you just cited.

22       MR. DAVIS:  Expedited removal they can raise a

23 credible fear, but if the immigration officer rejects it and if

24 an immigration judge quickly rejects it, they can be removed

25 within 24 hours.

P4MBGFFH

THE COURT:  That's because there is a procedure for withdrawal of removal, and this is curtailing that right.  I haven't read that case, that's the way it sounds.

MR. DAVIS:  Your Honor, D.C. Circuit has upheld the due process under the expedited --

THE COURT:  That's part of the INA.  You could do that, but there's safeguarding.  There's been a hearing. There's been adjudication.  Okay.  I think I've got the sense. I've read your papers.

MR. DAVIS:  Understood, your Honor.

THE COURT:  I've considered your arguments. Mr. Gelernt, anything you want to tell me?

MR. GELERNT:  Your Honor, I'll be very brief.  I've just wanted to update the Court on what's happened since the filing of our reply brief.  The same declaration that was presented to you by Mr. Elliston was also presented in the Northern District of Texas, and the government made the same arguments.  They said that two named petitioners there were safe.  They made no similar claim as to the class members, no similar assurances.  Nonetheless, the Northern District of Texas judge understood that to be that even the class members were safe.

Five hours -- well, four hours later that night, this is this past Thursday, all of a sudden the notices started being handed out to these men, and it was only in English,

P4MBGFFH

1    these notice forms.  Did not tell them how they could contest

2    it, much less that they even could contest it, or how long they

3    would have.  They were starting to be rounded up ultimately put

4    on buses the next afternoon only because the Supreme Court

5    intervened in the AARP case at one in the morning that night,

6    Friday night, that they were safe from also be in El Salvador.

7              This same declaration that's in this case from

8    Mr. Elliston was there also, and it was said they would be

9    "reasonable notice." The Supreme Court, as you, your Honor,

10   pointed out in J.G.G. said, it needs to be notice sufficient

11   for them to be able to contest the allegations. Under no

12   conceivable understanding of what the Supreme Court said could

13   24 hours or less with an English form that doesn't tell them

14   how to contest their removal for people in detention who are

15   not sophisticated about the law, that cannot possibly comply.

16             And so the government's suggestion that they're going

17   to give reasonable notice just like they told the judge in the

18   Northern District of Texas, I think that that can't be

19   sufficiently satisfactory.  And again, the Supreme Court

20   ultimately granted administrative stay.  We'll see how the

21   Supreme Court handles it going forward.  But to your point,

22   your Honor, there has to be sufficient notice.  And I recognize

23   and I think you're right to look to the INA as a guidepost.

24   Obviously the Alien Enemies Act is something different because

25   the government's eliminating any protections against

P4MBGFFH

1    persecution or torture, and sending people to a foreign prison

2    which couldn't be done under the INA, so we think more than the

3    10 days in the INA would be necessary.  We think that's what

4    the Germans got in World War II.

5         THE COURT:  More than 10 days, that's what you're

6    arguing for?

7         MR. GELERNT:  We are arguing for 30 days based on

8    historical precedent during World War II, the last time, as

9    your Honor knows, the Alien Enemies Act was used.  That's what

10   the Germans got there.  Certainly it has to be more than 24

11   days.  And I think a critical component of that has to be that

12   it's in a form in the language that you read, and class counsel

13   needs to be notified, and any immigration counsel they may have

14   been lucky to have obtained.  I mean I think those parts were

15   essential.  There needs to be sufficient time, and we get

16   notice and immigration attorneys get notice, and it be written

17   in a language they can understand.  I think right now the

18   government's suggestion that 24 hours or less in an

19   English-only form that doesn't tell them anything other than

20   you can make a phone call can't possibly be sufficient.

21        THE COURT:  I think the 10-day requirement in the INA

22   is a good guidepost, and so it could be applicable here.

23   There's other requirements too along with a list of lawyers who

24   might be available to take such cases.

25        MR. GELERNT:  Your Honor, if you are going to use the

P4MBGFFH

 1    10 days, I think we would ask that the form be in Spanish, but

 2    most critically --

 3             THE COURT:  I think I've already said in the order

 4    English and Spanish.

 5             MR. GELERNT:  I think the most critical part is that

 6    the class counsel be notified, because this is very different

 7    than a regular immigration case where it can play out over a

 8    long period of time and there's lots of organizations that can

 9    take on routine immigration cases.  This is going to be very

10    different.  So if we get notice, we can file these habeas

11    petitions potentially, or find sophisticated counsel who can

12    deal with a wartime authority.  But since it's very different

13    than just putting up a list of immigration lawyers who might be

14    able to take a routine case, so that's what we would ask if

15    your Honor is going to stick with 10 days that we be given

16    notice of any time they're going to designate someone.

17             THE COURT:  Okay.  I think the law provides notice to

18    counsel.

19             MR. GELERNT:  So certainly if you certify a class,

20    that should certainly be what happens.  Your Honor, I wanted to

21    give you the cite to the Supreme Court filings where you can

22    find notice that they were given out in the Northern District

23    of Texas if it's okay.

24             THE COURT:  Yes, please.

25             MR. GELERNT:  24-A-1007, and that has the pleadings

P4MBGFFH

1    from both sides, as well as the attachment with the actual

2    notice they've been giving out because they've been provided

3    here in this court.

4            THE COURT:  What do you make of the provision in

5    Section 1229(a)(3) which provides that the procedures in the

6    INA are exclusive, unless otherwise specified in this chapter,

7    a proceeding under this section shall be the sole and exclusive

8    procedure for determining whether an alien may be admitted to

9    the United States or if the alien has been so admitted removed

10   from the United States?

11           MR. GELERNT:  Yes, your Honor.

12           THE COURT:  This alien has not been admitted, so this

13   wouldn't apply.

14           MR. GELERNT:  Your Honor, I'm glad that you asked me

15   about that.  That is one of our claims that, as your Honor

16   knows, our first and fundamental claim is that there is no

17   invasion by a foreign government here.  I know your Honor

18   didn't want to reach that during the TRO.  I'm happy to discuss

19   that if your Honor wants to.

20           Our second claim is that there need to be notice, but

21   we do have claims that go to exactly what your Honor is asking

22   me about now, which is that Congress enacted this statute after

23   the Alien Enemies Act fully aware of the Alien Enemies Act, and

24   said this is the sole and exclusive procedure for removing a

25   noncitizen.  They didn't carve out the Alien Enemies Act.

P4MBGFFH

1          THE COURT:  Well, they say removal of a person

2   lawfully admitted into the United States, and these people were

3   not lawfully admitted into the United States.

4          MR. GELERNT:  I think the procedures --

5          THE COURT:  Some of them were.

6          MR. GELERNT:  -- go to both, people lawfully admitted

7   and unlawfully admitted.  And we have that in our brief, the

8   relevant section cites.  That for everyone in the United States

9   who they want to remove, it has to be done through the

10  procedures specified in the INA.  I don't know that your Honor

11  needs to reach that claim.

12         But another part of our claim is that putting aside

13  the procedural protections, they certainly can't be sent to a

14  foreign prison without being screened for persecution or

15  torture.  And as your Honor noted, I think it's now clear and

16  we've put declarations in just how bad the situation is in El

17  Salvador.  So there are various procedures that the Alien

18  Enemies Act proclamation is bypassing I think intentionally.

19  But at the end of the day, the notice can come straight through

20  interpretation of the Alien Enemies Act as the Supreme Court

21  did in J.G.G. And I think it's just a matter, as your Honor has

22  pointed out, filling in exactly what a reasonable notice would

23  look like.  And whether that's 10 days, 30 days, the District

24  Court in Colorado decided on 21 days.  And so your Honor would

25  have some discretion about that.  We think 30 days because this

P4MBGFFH

1    is such a complicated situation with a new Act that's not been

2    invoked more than three times in our country.

3          THE COURT:  I think 30 days would be inconsistent with

4    the urgency expressing the proclamation, and I don't think that

5    a district judge, no matter how he feels, can counter this

6    feeling of urgency.

7          I want to go back to a point you made before, and it's

8    Section 21 and this issue of invasion of predatory incursion.

9    The statute reads "When there is a declared war between the

10   United States and any foreign nation or government," and we do

11   not have that situation here.  There's no declaration.

12   Congress declares war, not the President, "Any invasion or

13   predatory incursion is perpetrated attempted or threatened

14   against a territory of the United States by any foreign nation

15   or government."

16         So the proclamation and the position taken by the

17   government here is that there have been insidious incursions

18   into the United States of this gang, that they have been

19   sanctioned, if not more by the government of Venezuela to do

20   that, and that is something that the judiciary cannot question.

21   What's your take on that?

22         MR. GELERNT:  I don't think that's correct, your

23   Honor, respectfully.  I think that's the government's position.

24         THE COURT:  I know that's the government position,

25   what's your comment?

P4MBGFFH

1    MR. GELERNT:  Absolutely you can review whether the
2    statutory predicates have been satisfied.  I would start just
3    with a general observation that the Supreme Court never, never
4    in the history of the country has said statutory predicates
5    can't be reviewed, either under the Alien Enemies Act or more
6    general under the political question doctrine.

7    THE COURT:  This is an application.  The President
8    says, Applying Section 21 I find, et cetera.  Can I question
9    the President's finding?

10    MR. GELERNT:  Your Honor, I don't think you actually
11    have to question the findings.  Let me tell you why to begin
12    with.  *Ludecke* and J.G.G. quoting Ludecke said, You can
13    interpret, yeah, interpret what it means; so therefore, you can
14    interpret what "foreign government" or "nation" means, and you
15    can interpret what "invasion" means.  When you do that, you'll
16    see that the proclamation on its face, on its face, doesn't
17    satisfy that, so you wouldn't even have to get to point.

18    THE COURT:  I wonder if you can do this, Mr. Gelernt.
19    "Or," as a word that suggest equivalence between that which
20    preceded and that which followed.  What preceded "or" is that
21    declaration one.  What follows it is invasion or predatory
22    incursion.

23    Should the statute be read as an equivalence that the
24    invasion or predatory incursion is that which is akin to a
25    declaration of war, some invasion by a foreign state or

P4MBGFFH

government more than a gang of people?

1

            MR. GELERNT:  For sure, your Honor.  That's what I
would recommend to you, your Honor, Judge Henderson's
thoughtful opinion in the D.C. Circuit in J.G.G. where she goes
through that and looks at the historical context in which this
was enacted in 1798.

            THE COURT:  She was reversed.

            MR. GELERNT:  It was all about military invasion.

            THE COURT:  She was reversed.

            MR. GELERNT:  Well, she was reversed not on that
point, your Honor. The Court didn't reach that.  It simply said
bring these cases in Habeas.

            THE COURT:  The time the Alien Enemies Act was passed,
it was post the Revolutionary War, but we were fearful of the
French.  The Federalist who were in power were fearful of the
French coming into the country and taking over.  So this Alien
Enemies Act was an act that was fearful of French invasion; for
example, from Quebec.

            MR. GELERNT:  Your Honor, not a French gang.  The
French government, cause there were already ships.  There was
an incursion, a military incursion with using ships, so we were
afraid of an actual war with France, and I think that's why the
Supreme Court pointed out --

            THE COURT:  So it's akin to a declaration of war.
It's not a declaration.

P4MBGFFH

1          MR. GELERNT:  A military invasion.

2          THE COURT:  It's a state of war.

3          MR. GELERNT:  Right, exactly, your Honor.  I think one

4    thing that the Supreme Court has repeatedly noted, especially

5    in recent times is, courts ought to be skeptical about finding

6    a new unprecedented and extraordinary power and a statute

7    that's been around for a long time and never been found before.

8    This has been three times.

9          THE COURT:  That's not true.  That's not true.  It was

10   applied during the war of 1812 to round up English people.  It

11   was applied Post-world War I to round up people of German

12   ancestry. It was applied World War II.

13         MR. GELERNT:  All three declared war is all I'm

14   saying, your Honor.  And so this is unprecedented.  The key I

15   think is that the proclamation on its face doesn't claim that

16   this gang is the Venezuelan government that can make treaties;

17   that, as the statute says, has denizens and citizens of it.

18   That's why the proclamation says members.  Even the

19   declarations they've submitted doesn't try to say the

20   proclamation is saying --

21         THE COURT:  They do say there's a very tight

22   relationship between the Madura government in Venezuelan and

23   the TdA.

24         MR. GELERNT:  I think, your Honor, I don't think the

25   historical materials would show that you need a foreign

P4MBGFFH

1    government, a foreign government can make treaties.  A foreign

2    government is actually a foreign government. There are lots of

3    countries including our own where there are private people

4    intertwined with the government who have a lot of influence,

5    and that cannot possibly be what Congress meant.  And I think

6    that's why it's only been three times during a declared war.

7         What your Honor pointed out before about Rico, I think

8    I want to sort of use that analogy.  What the proclamation

9    reads like is a Rico indictment.

10        THE COURT:  Is what?

11        MR. GELERNT:  Like a Rico indictment.  That's what the

12   proclamation reads like.  It does not claim that TdA is a

13   foreign government.  It says it has some influence, not even

14   that much influence.

15        THE COURT:  Rico requires more, Mr. Gelernt.

16        MR. GELERNT:  Absolutely requires more, and that's why

17   I don't think your Honor even has to pushback on the findings,

18   if it concludes that the statute properly construed, which your

19   Honor clearly has the right to do, if it finds that it requires

20   military action, and an actual foreign government, not just a

21   gang that has some influence in certain parts of a country.

22   Then I think on the face of the proclamation, it doesn't

23   satisfy the TdA.  And I think that's where Judge Henderson's

24   opinion went, and that's where the opinion this morning in the

25   Colorado case went.

P4MBGFFH

1          THE COURT:  Judge Henderson's in what court?

2          MR. GELERNT:  Judge Henderson in the D.C. Circuit in

3    J.D.G.

4          THE COURT:  That decision was reversed by the Supreme

5    Court.

6          MR. GELERNT:  It was, your Honor, but not on this

7    point.  The Supreme Court emphasized that it was not reaching

8    the merits.  I think obviously Judge Henderson's opinion

9    doesn't bind, but I think it's persuasive.

10          THE COURT:  It was reversed because there was a

11    question of jurisdiction.

12          MR. GELERNT:  Of venue and personal jurisdiction, not

13    Habeas.

14          THE COURT:  And there was a question also of judicial

15    review.  Supreme Court held that the only review should be a

16    Habeas review.

17          MR. GELERNT:  Absolutely, your Honor. All I'm simply

18    saying that, that opinion doesn't bind you, but I think it's

19    persuasive in how it goes through the historical materials to

20    show that this does not apply outside the military context.

21    That's all we're asking you to hold.

22          THE COURT:  Let me get Mr. Davis' view and

23    interpretation of Section 21.

24          MR. DAVIS:  Thank you, your Honor.  Briefly.  You want

25    to focus on declare war in saying that essentially invasion,

P4MBGFFH

predatory incursion, they all have to similar, but there's

meaningful variation between those words.  I think, as you

pointed out, the Quasi-War, which is what started this Act and

what brought it into existence is a good example. That was not

a declared war.  In fact, the French used a lot of privateers

in order to impress in U.S. sailors.

          And in response, John Adams, the president at the

time, issued proclamations of Marque and Reprisal to let our

own privateers and merchants fight back and impress their own

ships.  That, if they ended up coming on America soil, I think

that would clearly be contemplated by the Alien Enemies Act,

and French citizens could be removed under it.

          Under their reading, that would not apply to the

French during the Quasi-War.  It wouldn't apply to Al-Qaeda

after 9/11.

          THE COURT:  I think it would apply to the French.

          MR. DAVIS:  I would sure hope so.  But based on their

interpretations, I'm not sure that it would.  Again, at the

same time, there is the Barbary Wars, which it's not apparent

that the Barbary coast pirate kingdoms were actually states.

And they had pirates that were attacking shipping. If they

ended up raiding Manhattan, I think that people at the time

would have understood that that would have led to invasion or a

predatory incursion of the United States.

          THE COURT:  It's rather fanciful.  If the Barbary

P4MBGFFH

1    pirates would have been able to invade the United States, it

2    probably would be the same as a declaration of war.

3            MR. DAVIS:  There's Al-Qaeda as well.

4            THE COURT:  The point that troubles me is what scope

5    of jurisdiction I have to question the President in his finding

6    that there is some kind of an invasion or predatory incursion

7    by a criminal gang that is very powerful in Venezuela.

8            I do have the jurisdiction to interpret the statute.

9    I do have the ability to interpret the statute as requiring

10   equivalences between a declaration of war and the type of

11   reaction to invasion of predatory incursion that the Alien

12   Enemies Act contemplates.  I think you need more than just

13   infiltration of gang members into a gang society of the United

14   States.  I don't think that might be enough, but I've got to

15   worry about that, and I don't have an answer.  Okay.  I think

16   we've covered everything there is.  Have we?

17           MR. DAVIS:  Your Honor, just really quick.  I

18   understand your hesitancy to rule, as I agree you could

19   interpret the statute; for example, to say that United States

20   citizens are not covered.  That is clearly within your power.

21   Our point is, we don't think, as you pointed out, that you

22   could question the determination of the facts that these meet

23   the prerequisites of the statute.  We think *Ludecke*'s found the

24   point there.

25           Citizens protective lead from the D.C. Circuit said,

P4MBGFFH

"The unreviewable power in the President is the essence of the

Act.  And that's where we think the Court need not and should

not cross that line and question what the President found

there.

            THE COURT:  But the Supreme Court J.G.G. says that

questions of statutory interpretation belong to me.

            MR. DAVIS:  Right.  Again, your Honor, you can

interpret the statute to, for example, it doesn't include U.S.

citizens.  And we believe that you can interpret the statute to

say there's meaningful variation between a declared war and an

invasion and a predatory incursion.

            THE COURT:  If I'm interpreting the statutes, I

interpret a proclamation, whether or not it ultra vires the

statute because it goes beyond the statute.

            MR. DAVIS:  I think we respectfully disagree that you

could go that far with *Ludecke*, your Honor.

            THE COURT:  Okay.  Thank you, everybody.  Decision is

reserved.  Yes, Mr. Gelernt.

            MR. GELERNT:  Nothing, sorry.

            THE COURT:  Decision is reserved.  The TRO is extended

for 14 days from tomorrow when this present TRO runs out.  This

TRO will expire at the conclusion of the preliminary injunction

hearing or by the further order of the Court.  So the hearing

is today, in 14 days from today will be May 6.  So the TRO is

extended until May 6, or should I need more time for the order

P4MBGFFH

1    of the Court.

2            MR. DAVIS:  Understood, your Honor.

3            THE COURT:  Okay.  Folks, thank you very much for an

4    interesting argument.

5            (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25